No. 24-1322

# United States Court of Appeals for the Federal Circuit

MEMORYWEB, LLC

*Appellant*

v.

SAMSUNG ELECTRONICS CO., LTD.,

*Appellee*

Appeal from the Patent and Trademark Office, Patent Trial and Appeal Board in Case No. PGR2022-00034

**APPELLANT MEMORYWEB, LLC'S CORRECTED OPENING BRIEF**

JENNIFER HAYES
NIXON PEABODY LLP
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Tel: 213-629-6000

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 W. Madison Street, Suite 5200
Chicago, IL 60602-4378
Tel: 312-977-4400

*Counsel for Appellant MemoryWeb, LLC*

## EXEMPLARY PATENT CLAIM

**Claim 1 of U.S. Patent 11,163,823**

1. A method comprising:

causing an interface to display a search-filter view, the search-filter view permitting a user to filter a plurality of digital files based on one or more criteria;

responsive to a first input within the search-filter view, causing the interface to display a people view including a first image associated with a first person and a second image associated with a second person;

responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including a first digital file associated with the first person;

responsive to an input that is indicative of a selection associated with the first digital file, causing a first detail view to be displayed on the interface, the first detail view including (i) the first digital file, (ii) first information associated with the first digital file and (iii) a first map image associated with the first digital file, the first digital file having a first size in the first person view and a second size in the first detail view, wherein the second size is greater than the first size;

responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including a second digital file associated with the second person;

responsive to an input that is indicative of a selection associated with the second digital file, causing a second detail view to be displayed on the interface, the second detail view including (i) the second digital file, (ii) second information associated with the second digital file and (iii) a second map image associated with the second digital file; and

responsive to a second input within the search-filter view, causing the interface to display a locations view including a first name associated

with a first location, and a second name associated with a second location;

responsive to an input that is indicative of a selection associated with the first location, causing a first set of digital files to be displayed on the interface, each digital file in the first set of digital files being associated with the first location; and

responsive to an input that is indicative of a selection associated with the second location, causing a second set of digital files to be displayed on the interface, each digital file in the second set of digital files being associated with the second location.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-1322

**Short Case Caption** MemoryWeb, LLC v. Samsung Electronics Co., Ltd.

**Filing Party/Entity** MemoryWeb, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/28/2024

Signature: /s/ Jennifer Hayes

Name: Jennifer Hayes

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| MemoryWeb, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i
TABLE OF AUTHORITIES ..... ii
STATEMENT OF RELATED CASES ..... iv
JURISDICTIONAL STATEMENT ..... iv
INTRODUCTION ..... 1
STATEMENT OF THE ISSUES ..... 3
STATEMENT OF THE CASE ..... 4
A. The Inventions of the '823 Patent ..... 4
B. The PGR Proceeding ..... 11
1. The Parties' Positions Regarding Displaying the "Locations View" Responsive to a Second Input in the Search-Filter View ..... 11
C. The Board's Decision ..... 16
SUMMARY OF THE ARGUMENT ..... 18
STANDARD OF REVIEW ..... 19
ARGUMENT ..... 20
I. THE BOARD ERRED BY NOT PROPERLY APPLYING THE INHERENCY DOCTRINE AND FINDING THAT POGUE DISPLAYS THE "LOCATIONS VIEW" RESPONSIVE TO THE SECOND INPUT IN THE SEARCH FILTER VIEW ..... 20
A. The Board Erred By Not Recognizing Samsung's Inherency Theory ..... 20
B. The Board Erred By Not Properly Applying The Inherency Doctrine ..... 22
C. THE BOARD ERRED BY FAILING TO CONSTRUE "RESPONSIVE TO" ..... 24
CONCLUSION AND RELIEF SOUGHT ..... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) ....................19

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) ....................26

*Corephotonics, Ltd. v. Apple, Inc.*,
84 F.4th 990 (Fed. Cir. 2023) ....................19

*CSR, PLC v. Skullcandy, Inc.*,
594 F. App'x 672 (Fed. Cir. 2014) ....................25

*Homeland Housewares, LLC v. Whirlpool Corp.*,
865 F.3d 1372 (Fed. Cir. 2017) ....................19, 24

*In re Napier*,
55 F.3d 610 (Fed. Cir. 1995) ....................19

*LBT IP I LLC v. Apple Inc.*,
No. 2022-1613, 2023 WL 3914920 (Fed. Cir. June 9, 2023)....................20, 24

*Meyer Intell. Properties Ltd. v. Bodum, Inc.*,
690 F.3d 1354 (Fed. Cir. 2012) ....................25

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................22

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
952 F.3d 1336 (Fed. Cir. 2020) ....................19

*PersonalWeb Techs., LLC v. Apple, Inc.*,
917 F.3d 1376 (Fed. Cir. 2019) ....................22, 23

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................19

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010) ....................27

*Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021) ....................19

*Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343 (Fed. Cir. 2009) ....................25

**Statutes**

28 U.S.C. § 1295 ....................iv

35 U.S.C. § 6 ....................iv

35 U.S.C. § 141 ....................iv

35 U.S.C. § 311 ....................iv

**Rules and Regulations**

37 C.F.R. § 90.3(a)(1) ....................iv

## STATEMENT OF RELATED CASES

No other appeal from these proceedings has previously been before this or any other appellate court. The following proceedings may be directly affected by this Court's decision in these appeals:

- *Apple Inc. v. MemoryWeb, LLC*, Nos. 23-2361, 24-1043, 24-1050, 24-1318, 24-1320 (Fed. Cir.);
- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, No. 24-1332 (Fed. Cir.);
- *MemoryWeb, LLC v. Unified Patents, LLC*, No. 24-1328 (Fed. Cir.);
- *MemoryWeb, LLC v. Apple Inc.*, 3:21-cv-09839-VC (N.D. Cal.); and
- *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, 3:22-cv-03776-VC (N.D. Cal.).

Counsel is aware of no other case that may directly affect or be directly affected by the outcome of this appeal.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 35 U.S.C. §§ 6(b) and 311 et seq. and issued its final written decision on November 16, 2023. Appx1. MemoryWeb timely appealed on January 3, 2024. 37 C.F.R. § 90.3(a)(1). Appx5281–5283. This Court has jurisdiction over MemoryWeb's appeal under 35 U.S.C. § 141(c) and 28 U.S.C. § 1295(a)(4)(A).

## INTRODUCTION

This appeal arises from a post-grant review involving MemoryWeb's Patent No. 11,163,823 ("the '823 Patent") which is directed to methods for filtering and displaying large numbers of digital files such as digital photographs. The claimed technology enables users to navigate through and view their captured memories via an interactive interface in a novel way.

The '823 Patent requires displaying, *inter alia*, a "locations view" that includes certain location information "responsive to" a second input within a "search-filter view." The parties disputed the proper construction of the phrase "responsive to" as it relates to displaying the locations view: MemoryWeb argued that the claims require a direct-cause effect relationship between the second input and displaying the locations view, while Samsung argued that "responsive to" allows for intervening inputs between the second input and displaying the locations view. Pogue—which was the only reference Samsung relied on in the Petition for the locations view—requires an additional input in a different view to display the locations view.

The Board did not resolve the parties' claim construction dispute. Instead, the Board adopted testimony from Samsung's expert opining that a skilled artisan would understand that the prior art ***could***—but not ***necessarily***—default to showing the alleged locations view "responsive to" the second input under MemoryWeb's

narrower construction. However, the Board failed to recognize that in the absence of an express disclosure of this behavior in the prior art—and there was none—Samsung's argument was effectively one of inherency. Under the inherency doctrine, the Board's findings cannot stand because there is no evidence that the prior art necessarily discloses the claimed locations view under MemoryWeb's construction.

Pursuant to Federal Circuit Rule 28(j), MemoryWeb provides notice that portions of its brief are duplicative of or nearly duplicative of briefs in related cases *MemoryWeb, LLC v. Samsung Electronics Co., Ltd.*, Nos. 24-1315, -1316 and *MemoryWeb, LLC v. Unified Patents, LLC*, No. 24-1328, which address appeals of other Board Decisions involving related MemoryWeb patents having a common specification and that concern the same "responsive to" construction dispute.

For these reasons, and as explained below, this Court should reverse, or at least vacate and remand for further analysis, the Board's Decision finding that claims 1-34 of the '823 Patent are unpatentable.

## STATEMENT OF THE ISSUES

Samsung's Petition argued that the primary reference in its obviousness combination, Pogue, expressly discloses displaying a "locations view" responsive to a second input within a search-filter view as required in the independent claims of the '823 Patent. Recognizing that Pogue did not ***necessarily*** disclose this feature, the Board relied on testimony from Samsung's expert that a skilled artisan would understand that, in Pogue, the alleged "locations view" ***could*** be displayed directly responsive to the alleged second input.

1. Did the Board err in failing to recognize that Samsung's argument regarding the skilled artisan's understanding of the prior art was substantively an argument of inherency?
2. Did the Board err in finding Samsung met its burden under the applicable standard for inherency when there was no evidence that the prior art necessarily discloses displaying the claimed locations view?
3. All claims in the '823 Patent recite the phrase "responsive to." Did the Board err in failing to find that the plain meaning of "responsive to" requires a cause-effect relationship between the second input within the search-filter view and causing the locations view to be displayed?

## STATEMENT OF THE CASE

### A. The Inventions of the ‘823 Patent

During a time of explosive growth in the field of digital photography, the inventors recognized that the then-existing technology failed to provide a way to easily filter, organize, view and display digital photos and videos. Appx161 (1:35–41). While prior systems like Facebook, Flickr, Shutterfly, and other social media and specialty sites provided limited organizational functionality, they all suffered from the same inability to easily filter and navigate the expanding volume of digital files. Appx161 (1:45–51).

The ‘823 Patent addresses the limitations of prior photo management systems by disclosing and claiming novel methods for filtering and displaying digital files “allowing people to organize, view, preserve and share these files with all the memory details captured, connected, and vivified via an interactive interface.” Appx161 (1:56–62). The ‘823 Patent discloses novel and specific search filtering and navigation pathways through a variety of “views” with different content in order to “save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.” Appx161 (2:51–55). To that end, the ‘823 Patent claims the specific search filtering and navigation pathways through various “views” with different content.

Accordingly, the ‘823 Patent discloses a search-filter view as shown in Fig. 18, from which subsequent inputs allow users to navigate to sets of photos based on particular filtering criteria. Appx164 (7:15–43).




Appx128 (FIG. 18) – Search Filter View

Relevant to this appeal, the claims of the ‘823 Patent require that in the search filter view: (i) responsive to a first input, filtering occurs based on people/person identifications, and (ii) responsive to a second input, filtering occurs based on location-related information. Appx178–179 (35:6–9, 35:39–43, 37:50–54, 38:19–23).

For example, the ‘823 Patent first discloses filtering to a “people view” which displays a thumbnail of each person’s face along with their name:




Appx116 (FIG. 6) – People View

Appx163 (6:20–22); *see also* Appx142 (FIG. 32). From within the people view, a user can select an individual's thumbnail and navigate to a "person view" that includes the person's name, a profile photo, and photos associated with that person, as shown in Fig. 7 below. Appx163 (6:22–26).




Appx117 (FIG. 7) – Person View

The '823 Patent then discloses filtering pathways that allow for organization based on location in response to a second user input in the search filter view. The '823 Patent discloses several embodiments of a "locations view." For example, Fig. 15 discloses a "locations view" including names of locations. Appx164 (7:1–4).

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

Appx125 (FIG. 15) – Locations View

A user can click on any location in the locations view and see all of the digital files associated with that specific location. Appx164 (7:4–6). Another example of a locations view is disclosed in Fig. 34. Appx172 (23:61–66).




Appx144 (FIG. 34) (cropped)

Based on a selection in the locations view, the system further filters to an individual location view that includes a set of digital files associated with the selected location. Appx172 (24:15–21).




Appx144 (FIG. 34) (cropped) – Location View

Distinct from the location views which are displayed responsive to the user's second input as set forth in claim 1, the '823 patent also discloses one or more "map" views. In one example, the map view includes an interactive map with pins showing where digital files were taken. Appx163 (6:14–19).



Appx115 (FIG. 5) – Map View

In another example, the map view includes an interactive map with thumbnail images showing where digital files were taken, which includes the number of digital files for each location. Appx175 (29:24–31).




Appx151 (FIG. 41) – Map View

These and other views containing specific content are interconnected in novel ways to allow users to intuitively filter and navigate their digital files.

### B. The PGR Proceeding

Samsung challenged claims 1-34 of the '823 Patent and asserted three grounds of unpatentability, all of which depended on two general audience non-patent references describing Apple's iPhoto '09 photo management product: iPhoto '09 The Missing Manual ("Pogue") and Visual Quickstart Guide iPhoto '09 ("Engst"). Appx317.

#### 1. The Parties' Positions Regarding Displaying the "Locations View" Responsive to a Second Input in the Search-Filter View

Using the annotated screenshot below, Samsung argued in its Petition that Pogue discloses the claimed "search-filter view." Appx329.




Appx329 (annotating Appx1199 (Figure 4-3))

For the claimed "locations view," which must be displayed "responsive to" a second input in the search-filter view, Samsung argued that selecting the Places tab on the left-hand side of the search-filter view corresponds to the claimed second input and that the Browser view—which only appears when the "Browser button" shown along the bottom of the screen is selected—corresponds to the claimed locations view. Appx349–350. These features are shown below:




Appx350 (annotating Appx1216 (Figure 4-16))

In response, MemoryWeb explained that the proper construction of the phrase "responsive to" requires a direct cause-effect relationship between (1) the second input within the search-filter view and (2) displaying the locations view. Appx3512–3516. MemoryWeb cited, *inter alia*, admissions from Samsung's expert confirming this construction. Appx4470–4471. Samsung's expert testified about a scenario in

which (1) an input in a first view is considered the "first event;" (2) an input in a second view is considered the "second event;" and (3) displaying a third view is the "third event." Appx4887 (97:2–99:15).




Appx142–143 (FIGS. 32-33) (annotated)

Samsung's expert admitted that a skilled artisan would consider the third event to be "responsive to" the second event, ***not*** the first event. Appx4887 (99:16–100:24).

Under this construction, MemoryWeb argued that Pogue failed to disclose displaying the locations view "responsive to" the second input. According to Pogue—which was the only reference the Petition cited for the locations view—after a user selected the Places tab as the second input, Pogue required the user to

additionally select the "Browser button" to navigate from a "World view" in order to display the claimed locations view. Appx3528–3531; Appx1215–1216.




Appx1216 (Figure 4-16)

Thus, the locations view is not displayed "responsive to" selecting the Places tab; rather, it is displayed "responsive to" selecting the Browser button.

The sequence of events in Pogue is logically indistinguishable from the hypothetical Samsung's expert addressed: displaying the locations view (the third event) is responsive to selecting the browser button (the second event) – not the selection of the places tab (the first event). Appx4887 (99:16–100:24).




Appx3531

In reply, Samsung argued for the first time that "responsive to" merely requires the second event to happen "subsequent to" the first event "based on a combination of user interaction and software implementation." Appx4012. Recognizing that it also needed to address MemoryWeb's "responsive to" construction, Samsung further argued that the prior art disclosed this limitation under MemoryWeb's construction because Engst, which Samsung had not relied on for this limitation previously, "explicitly and unambiguously discloses that selecting 'Places' ***can*** directly lead to either the map view or the locations view, depending on which of the two corresponding buttons . . . was previously selected by the user." Appx4024 (emphasis added). Samsung argued that because iPhoto can, in certain instances, allegedly default to the locations view instead of the map view when the Places tab is selected, the locations view is displayed "responsive to" the correct input under MemoryWeb's construction.

MemoryWeb explained Samsung's reliance on Engst for the locations view limitation in its Reply was improper because Samsung only relied on Pogue for this limitation in its Petition. Appx4778. MemoryWeb also explained that because neither Pogue nor Engst explicitly describes defaulting to the locations view instead of the map view, Samsung's argument based on inferences drawn by its expert was effectively an inherency argument. Appx3535–3536; Appx4779. As such, it did not matter if Samsung's interpretation of iPhoto was plausible or even the most probable way iPhoto works – Samsung was required to show that iPhoto ***necessarily*** discloses defaulting to the locations view. Appx3535–3536. MemoryWeb demonstrated that there were other plausible interpretations of Pogue and Engst that did not necessarily involve defaulting to the locations view. Appx3533–3535; Appx4778–4779.

### C. The Board's Decision

The Board found claims 1-25 and 27-34 unpatentable over Pogue and Engst and claim 26 unpatentable over Pogue, Engst, and Belitz. Appx102.

The Board declined to resolve the parties' dispute regarding the proper construction of "responsive to" because, in the Board's view, "the prior art meets [MemoryWeb]'s more restrictive view of the claim." Appx14.

The Board also failed to address the apparent inherency issue raised by MemoryWeb, including the other plausible interpretations of Engst, and simply adopted Samsung's argument that iPhoto can default to showing the locations view

upon selecting the Places tab (the alleged second input in the claim) instead of the map view. Appx75. The Board did not—because it could not—find that Pogue or Engst expressly discloses this behavior. Appx69–75. Instead, the Board relied on testimony from Samsung's expert that a skilled artisan would understand that iPhoto can default to showing the locations view instead of the map view. Appx74–75. The Board concluded: "[b]ased on the evidence of record, a person of ordinary skill in the art would understand that ***iPhoto***, as described by Pogue, ***and corroborated by Engst***, does not default to showing the World view as [MemoryWeb] contends, but that selecting the "Places" tab on the source pane can directly lead[1] to either the "*Locations view"* (Browser view window shown in Pogue 4-16) or the "*Locations view (map)"* (World view window shown in Pogue 4-15) identified by Petitioner." Appx75 (emphases added).

[1] The Board reached its conclusion applying MemoryWeb's construction of "responsive to" without affirmatively construing "responsive to." *See* Appx14.

## SUMMARY OF THE ARGUMENT

Rather than resolve the parties' claim construction dispute about the meaning of "responsive to," the Board concluded that Samsung met its burden to show that the prior art displays a location view "responsive to" a second input in a search-filter view based on testimony from Samsung's expert opining that a skilled artisan would understand from Pogue and Engst that iPhoto ***could*** display the locations view under MemoryWeb's construction. Importantly, the Board did not find that this behavior was explicitly disclosed in either reference. The Board erred by failing to recognize that Samsung's arguments about what a skilled artisan would infer from Pogue was substantively an inherency argument even though Samsung did not label it as such.

Under the inherency doctrine, Samsung was required to show that Pogue ***necessarily*** discloses displaying the claimed locations view under MemoryWeb's construction for "responsive to." The Board did not find this feature was necessarily present in Pogue; instead, it found that Engst corroborated Pogue's description of that iPhoto could work that way. Indeed, MemoryWeb demonstrated at least one plausible interpretation of Pogue and Engst contradicting Samsung's theory. Because MemoryWeb's construction is the correct, and because, under MemoryWeb's construction, the Board failed to correctly apply the law of inherency and its conclusions are unsupported by substantial evidence, the Decision should be reversed or, alternatively, vacated and remanded for further proceedings.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions on obviousness *de novo* and its underlying factual findings for substantial evidence. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1374 (Fed. Cir. 2017). What a reference discloses and whether a skilled artisan would have been motivated to combine references are questions of fact. *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015). The inherent teaching of a reference is a question of fact. *In re Napier*, 55 F.3d 610, 613 (Fed. Cir. 1995). The Court will reverse decisions where the Board's factual findings lack substantial evidence. *Univ. of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155 (Fed. Cir. 2021).

The Board abuses its discretion when its decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact finding; or (4) involves a record that contains no evidence on which the Board could rationally base its decision." *Corephotonics, Ltd. v. Apple, Inc.*, 84 F.4th 990, 1003 (Fed. Cir. 2023).

Claim constructions are reviewed *de novo* and factual findings regarding extrinsic evidence are reviewed for substantial evidence. *Homeland Housewares,* 865 F.3d at 1374. The *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) claim construction standard applies to this proceeding. *See Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1340 n.2 (Fed. Cir. 2020).

## ARGUMENT

### I. THE BOARD ERRED BY NOT PROPERLY APPLYING THE INHERENCY DOCTRINE AND FINDING THAT POGUE DISPLAYS THE "LOCATIONS VIEW" RESPONSIVE TO THE SECOND INPUT IN THE SEARCH FILTER VIEW

The Board erred by neither properly recognizing, nor applying, the inherency doctrine to find that Pogue displays the locations view responsive to the second user input in the search filter view.

#### A. The Board Erred By Not Recognizing Samsung's Inherency Theory

Samsung's arguments about what "a skilled artisan would understand" Pogue discloses or suggests is "substantively [an argument] of inherency." *LBT IP I LLC v. Apple Inc.*, No. 2022-1613, 2023 WL 3914920, at *3 (Fed. Cir. June 9, 2023) (non-precedential) (finding petitioner relied on inherency where it conceded there was no explicit disclosure of a limitation but that a skilled artisan would understand the limitation is present).

Independent claims 1 and 29 recite, in part, "responsive to a second input within the search-filter view, causing the interface to display a locations view …." Appx178–179 (35:39–43, 38:19–23). In the Petition, Samsung relied on Pogue as disclosing this limitation. Appx349–350. Samsung did not argue that either Engst, Pogue in combination with Engst, or Pogue as corroborated by Engst discloses this limitation. *Id.* Notably Dr. Greenspun conceded in his first deposition that he did not know whether the locations view in Pogue could be displayed responsive to the

second input. Appx3613 (43:17–44:1); Appx3634 (128:6–11). He later speculated that a user of iPhoto may be able to navigate to the map view, then the locations view, and then later re-select the Places tab (the second input) and the locations view would be displayed instead of the map view. Appx3634 (128:12–19, 129:7–11). Dr. Greenspun pointed to Engst—not Pogue—as disclosing that "whatever mode you were in is the mode that you get back to" when clicking the Places tab in the source pane. Appx3635 (130:18–131:6).

Following his deposition, Samsung offered a second declaration from Dr. Greenspun opining that "Pogue mentions that the World View button (*i.e.,* 'globe icon') should be clicked to get to the map view, ***further suggesting*** that there will be instance[s] in which the system does not default to showing the map view (meaning that the locations view was shown first)." Appx4045 (¶ 17); *see also* Appx74.

The Board concluded: "[b]ased on the evidence of record, a person of ordinary skill in the art would understand that ***iPhoto***, as described by Pogue, ***and corroborated by Engst***, does not default to showing the World view as [MemoryWeb] contends, but that selecting the "Places" tab on the source pane can directly lead to either the '*Locations view'* (Browser view window shown in Pogue 4-16) or the '*Locations view (map)'* (World view window shown in Pogue 4-15) identified by Petitioner." Appx75 (emphases added). In reaching its conclusion, the

Board relied on testimony from Samsung's expert, Dr. Greenspun, that a skilled artisan "would understand that [in] iPhoto . . . selecting the 'Places' tab . . . ***can*** directly lead to either the" locations view or the map view. Appx75 (emphasis added).

### B. The Board Erred By Not Properly Applying The Inherency Doctrine

Under the inherency doctrine, Samsung needed to show that functionality causing the locations view to be displayed responsive to selecting the places tab was "***necessarily*** present" or "the natural result of the combination of elements explicitly disclosed by" Pogue and Engst. *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195–96 (Fed. Cir. 2014). As this Court has stated, "mere possibilities" that the claimed feature is disclosed is not enough; nor is it enough that Samsung's interpretation of the reference is "plausible" where "an equally plausible, if not more plausible, understanding" of the reference would not meet the claim limitation. *PersonalWeb Techs., LLC v. Apple, Inc.*, 917 F.3d 1376, 1382 (Fed. Cir. 2019).

The evidence in this case fails to meet the stringent standard for inherency. Indeed, the Board did not find this element was necessarily present in Pogue; instead, it found that Engst corroborated that iPhoto, which is described in Pogue, could work that way. Appx74–75. The Board, therefore, erred in finding that Pogue discloses this limitation.

As in *PersonalWeb*, there are other plausible interpretations of Pogue and Engst refuting that iPhoto, as described by Pogue, works in this way. 917 F.3d at 1382. Because the Board did not properly view this as an inherency issue, it discounted this evidence. For starters, in describing the locations view, Pogue states "[t]he Map view is fun and all, but sometimes you want to see all your Places information grouped together in a good, old-fashioned list" and instructs the user to "[c]lick the Browser button." Appx1215. Pogue instructs users to "[c]lick the Browser button in the iPhoto toolbar . . . to leave World view and go to a more text-based place," i.e., the locations view. Appx1216. By contrast, Pogue states that the map view is displayed simply by selecting "Places in the Source list." Appx1214; Appx3962 (¶ 115). Engst similarly instructs users to select the "Places" tab to see the World View and then to select the Browser button to see the alleged locations view. Appx1564-1565. These disclosures suggest to a skilled artisan that iPhoto does not display the locations view responsive to selecting the places tab. Appx3962–3963 (¶¶ 115–116); Appx4892 (118:16–119:21).

Like Pogue, Engst does not expressly disclose that the "Places" tab leads directly to the alleged locations view. Appx3960–3961 (¶ 112). Engst also supports a plausible inference that iPhoto does not default to the locations view responsive to selecting the places tab. For example, Engst states that to display the map view, the user has to "[c]lick Places in the source pane and, if necessary, click the World View

button in the View control in the toolbar." Appx1564; Appx3961 (¶ 113). By contrast, Engst states that to see the locations view, the user has to first "[c]lick Places in the source pane" and then "[c]lick the Browser View button." Appx1565; Appx3961 (¶ 113). If iPhoto necessarily allowed for the locations view to be displayed ***without*** selecting the browser button, then Pogue would have added the same "if necessary" qualifier as it did for the map view when referring to the locations view. Appx3961 (¶ 113). A skilled artisan would therefore infer that iPhoto does not necessarily default to showing the locations view. *Id*. The Board's finding that a person of skill in the art would understand that this limitation is disclosed by Pogue is therefore not supported by substantial evidence. *LBT*, 2023 WL 3914920 at *3–4 (concluding substantial evidence did not support Board's finding that a prior art reference inherently disclosed a claim limitation).

### C. THE BOARD ERRED BY FAILING TO CONSTRUE "RESPONSIVE TO"

As discussed above, the Board failed to resolve the parties' dispute regarding the meaning of the phrase "responsive to" but adopted MemoryWeb's construction for purposes of its analysis. Because this term was disputed and the record has been developed, MemoryWeb urges the Court to construe "responsive to" as MemoryWeb proposes. *Homeland*, 865 F.3d at 1375; Appx3512–3516; Appx4769–4773. While the Board "found no reason" construe "responsive to," there is no need to remand this case for the Board to construe "responsive to" in the first instance

because this Court can and should do so. *Meyer Intell. Properties Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1368–69 (Fed. Cir. 2012). The record is "sufficiently developed to enable [this Court] to construe the claim term without prejudicing either party." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1355 (Fed. Cir. 2009). If the Court finds that some of the facts are unclear, this Court should at least vacate the Decision and remand the case to the Board for further determination. *CSR, PLC v. Skullcandy, Inc.*, 594 F. App'x 672, 674 (Fed. Cir. 2014) ("Because the Board erred by failing to construe "threshold value" . . . , we vacate . . . and remand.") (non-precedential).

The plain and ordinary meaning of the phrase "responsive to" in the claims of the '823 Patent requires a direct cause-effect relationship between (1) a second input within the search-filter view and (2) causing the interface to display a locations view. Appx3946–3947 (¶¶ 85–86). Samsung's construction—which merely requires that displaying the locations view occur subsequent to the second input based on a combination of user interaction and software implementation—should be rejected. Appx4012.

Contrary to the Samsung's proposed construction, "responsive to" cannot mean the same thing as "subsequent to." The '823 Patent itself expressly draws this distinction. Dependent claim 25 recites displaying a map view "***subsequent to*** causing the interface to display the search filter view." Appx179 (37:22–24); *see*

*also* Appx179 (38:50–53) (claim 32). It is axiomatic that "[d]ifferent claim terms are presumed to have different meanings." *Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008). In this case, construing "responsive to" to be synonymous with "subsequent to" improperly construes both of these phrases without different meanings and is improper.

Perhaps most fatal to Samsung's construction is the admissions from its expert. Using the images below, MemoryWeb posed a hypothetical in which (1) selecting the people tab in the collection view (top left image) to display the people view (top right image) is the first event, (2) selecting a thumbnail in the people view is the second event, and (3) displaying the person view (bottom image) is the third event. Appx4886–4887 (96:8–99:20).




Appx142–143 (FIGS. 32-33) (annotated)

Consistent with MemoryWeb's construction, Dr. Greenspun admitted that a skilled artisan would say that the third event occurred responsive to the second event. Appx4887 (99:21–100:5). He also agreed that saying that the third event is "responsive to" the first event would ***not*** "be the usual way to describe" the relationship between those events. Appx4887 (100:8–24). This testimony confirms that "responsive to" requires a direct cause-effect relationship.

MemoryWeb's construction is also consistent with a purpose of the invention. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir. 2010) (rejecting construction that would "defy the invention's goal"). The '823 patent states that its inventions "save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience." Appx161 (2:51–55). Merely displaying the locations view subsequent to the second input (e.g., 1 minute later, 1 hour later, 1 day later, etc.) is antithetical to those goals, whereas displaying the locations view "responsive to" the second input is consistent with those objectives. Appx3947–3948 (¶ 87). MemoryWeb's construction should, therefore, be adopted.

Because the Board failed to correctly apply the law of inherency and its findings that Pogue discloses this limitation are not supported by substantial evidence under MemoryWeb's construction, the Decision should be reversed.

## CONCLUSION AND RELIEF SOUGHT

The Board's final written decision should be reversed or vacated and remanded for further proceedings.

Respectfully submitted,

/s/ Jennifer Hayes
JENNIFER HAYES
NIXON PEABODY LLP
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Tel: 213-629-6000
Fax: 213-629-6001

DANIEL SCHWARTZ
MATTHEW WERBER
ANGELO CHRISTOPHER
NIXON PEABODY LLP
70 West Madison Street
Suite 5200-4378
Chicago, IL 60602
Tel: 312-977-4400
Fax: 312-977-4405

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I certify that the brief contained herein has a proportionally spaced 14-point font typeface and contains 4,531 words, based on the "Word Count" feature of Microsoft Word, excluding the cover page, patent claims, Certificate of Interest, Tables of Contents and Authorities, Statement of Related Cases, signature block, Addendum, Certificate of Compliance, and Certificate of Service.

Date: May 28, 2024

/s/ Jennifer Hayes

JENNIFER HAYES
**NIXON PEABODY LLP**
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Appellant*
*MemoryWeb, LLC*

## CERTIFICATE OF SERVICE

I, Jennifer Hayes, hereby certify that, on this 28th day of May 2024, I caused a copy of the foregoing **Corrected Opening Brief of Appellant** to be served on counsel of record via the Court's CM/ECF system.

Date: May 28, 2024

/s/ Jennifer Hayes
JENNIFER HAYES
**NIXON PEABODY LLP**
300 South Grand Avenue
Suite 4100
Los Angeles, CA 90071-3151
Telephone: (213) 629-6000
Facsimile: (213) 629-6001

*Counsel for Appellant*
*MemoryWeb, LLC*

## ADDENDUM TABLE OF CONTENTS


| Date | Document | Appendix Page(s) |
|---|---|---|
| 2023-11-16 | Paper 39 - '823 Patent Final Written Decision, Case No. PGR2022-00034 | Appx1-Appx104 |
| 2022-04-20 | Ex. 1001 - U.S. Patent No. 11,163,823 | Appx105-Appx180 |

# ADDENDUM

Trials@uspto.gov
571-272-7822

Paper 39
Date: November 16, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SAMSUNG ELECTRONICS CO., LTD. and
SAMSUNG ELECTRONICS AMERICA, INC.,
Petitioner,

v.

MEMORYWEB, LLC,
Patent Owner.

---

PGR2022-00034
Patent 11,163,823 B2

---

Before LYNNE H. BROWNE, NORMAN H. BEAMER, and KEVIN C. TROCK, *Administrative Patent Judges*.

TROCK, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 328(a)*

Denying Patent Owner's Motion to Exclude
*37 C.F.R. § 42.64*

# I. INTRODUCTION

*A. Background*

Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively "Petitioner") filed a Petition, Paper 3 ("Pet." or "Petition") to institute a post-grant review of claims 1–34 (the "challenged claims") of U.S. Patent No. 11,163,823 B2 (Ex. 1001, "the '823 Patent"). MemoryWeb, LLC ("Patent Owner") timely filed a Preliminary Response, Paper 8 ("Prelim. Resp."). With our authorization, Petitioner filed a Preliminary Reply, Paper 9, and Patent Owner filed a Preliminary Sur-Reply, Paper 10.

On November 17, 2022, we instituted a post-grant review of all challenged claims based on all grounds in the Petition. Paper 11 ("Inst. Dec."). Patent Owner filed a Response. Paper 17 ("PO Resp."). Petitioner filed a Reply. Paper 24 ("Pet. Reply"). Patent Owner filed a Sur-reply. Paper 30 ("PO Sur-reply"). An oral hearing was held on September 19, 2023. A transcript of that hearing has been entered into the record. Paper 38 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is issued under 35 U.S.C. § 328(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that all of the challenged claims are unpatentable.

*B. Related Proceedings*

The parties identify that the '823 Patent is related to the following U.S. Patents: 9,098,531 ("the '531 patent"); 9,552,376 ("the '376 patent"); 10,423,658 ("the '658 patent"); 10,621,228 ("the '228 patent"); 11,017,020 ("the '020 patent"); and 11,170,042 ("the '042 patent") (collectively "the related patents"). Paper 4, 2; Paper 7, 1.

According to the parties, the ’823 Patent and the related patents are the subject of the following actions: *MemoryWeb, LLC v. Samsung Electronics Co., Ltd. et al.*, No. 6:21-cv-00411 (W.D. Tex.) (pending); *MemoryWeb, LLC v. Apple, Inc.*, No. 6:21-cv-00531 (W.D. Tex.) (pending); *MyHeritage (USA), Inc. et al. v. MemoryWeb, LLC*, No. 1:21-cv-02666 (N.D. Il.) (dismissed); *Samsung Electronics Co., Ltd. v. MemoryWeb, LLC*, IPR2022-00222 (pending); *Samsung Electronics Co., Ltd. v. MemoryWeb, LLC*, IPR2022-00221 (pending); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00111 (pending); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00033 (pending); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032 (pending); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00031 (pending); *United Patents, LLC v. MemoryWeb, LLC*, IPR2021-01413; and U.S. Patent Application No. 17/459,933 (pending). Pet. 97–98; Paper 4, 2–3; Paper 7, 1–2.

Petitioner further identifies a concurrent *inter partes* review proceeding involving the ’823 Patent: *Samsung Electronics Co. Ltd. et al. v. MemoryWeb, LLC*, IPR2022-00085 (pending). Pet. 97. Petitioner also identifies the following action involving the ’020 patent: *Apple Inc. v. MemoryWeb, LLC*, PGR2022-00006 (pending). Pet. 98; Paper 7, 2.

*C. The ’823 Patent (Ex. 1001)*

The ’823 Patent relates to a computer-implemented system and method for managing and using digital files such as digital photographs. Ex. 1001, 1:17–20. Specifically, the ’823 Patent describes a storage system that includes a digital file repository for storing and retrieving digital files (such as photos), a digital tagging system configured to assign digital tags to the digital files, a storing system, and a user interface. *Id.* at 4:34–38.

As described by the ’823 Patent, the digital tagging system includes various types of data, such as a person’s name, a location, a recipe, a date, a

family relationship to the user, an event name, a rating, sharing rights, file type and a document name. *Id.* at 4:39–42. The sorting system allows the digital files to be searched and stored according to a plurality of types of data and is used for creating and organizing special views. *Id.* at 4:42–45. The user interface is user-configurable, and presents the digital files on a user's screen based on these user inputs. *Id.* at 4:45–47.

Figure 18 is a screenshot of a search filter view of a digital file storage system. *Id.* at 3:30–31. Figure 18 is reproduced below.

**FIG. 18**




Figure 18, above shows a search filter that allows users to select one or more criteria that will narrow down their results to only the digital files matching input criteria. *Id.* at 7:15–18, 7:42–43. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. *Id.* at 7:18–21.

Figure 6 is a screenshot of a people thumbnail view of the digital file storage system. *Id.* at 3:5–6. Figure 6 is reproduced below.

**FIG. 6**




Figure 6, above, shows a people view (*i.e.*, thumbnail photos of all the people in the system that can be clicked in for a people profile view). *Id.* at 6:20–22.

Figure 7 is a screenshot of a people profile view of the digital file storage system. *Id.* at 3:7–8. Figure 7 is reproduced below.

**FIG. 7**




Figure 7, above, shows a people profile view (*i.e.*, a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system (such as a location view)). *Id.* at 6:22–26.

Figure 5 is a screenshot of a location view of the digital file storage system. *Id.* at 3:3–4. Figure 5 is reproduced below.

**FIG. 5**



Figure 5, above, shows a location view which identifies within an interactive map where digital files were taken or originated. *Id.* at 6:14–16. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. *Id.* at 6:16–19.

Figure 2 is a screenshot of a photo detail view of the digital file storage system. *Id.* at 2:64–65. Figure 2 is reproduced below.

**FIG. 2**




Figure 2, above, shows an individual album or event view which allows one to see the files associated with a specific group. *Id.* at 6:9–10.

*D. Challenged Claims*

Petitioner challenges claims 1–34 of the '823 Patent. Pet. 1. Claims 1 and 29 are independent. Claim 1 is illustrative.

> [1pre] 1. A method comprising:
>
> [1a] causing an interface to display a search-filter view, the search-filter view permitting a user to filter a plurality of digital files based on one or more criteria;
>
> [1b] responsive to a first input within the search-filter view, causing the interface to display a people view including a first image associated with a first person and a second image associated with a second person;
>
> [1c] responsive to an input that is indicative of a selection associated with the first person,

causing a first person view to be displayed on the interface, the first person view including a first digital file associated with the first person;

[1d] responsive to an input that is indicative of a selection associated with the first digital file, causing a first detail view to be displayed on the interface, the first detail view including (i) the first digital file, (ii) first information associated with the first digital file and (iii) a first map image associated with the first digital file, the first digital file having a first size in the first person view and a second size in the first detail view, wherein the second size is greater than the first size;

[1e] responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including a second digital file associated with the second person;

[1f] responsive to an input that is indicative of a selection associated with the second digital file, causing a second detail view to be displayed on the interface, the second detail view including (i) the second digital file, (ii) second information associated with the second digital file and (iii) a second map image associated with the second digital file; and

[1g] responsive to a second input within the search-filter view, causing the interface to display a locations view including a first name associated with a first

> location, and a second name associated with a second location;
>
> [1h] responsive to an input that is indicative of a selection associated with the first location, causing a first set of digital files to be displayed on the interface, each digital file in the first set of digital files being associated with the first location; and
>
> [1i] responsive to an input that is indicative of a selection associated with the second location, causing a second set of digital files to be displayed on the interface, each digital file in the second set of digital files being associated with the second location.

Ex. 1001, 35:2–54 (numbering and formatting designated by Petitioner; *see* Pet. 13–37).

### *E. Evidence*

Petitioner relies upon the following evidence: David Pogue and J.D. Biersdorfer, iPhoto '09 The Missing Manual (2009) ("Pogue") (Ex. 1005); Adam C. Engst, Visual QuickStart Guide iPhoto '09 (2009) ("Engst") (Ex. 1006); U.S. Patent App. Pub. No. 2010/0058212 A1 ("Belitz") (Ex. 1008); and U.S. Patent App. Pub. No. 2005/0116954 A1 ("Ripps") (Ex. 1009).

Petitioner relies on the declarations of Phillip Greenspun, Ph.D. (Exs. 1003, 1027), and June Ann Munford (Exs. 1010, 1028). Patent Owner relies on the declarations of Glenn Reinman, Ph.D. (Ex. 2020), and Laura A. Whitbeck (Ex. 2021).

### *F. Asserted Grounds*

Petitioner asserts the following grounds of unpatentability in the Petition.

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–25, 27–34 | 103 | Pogue, Engst |
| 26 | 103 | Pogue, Engst, Belitz |
| 12–14 | 103 | Pogue, Engst, Ripps |

Pet. 8.

## II. ANALYSIS

### *A. Post-Grant Review Eligibility*

The parties do not dispute that the ’823 patent is eligible for post-grant review. *See* Pet. 1–7; Prelim. Resp. 9. For the reasons stated in our Decision on Institution, we determine that the ’823 Patent is eligible for post-grant review. *See* Inst. Dec. 11–14.

### *B. Level of Ordinary Skill in the Art*

Petitioner describes a person of ordinary skill in the art as a person having "(1) a bachelor's degree in computer science, computer engineering, electrical engineering, or a related field, and (2) at least one year of experience designing graphical user interfaces for applications such as photo organization systems." Pet. 9 (citing Ex. 1003 ¶¶ 26–27). Petitioner also describes that "[a]dditional graduate experience could substitute for professional experience, or significant experience in the field could substitute for formal education." Pet. 9. Patent Owner does not contest Petitioner's description of a person of ordinary skill in the art. *See* PO Resp. 22–23.

In the Institution Decision, we applied Petitioner's proposed description, with the exception of the qualifier "at least," to keep the description from being vague and extending to a level reflecting that of an expert. Inst. Dec. 20–21. We continue to find that this skill level is

consistent with the record. Thus, we use the same description here that we used in the Institution Decision.

### *C. Claim Construction*

The Board applies the same claim construction standard as that applied in federal courts. *See* 37 C.F.R § 42.100(b) (2019). Under this standard, claim terms "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citations omitted).

Under *Phillips,* the meaning of claim terms are considered in the context of the specification, the prosecution history, other claims, and even extrinsic evidence including expert and inventor testimony, dictionaries, and learned treatises, although extrinsic evidence is less significant than the intrinsic record. *Phillips*, 415 F.3d at 1312–17. Usually, the specification is dispositive, and it is the single best guide to the meaning of a disputed term. *Id.* at 1315.

Only terms that are in controversy need to be construed, and then only to the extent necessary to resolve the controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (in the context of an *inter partes* review, applying *Vivid Techs.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

In their initial papers, neither party proposed any claim construction, and both parties agreed that the claims can be afforded their plain and ordinary meaning. *See* Pet. 8–9; PO Resp. 23. In its Response, Patent Owner "offers a discussion of the plain meaning of certain terms and phrases . . . in the event the Board determines that is necessary to resolve Petitioner's patentability challenges." PO Resp. 23.

We consider the claim terms and phrases identified by Patent Owner below.

1. *Limitations 1[g] and 29[i]: "responsive to a second input within the search-filter view, [causing/cause] the interface to display a locations view"*

Patent Owner asserts that

> [t]he plain and ordinary meaning of the phrase "*responsive to a second input within the search-filter view, [causing/cause] the interface to display a locations view*" requires a cause-effect relationship between (i) the second input within the search-filter view and (ii) causing the locations view to be displayed.

PO Resp. 23–24 (citing Ex. 2020 ¶ 85) (emphasis added). Patent Owner points to the '823 Patent's use of the term "*subsequent to*" in claims 25 and 32, as well as case law and extrinsic evidence, to support its view that "the phrase 'responsive to' requires more than a straight temporal sequence," and instead requires "a 'cause-and-effect relationship' between two events, where the second event occurs in reaction to the first event." PO Resp. 25–27.

In its Reply, Petitioner asserts that

> to the extent that MemoryWeb is asserting that a "responsive to" relationship precludes any intervening user actions (such as additional clicks or scrolls, for instance), the '823 patent itself clearly dispels this notion. [Ex.] 1027, ¶5. As Dr. Greenspun previously explained in a related proceeding, a POSITA would have recognized that the term "responsive to" merely requires the second event to happen "subsequent to" the first event based on a combination of user interaction and software implementation. [Ex.] 1032, 42:21-44:22; [Ex.] 1033, 108:20-109:12; [Ex.] 1027, ¶6. That is, a series of related user actions do not destroy the "responsive to" relationship.

Pet. Reply 4 (citing Ex. 1027 ¶¶ 6, 8, 10).

In its Sur-reply, Patent Owner frames the issue as "whether 'responsive to' requires a *direct* cause-effect relationship between two events, as Patent Owner proposes, or if it also encompasses an indirect cause-effect relationship allowing a seemingly infinite number of intervening events, as Petitioner proposes." PO Sur-reply 11 (citing Ex. 2025, 88:9–11). We believe Patent Owner misstates Petitioner's position.

It appears that the views of the parties boil down to whether the phrase "*responsive to*" in limitations [1g] and 29[i] is limited to "a direct cause-effect relationship between two events" as Patent Owner submits (*see* PO Sur-reply 11), or whether the phrase permits "intervening user actions (such as additional clicks or scrolls, for instance)" as Petitioner submits (*see* Pet. Reply 4).

It is not necessary, however, for us to resolve this issue in order to determine patentability of the challenged claims. First, Patent Owner's lead counsel at the hearing in this matter stated that "although we continue to believe that the plain and ordinary meaning of *responsive to* requires a cause-and-effect relationship, I don't actually think it's necessary to reach the right outcome for this particular claim." Tr. 27:13–16 (emphasis added).

Second, even if we were to adopt Patent Owner's more restrictive view of the phrase "*responsive to*," the prior art submitted by Petitioner meets the claim limitation. *See* Section II.E.3.b.(2), below. Claim terms need be construed only to the extent necessary to resolve the controversy, and because the prior art meets Petitioner's more restrictive view of the claim, an express construction of the phrase "*responsive to*" is not necessary to resolve the question of obviousness. *See Nidec Motor Corp.*, 868 F.3d at 1017 (in the context of an *inter partes* review, applying *Vivid Techs.*, 200 F.3d at 803).

*2. Claims 1, 25, 29 and 32: the "search-filter view," "locations view," and "map view" are separate and distinct views*

In its Response, Patent Owner asserts that "[t]he plain language of claims 1 and 29 dictates that the 'search-filter view,' 'locations view,' and 'people view' are separate and distinct views." PO Resp. 27 (citing Ex. 2020 ¶¶ 89–92. "Likewise," Patent Owner asserts, "the language of claims 25 and 32 dictates that the 'map view' is separate and distinct from the 'locations view.'" PO Resp. 27 (citing Ex. 2020 ¶¶ 93–94). Patent Owner asserts that "[t]he separate listing of various views – the 'search-filter,' 'people,' locations,' and 'map' views define separate and distinct views that are displayed on the interface. PO Resp. 28 (citing Ex. 2020 ¶¶ 90, 94).

Citing to Dr. Greenspun's testimony, Petitioner asserts that "there is no requirement in the '823 Patent that 'a search-filter view must be completely distinct from the other views.'" Pet. Reply 7–8 (citing Ex. 1027 ¶ 11). Petitioner points to Dr. Reinman's testimony that "the filter function in the '823 Patent can be selected 'from almost any Application View,' such as people view and locations view." Pet. Reply 7 (citing Ex. 2020 ¶ 40 (citing Ex. 1001, 27:64–67, 28:11–13, Fig. 38)). Petitioner argues that "according to the specification of the '823 Patent and as per Dr. Reinman's testimony, a particular view can qualify as both a search-filter view as well as a locations/people view." Pet. Reply 7 (citing Ex. 1001, 27:64–67, 28:11–13, Fig. 35).

In its Sur-reply, Patent Owner argues that Dr. Greenspun's testimony is inconsistent because "Dr. Greenspun previously testified that 'the locations view is a different view than the people view.'" PO Sur-reply 15 (citing Ex. 2006, 54:24–55:4; Ex. 2025, 60:14–61:12).

As noted previously, claim terms need be construed only to the extent necessary to resolve the controversy. *Nidec Motor Corp.*, 868 F.3d at 1017. As best we can tell, the only dispute between the parties where the issue of "separate and distinct views" might be material is Patent Owner's contention that Petitioner has failed to establish obviousness with respect to dependent claims 25 and 32 because "the same World View from Pogue/Engst cannot be both the 'locations view' and the 'map view' in the claims." PO Resp. 56–57 (citing Ex. 2020 ¶¶ 124–125).

We begin our analysis with the claim language. Claim 25 depends from, and therefore further limits, independent claim 1. Claim 32 depends from independent claim 29. Dependent claims 25 and 32 are substantially similar and any differences stem essentially from independent claim 1 being drafted as a method claim and independent claim 29 being drafted as a system claim. Dependent claim 25 is exemplary and states:

> 25. The method of claim 1, subsequent to causing the interface to display the search filter view, *causing the interface to display a map view* including (i) an interactive geographic map, (ii) a first indication on the interactive map 25 that is associated with one or more digital files, and (iii) a second indication on the interactive map that is associated with one or more digital files.

Ex. 1001, 37:22–28 (emphasis added).

Although dependent claim 25 does not recite a "locations view," independent claim 1 recites the following:

> [1g] responsive to a second input within the search-filter view, *causing the interface to display a locations view* including a first name associated with a first location, and a second name associated with a second location.

*Id.* at 35:39–43 (emphasis added). Reading claim 25 in its entirety (i.e. including claim 1's limitations) indicates that the recited interface has the ability to display a "*locations view*" and a "*map view*".

We bear in mind, as Patent Owner points out in its Response, that "[w]here a claim lists elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention." *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (citing *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004); *Engel Indus., Inc. v. Lockformer Co.*, 96 F.3d 1398, 1404–05 (Fed. Cir. 1996)) (second alteration in original). We are also aware that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004)).

Claims, however, cannot be read and understood in isolation. *See Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history." (alteration in original)). As the Federal Circuit articulated in *Phillips*,

> The claims, of course, do not stand alone. Rather, they are part of "a fully integrated written instrument," *Markman*, 52 F.3d at 978, consisting principally of a specification that concludes with the claims. For that reason, claims "must be read in view of the specification, of which they are a part." *Id.* at 979. As we stated in *Vitronics*, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." 90 F.3d at 1582.

*Phillips*, 415 F.3d at 1315.

Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

The '823 Patent explains that its "Application" (also called the "MemoryWeb Application" or "System") "is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including" the ability to "view, sort, annotate, and share Digital Files from the various Application Views." Ex. 1001, 8:59–9:1. The '823 Patent explains that its "Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes." *Id.* at 9:18–22. Thus, we understand the '823 Patent's "Application Views" to be customized displays of associated digital tags or files and that the '823 Patent's Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes are all examples of the System's "Application Views." *Id.*; *see also id.* at Figs. 32–36; 3:58–62 (identifying Figs. 32–36 as screenshots of People Application Views, Collection Application Views, Location Application Views, Uploads Application View, and Recipe Application View, respectively).

The '823 Patent does not expressly identify a "*map view*" as that term is recited in claims 25 and 32. The '823 Patent does, however, identify several "*location views*" displaying maps. In particular, the '823 Patent identifies Figure 5 as "a screenshot of a location view." *Id.* at 3:3–4. Figure 5 from the '823 Patent is shown below.

**FIG. 5**



Figure 5 from the ’823 Patent, shown above, depicts a world map with several pins set at particular locations on the map. The ’823 Patent describes Figure 5 as “[a] location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated.” *Id.* at 6:14–16.

The ’823 Patent also identifies Figure 41 as “a screenshot of the Single Application Dot-Tag Filter in Location Application View.” *Id.* at Figs. 41, 4:3–4. Figure 41 of the ’823 Patent is shown below.

FIG. 41




Figure 41 from the '823 Patent depicts a world map with indicators 0874 and 0875 marked on the map. With respect to Figure 41, the '823 Patent explains that "[w]ithin the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example)." *Id.* at 29:19–21.

The '823 Patent further explains the relationship between "*location views*" and maps where it explains that "the Application utilizes a world map view to illustrate all the locations that are associated to one or more Digital Files for a user *within the Location Application View* (see FIG. 41 (indicator 0880))." *Id.* at 31:56–60 (emphasis added). The '823 Patent goes on to explain that "the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (1109) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information

*within the Location Application View* (1100).” *Id.* at 32:10–16 (emphasis added).

Dr. Reinman testifies that a person of ordinary skill in the art “would understand from the words of the claims that the ‘map view’ is separate and distinct from the ‘locations view,’” because “the use of the different words ‘locations’ and ‘map’ to modify view,” as “[t]hese words would be superfluous if they did not delineate separate and distinct views.” Ex. 2020 ¶ 94. Dr. Reinman also testifies that “[t]he surrounding claim language further confirms that the ‘map view’ and ‘locations view’ are separate views,” and that the “differing conditions for displaying the ‘map view’ and ‘locations view’ reinforces that they are separate and distinct views.” *Id.* ¶ 95. Dr. Reinman further testifies that “the claims specify that these views have different content,” and “[t]he differing content in these views also confirms that they are separate and distinct views.” *Id.* ¶ 96.

Dr. Reinman’s testimony, however, fails to consider the ’823 Patent’s Specification with respect to the recited “*locations view*” and maps, the lack of an express identification of an exemplary “*map view*” in the Specification, the Specification’s identification of Figure 5 depicting a world map as a “*location view*,” and the Specification’s explanation of how the Location Application View displays selected digital files on an interactive map, such as Figure 41, indicating where the digital files were taken or originated. Without consideration of these descriptions and other information from the Specification and its impact on how a person of ordinary skill in the art would understand the relationship between the recited “*locations view*” and “*map view*” in dependent claims 25 and 32, Dr. Reinman’s testimony has limited value.

In its Response, Patent Owner appears to implicitly acknowledge the relationship between "*location views*" and "*map views*" in the '823 Patent where is identifies Figure 5 as an example of a "*map view*," even though the '823 Patent clearly identifies Figure 5 as a "*location view*." *Compare* PO Resp. 11 (Patent Owner identifying Figure 5 as an example of a "*map view*"), *with* Ex. 1001, 3:3–4 (the '823 Patent identifying Figure 5 as a "*location view*"). Similarly, Patent Owner identifies Figure 41 as a "*map view*" (*see* PO Resp. 11–12) even though the '823 Patent identifies Figure 41 as a "Location Application View" (*see* Ex. 1001, 4:3–4).

After considering the '823 Patent in its entirety, we determine that a person of ordinary skill in the art would understand that the "*map view*" recited in dependent claims 25 and 32 is a "Location Application View" where selected digital files are displayed on a geographical map indicating where the digital files were taken or originated. *See, e.g.*, Ex. 1001, 29:17–21 (explaining with respect to Figure 41, that "[w]ithin the Location Application View the Digital Files are displayed within an interactive map"); 6:14–16 (explaining that "[a] location view, as shown in FIG. 5, identifies within an interactive map (Google map shown as an example) where digital files were taken or originated"). We decline to adopt Patent Owner's sweeping generalization that "the language of claims 25 and 32 dictates that the 'map view' is separate and distinct from the 'locations view.'" PO Resp. 27 (citing Ex. 2020 ¶¶ 93–94).

*D. Prior Art Status of Pogue and Engst*

Two of the references Petitioner relies upon in its challenge to claims 1–34 of the '823 Patent are printed publications in the form of books. These two references are 1) David Pogue and J.D. Biersdorfer, *iPhoto '09 The Missing Manual* (2009) ("Pogue") (Ex. 1005); and 2) Adam C. Engst, *Visual*

*QuickStart Guide iPhoto '09* (2009) ("Engst") (Ex. 1006). Petitioner has submitted electronic copies of both references into the record as part of our standard trial practice. The Pogue reference is approximately 385 pages long. *See generally* Ex. 1005. The Engst reference is approximately 240 pages long. *See generally* Ex. 1006.

The cover of Pogue (Ex. 1005) is shown below.




On the cover of Pogue, shown above, the title is indicated as "*iPhoto '09—The Missing Manual*." The authors are indicated as "David Pogue and J.D. Biersdorfer." The publisher is indicated as "Pogue Press/O'Reilly." The cover also states: "The book that should have been in the box." *Id.*

The copyright page of Pogue is shown below.

***iPhoto '09: The Missing Manual***
by David Pogue & J.D. Biersdorfer

Copyright © 2009 David Pogue. All rights reserved.
Printed in Canada.

Published by O'Reilly Media, Inc., 1005 Gravenstein Highway North, Sebastopol, CA 95472.

O'Reilly Media books may be purchased for educational, business, or sales promotional use. Online editions are also available for most titles: *safari.oreilly.com*. For more information, contact our corporate/institutional sales department: 800-998-9938 or *corporate@oreilly.com*.

April 2009: First Edition.

The Missing Manual is a registered trademark of O'Reilly Media, Inc. The Missing Manual logo, and "The book that should have been in the box" are trademarks of O'Reilly Media, Inc. Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book, and O'Reilly Media is aware of a trademark claim, the designations are capitalized.

While every precaution has been taken in the preparation of this book, the publisher assumes no responsibility for errors or omissions, or for damages resulting from the use of the information contained in it.

This book uses a durable and flexible lay-flat binding.

ISBN-13: 978-0-596-80144-1

The copyright page of Pogue, shown above, provides the following pertinent information: "***iPhoto '09: The Missing Manual*** by David Pogue & J.D. Biersdorfer"; "Copyright © 2009 David Pogue"; "Published by O'Reilly Media, Inc."; "April 2009: First Edition"; "ISBN-13: 978-0-596-80144-1". *Id.* at Bates No. 6.[1]

[1] The citations to Pogue (Ex. 1005) and Engst (Ex. 1006) in Section II.D of this Decision are to the original page numbers of the exhibit unless otherwise indicated as shown here.

The cover of Engst is shown below.




1 SAMSUNG 1006

The cover of Engst (Ex. 1006) is shown above. The title is indicated as "*Visual QuickStart Guide—iPhoto '09—for Mac OS X*." The author is indicated as "Adam C. Engst." The cover also states: "Learn iPhoto the Quick and Easy Way!" Ex. 1006.

The copyright page of Engst is shown below.

Visual QuickStart Guide
**iPhoto '09 for Mac OS X**
Adam C. Engst

**Peachpit Press**
1249 Eighth Street • Berkeley, CA 94710
510/524-2178 • 510/524-2221 (fax)
Find us on the Web at www.peachpit.com.
To report errors, please send a note to errata@peachpit.com.
Peachpit Press is a division of Pearson Education.

Copyright © 2009 by Adam C. Engst

Editor: Cliff Colby
Production Coordinator: Lisa Brazieal
Copyeditor: Tonya Engst
Compositor: Adam C. Engst
Indexer: James Minkin
Cover Design: Peachpit Press

**Notice of rights**
All rights reserved. No part of this book may be reproduced or transmitted in any form by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For information on getting permission for reprints and excerpts, contact permissions@peachpit.com.

**Notice of liability**
The information in this book is distributed on an "As Is" basis, without warranty. While every precaution has been taken in the preparation of the book, neither the author nor Peachpit Press shall have any liability to any person or entity with respect to any loss or damage caused or alleged to be caused directly or indirectly by the instructions contained in this book or by the computer software and hardware products described in it.

**Trademarks**
Visual QuickStart Guide is a registered trademark of Peachpit Press, a division of Pearson Education.
iPhoto, iTunes, iDVD, and iMovie are registered trademarks and/or registered service marks of Apple Inc.
Many of the designations used by manufacturers and sellers to distinguish their products are claimed as trademarks. Where those designations appear in this book, and Peachpit was aware of a trademark claim, the designations appear as requested by the owner of the trademark. All other product names and services identified throughout this book are used in editorial fashion only and for the benefit of such companies with no intention of infringement of the trademark. No such use, or the use of any trade name, is intended to convey endorsement or other affiliation with this book.

ISBN 13: 978-0-321-60131-5
ISBN 10: 0-321-60131-9

9 8 7 6 5 4 3 2 1

Printed and bound in the United States of America

3

The copyright page of Engst, shown above, provides the following pertinent information: "Visual Quickstart Guide—**iPhoto '09 for Mac OS X**"; "Adam C. Engst"; "Peachpit Press"; "Copyright © 2009 by Adam C. Engst"; "ISBN-13: 978-0-321-60131-5". *Id.* at Bates No. 3.

The Petition states that "Pogue and Engst are books describing iPhoto '09, which has a user interface for organizing photos." Pet. 13. Petitioner

explains that "Pogue and Engst describe the exact same digital photograph software developed by Apple—namely iPhoto '09—and its features include organizing digital image files by criteria, such as "Faces" and "Places." Pet. 18 (citing Ex. 1005, 2, 89, 93, 110; Ex. 1006, 2, 30, 64, 72; Ex. 1003 ¶ 77). Petitioner also explains that "Pogue and Engst are publications that serve as the manual for Apple's iPhoto '09 software." Pet. 18 (citing Ex. 1005, 2–4 ("This book was born to serve as the iPhoto ['09] manual."); *see also* Ex. 1006, 1 (Explaining that this book is meant to serve as the "manual iPhoto ['09] lacks."); Ex. 1003 ¶ 77).

Petitioner's expert, Dr. Greenspun, testifies that he has reviewed the Pogue and Engst references as part of his work on this case. Ex. 1003 ¶ 9. Dr. Greenspun also provides testimony that corroborates and supports Petitioner's statements regarding Pogue and Engst. *See, e.g.*, *id.* ¶¶ 74, 77.

Petitioner asserts that "the earliest possible priority date of the '823 Patent is June 9, 2011," and that "[t]he applied references were published prior to June 9, 2011, and are prior art to the '823 Patent (under Pre-AIA 102(b) or AIA 102(a)(1)) regardless of whether the '823 Patent is entitled to its earliest claimed priority." Pet. 12 (citing Ex. 1010).

Petitioner provides the declaration of Ms. June Ann Munford to support its position that the Pogue and Engst references are prior art publications to the '823 patent. Ex. 1010. Ms. Munford is a former Library Director with a Master of Science degree from the University of Milwaukee. *See id.* at App. CV. Ms. Munford testifies that she is "fully familiar with the catalog record creation process in the library sector," and in particular, library catalog records created in preparing acquired library materials for public availability, which Ms. Munford testifies, "are typically written in Machine Readable Catalog" or "MARC" code. *Id.* ¶ 4. Ms. Munford

testifies that she has "reviewed Exhibit 1005 *iPhoto 09 - the Missing Manual* by David Pogue & J.D. Biersdorfer, 1st edition," and "Exhibit 1006 *iPhoto 09 - Learn iPhoto the Quick and Easy Way* by Adam C. Engst." *Id.* ¶¶ 7, 11.

Ms. Munford testifies that she herself obtained and reviewed the MARC records for Pogue (Ex. 1005) from the Carnegie Library of Pittsburgh's public catalog, which "indicates [the] Carnegie Library of Pittsburgh first acquired this book as of January 21, 2009," and in her determination "was made available to the public shortly after its initial acquisition in January 2009." Ex. 1010 ¶¶ 8–10.

Ms. Munford also testifies that she obtained the MARC records for Engst (Ex. 1006) from the Illinois State University Library's public catalog, which "indicates the Illinois State University library first acquired this book as of May 25, 2009," and in her determination "was made available to the public shortly after its initial acquisition in May 2009." Ex. 1010 ¶¶ 11–13.

In its Response, Patent Owner contends that Petitioner fails to establish that Pogue and Engst qualify as printed publication prior art. PO Resp. 29–37. Patent Owner asserts that "the Petition is devoid of any explanation as to how Pogue and Engst were publicly accessible so as to qualify as printed publications." *Id.* at 29 (citing Pet. 12–13). Patent Owner also asserts that "Petitioner's citation to a librarian declaration without explanation violates the Board's rules," and "even if Petitioner's librarian declaration is considered, it is conclusory and relies on unreliable records that were modified numerous times after their creation date." PO Resp. 29.

Patent Owner asserts that "[t]he Petition identifies alleged publication dates for Pogue and Engst but is otherwise silent as to how 'persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence' could have located Pogue or Engst." *Id.* at 30 (citing

Pet. 12–13). Patent Owner also asserts that "Petitioner offers . . . the Munford Declaration . . . but cites to it ***only once*** and fails to state its relevance." PO Resp. 31 (citing Pet. 12) (emphasis by Patent Owner). Patent Owner argues that "Petitioner's blanket citation to the Munford Declaration amounts to improper incorporation by reference." PO Resp. 31.

Patent Owner also asserts that the MARC records cited in the Munford Declaration fail to establish that Pogue and Engst qualify as printed publications for at least four reasons. *Id.* at 33. First, Patent Owner argues that "Ms. Munford provides no indication that either Pogue or Engst 'was sufficiently indexed, catalogued, and shelved.'" PO Resp. 33. Second, Patent Owner argues that "the MARC records were altered in unknown ways after their creation dates." *Id.* at 34. Patent Owner speculates that "[i]t is possible that ***every*** field that was manually inputted when the MARC record was created was subsequently changed or added." *Id.* at 35 (citing Ex. 2021 ¶¶ 12, 15). Third, Patent Owner argues that "Ms. Munford's opinions that Pogue and Engst were 'made available to the public shortly after' the MARC records were created are conclusory and should be afforded no weight." PO Resp. 35. Patent Owner argues that "[t]he fact that a library created a MARC record on a given date does not necessarily mean that a skilled artisan could have been able to find it on that date in exercising reasonable diligence." *Id.* at 36. And fourth, Patent Owner argues that "while Ms. Munford compared scanned 'selections from' Pogue from the Carnegie Library of Pittsburgh to [Exhibit] 1005, she failed to perform a similar comparison for Engst." PO Resp. 36–37 (citing Ex. 1010 ¶¶ 12–13).

In its Reply, Petitioner asserts that "each of Pogue and Engst include various conventional indicia of publication and public availability several years prior to the critical date, including copyright date and ISBN number."

Pet. Reply 9 (citing Ex. 1005, 6; Ex. 1006, 3). Petitioner also asserts that they "include indicia of publication by an established publisher, namely O'Reilly and Peachpit/Pearson Education, respectively." Pet. Reply 9. Petitioner cites to Dr. Greenspun's testimony that "both are widely known book publishers that one of ordinary skill in the art would have looked to for further information/education concerning new software platforms, such as iPhoto '09." Pet. Reply 9 (citing Ex. 1027 ¶ 3).

Petitioner also argues that Ms. Munford's analysis of MARC records from multiple libraries, including Carnegie Library of Pittsburgh, Illinois State University library, Penn State University library, Kent State University library, and the Library of Congress, "all . . . confirm the early public availability dates of Pogue and Engst well before the Critical Date." Pet. Reply 11 (citing Ex. 1010 ¶¶ 7–13; Ex. 1028 ¶¶ 8–16, 20–26). Petitioner also points to Ms. Munford's testimony that a particular "field of the MARC record is 'reserved for denoting the date of creation of the library record itself' and 'accurately indicate[s] the date of an item's public availability.'" Pet. Reply 11 (citing Ex. 1010 ¶¶ 4–5) (alteration in original).

In its Sur-reply, Patent Owner argues that Petitioner's Reply "improperly offers several new 'prior art' theories in an attempt to rectify the undisputed deficiencies in the Petition," including relying on new MARC records from different libraries, relying on MARC records that pertain to electronic versions of Pogue and Engst, arguing that Pogue and Engst were published by "an established publisher," that Pogue and Engst were sold to the public through commercial websites, and that Pogue was cited in an IDS during prosecution. PO Sur-Reply 2–3.

Patent Owner also argues that Ms. Munford's opinions are flawed "because she did not apply the appropriate level of skill in the art" and that

"she offers no evidence that any of the MARC record libraries deviated from the Library of Congress or OCLC definitions of the MARC library cataloging standard." PO Sur-Reply 4, 6. Patent Owner argues that the Engst and Pogue MARC records (whether the print or electronic version) were "modified in unknown ways" after the critical date (PO Sur-Reply 7–8), and that there is "no evidence as to how or if Pogue or Engst were indexed . . . such that [a person of ordinary skill in the art] exercising reasonable diligence could have located them [PO Sur-Reply 8]."

We agree with Petitioner that the weight of the evidence demonstrates that both Pogue and Engst were disseminated and made available to the public prior to the critical date of the '823 patent. A person is not entitled to a patent if their invention was "described in a printed publication . . . before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1) (2023). The determination of whether a document is a "printed publication" under 35 U.S.C. § 102 "involves a case-by-case inquiry into the facts and circumstances surrounding the reference's disclosure to members of the public." *Medtronic, Inc. v. Barry*, 891 F.3d 1368, 1380 (Fed. Cir. 2018) (citing *In re Klopfenstein*, 380 F.3d 1345, 1350 (Fed. Cir. 2004)).

"Because there are many ways in which a reference may be disseminated to the interested public, 'public accessibility' has been called the touchstone in determining whether a reference constitutes a 'printed publication.'" *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016) (quoting *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)). "A given reference is 'publicly accessible' upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it." *SRI*

*Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008) (quoting *Bruckelmyer v. Ground Heaters, Inc.*, 445 F.3d 1374, 1378 (Fed. Cir. 2006))

Here, Pogue and Engst each include indicia of publication and public availability on their face. The titles of the references themselves, "iPhoto '09," reference the version of Apple's iPhoto software reviewed and described by the references. Ex. 1005; Ex. 1006. Dr. Greenspun testifies that he reviewed each of the references and that "Pogue and Engst are books describing iPhoto '09, which has a user interface for organizing photos," and that "Pogue and Engst describe the exact same digital photography software developed by Apple—namely iPhoto '09—and its features include organizing digital image files by criteria, such as 'Faces' and 'Places.'" Ex. 1003 ¶¶ 20, 74, 77. Patent Owner does not challenge this assessment that Pogue and Engst review and describe Apple's iPhoto '09 software.

The references themselves are consistent with Dr. Greenspun's testimony. For example, Pogue describes "What's New in iPhoto'09," explaining that "[t]he most talked-about feature in iPhoto '09 is *Faces*, a new component of the program that analyzes your photos and groups your collections based on the *people* who are in them." Ex. 1005, 2. Pogue also explains that "[w]ith its *Places* feature, iPhoto '09 offers *you* the power of Google Maps and a whole box of little virtual map pins to show off your travels." *Id.* Given the content of the references themselves, their titles, the testimony of Dr. Greenspun, and the lack of any challenge on this point by Patent Owner, the evidence clearly shows that both Pogue and Engst review and describe Apple's iPhoto '09 version of its digital photography software.

The references also contain other indicia of publication and public availability. Both Pogue and Engst display a notice of copyright by their

authors for the year 2009. *See* Ex. 1005, Bates No. 6; Ex. 1006, Bates No. 3. The copyright page of Pogue also indicates a "First Edition" date of April 2009. Ex. 1005, Bates No. 6. The references also provide information about their publishers, Pogue indicates that it was "Published by O'Reilly Media, Inc." and Engst indicates that "Peachpit Press" was its publisher. *Id.*; Ex. 1006, Bates No. 3. This information is also consistent with Petitioner's position that Pogue and Engst were made publicly available in 2009.

Petitioner provides additional evidence to establish the public availability of Pogue and Engst through the declaration of Ms. Munford. Ms. Munford testifies that she obtained the MARC records for Pogue from the Carnegie Library of Pittsburgh's public catalog, which indicates that the Carnegie Library acquired Pogue by January 21, 2009, and in Ms. Munford's determination, Pogue was made available to the public shortly thereafter. Ex. 1010 ¶¶ 8–10.

Ms. Munford also testifies that she obtained the MARC records for Engst from the Illinois State University Library's public catalog, which indicates that the library first acquired Engst by May 25, 2009, and was made available to the public shortly thereafter. *Id.* ¶¶ 11–13. Ms. Munford's testimony is consistent with, and also supports a determination that Pogue and Engst were made publicly available in 2009.

In response to Patent Owner contesting the public availability of Pogue and Engst, Dr. Greenspun provides testimony that

> each of Pogue and Engst were well-known publications from established publishers (*i.e.*, O'Reilly and Pearson), and [a person of ordinary skill in the art] would have certainly known to look to them for further information concerning the very popular iPhoto '09 software. Indeed, the "Missing Manual" series and the "Visual Quickstart Guide" series, of which Pogue and Engst

> are a part of, respectively, were popular resources for users wanting to find out more about popular software platforms.

Ex. 1027 ¶ 3.

We credit this testimony from Dr. Greenspun because the record indicates that Apple did not provide a user manual with its iPhoto ’09 software, and the stated purpose of publishing Pogue and Engst was to fill that void and provided a much-needed resource. *See, e.g.*, Ex. 1005, Bates No. 1 (“iPhoto ’09–The Missing Manual—The book that should have been in the box”), Bates No. 2 (“iPhoto ’09 makes it easier than ever to transfer photos . . . but there’s no printed manual”), Bates No. 13 (“Missing Manuals are witty, superbly written guides to computer products that don't come with printed manuals (which is just about all of them)”), Bates No. 20 (“This book was born to serve as the iPhoto manual-the book that should have been in the box. It explores each iPhoto feature in depth, offers shortcuts and workarounds, and unearths features that online help doesn't even mention.”).

Patent Owner criticizes Ms. Munford’s testimony, arguing that “Ms. Munford provides no indication that either Pogue or Engst ‘was sufficiently indexed, catalogued, and shelved.’” PO Resp. 33. But whether or not a publication has been “sufficiently indexed, catalogued, and shelved” is not the test for public accessibility. *See In re Lister*, 583 F.3d 1307, 1312 (Fed. Cir. 2009) (“neither cataloging nor indexing is a necessary condition for a reference to be publicly accessible”). Rather, whether a given reference is publicly accessible is based upon “a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it.” *SRI Int’l*, 511 F.3d at 1194 (quoting *Bruckelmyer*, 445 F.3d at 1378).

Patent Owner's reliance on *In re Hall*, 781 F.2d 897, 898–99 (Fed. Cir. 1986)) for its point is also misplaced. *In re Hall* stands for a different proposition, one which states that "competent evidence of the general library practice may be relied upon to establish an approximate time when a thesis became accessible." *Id.* at 781 F.2d at 898. Although Pogue and Engst are not doctoral theses, the principal espoused in *In re Hall* is still applicable here. Ms. Munford's testimony provides competent evidence of general library practices which can be relied upon to establish an approximate time when a printed publication became publicly accessible. Accordingly, we credit Ms. Munford's testimony on general library practices and accept her testimony as credible that Pogue was made available to the public by the Carnegie Library of Pittsburgh shortly after acquiring it on January 21, 2009, and that Engst was made available to the public by the Illinois State University Library shortly after acquiring it on May 25, 2009. Ex. 1010 ¶¶ 8–13.

Patent Owner argues that the MARC records relied upon by Ms. Munford "were altered in unknown ways after their creation dates," and speculates that "[i]t is possible that ***every*** field that was manually inputted when the MARC record was created was subsequently changed or added." PO Resp. 34–35 (citing Ex. 2021 ¶¶ 12, 15). Such speculation, however, has little probative value. Patent Owner cites to the declaration of Ms. Laura Whitbeck as support for its arguments, but we note that Ms. Whitbeck appears to be an employee of the law firm Nixon Peabody LLP, the same law firm that represents Patent Owner in this proceeding. *See* Ex. 2021 ¶¶ 3–4. Accordingly, we ascribe less weight to Ms. Whitbeck's testimony because of the risk of implicit bias caused by Ms. Whitbeck's employee relationship with Patent Owner's counsel.

Based on the complete record, we find that Petitioner has shown by a preponderance of the evidence that Pogue and Engst were disseminated or otherwise made available to the public prior to the critical date of the '823 patent, such that a person of ordinary skill in the art exercising reasonable diligence could locate the references. Therefore, we determine that Pogue and Engst qualify as printed publication prior art to the '823 patent.

### *E. Patentability Challenges*

As indicated above, Petitioner presents three grounds challenging the patentability of particular claims of the '823 Patent under 35 U.S.C. § 103. Specifically, Petitioner contends that: (1) claims 1–25 and 27–34 would have been obvious over the teachings of Pogue and Engst; (2) claim 26 would have been obvious over the teachings of Pogue, Engst, and Belitz; and (3) claims 12–14 would have been obvious over the teachings of Pogue, Engst, and Ripps. *See* Pet. 8, 13, 83, 89.

#### *1. Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness,

i.e., secondary considerations.[2] *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

The Supreme Court has made clear that we apply "an expansive and flexible approach" to the question of obviousness. *KSR*, 550 U.S. at 415. Whether a patent claiming the combination of prior art elements would have been obvious is determined by whether the improvement is more than the predictable use of prior art elements according to their established functions. *Id.* at 417. Reaching this conclusion, however, requires more than a mere showing that the prior art includes separate references covering each separate limitation in a claim under examination. *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011). Rather, obviousness requires the additional showing that a person of ordinary skill at the time of the invention would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention. *Id.*

*2. Relevant Prior Art*

*a) Pogue (Ex. 1005)*

Pogue is titled "iPhoto '09 The Missing Manual," and describes, explains, and provides directions on how to use Apple Inc.'s "iPhoto" software program that is designed to organize, edit and distribute digital photos (*i.e.*, photos). Ex. 1005, 2.[3] iPhoto includes a "Faces" feature that analyzes photos and groups photo collections based on the people who are in

---

[2] The parties do not present evidence or argument directed to secondary considerations.

[3] Citations to Pogue (Ex. 1005) and Engst (Ex. 1006) are to the exhibit's original page numbering, and not to numbering subsequently applied to the exhibit by counsel, unless otherwise indicated.

the photos. *Id.* iPhoto also includes a "Places" feature that plots photos on an electronic map. *Id.*

As previously described, iPhoto's Faces feature analyzes unique properties of each face in each photo and automatically groups the photos into photo collections based on its analysis. *Id.* at 89–90. Figure 4-3 is a screenshot of a Faces user interface. *Id.* at 92. Figure 4-3 is reproduced below.




Figure 4-3, above, shows the Faces user interface, selectable from a "Source" list, that displays thumbnail photos that have been tagged and assigned a name by a user. *Id.*

iPhoto also includes an "Events" feature that groups photos that were all taken at approximately the same time. *Id.* at 34. Figure 2-6 is a cropped screenshot of an Events user interface. *Id.* at 46. Figure 2-6 is reproduced below.




Figure 2-6, above, shows thumbnail photos, where each thumbnail represents one "pile" of photos, and where a pile represents an "event" (*i.e.*, a group of photos that were all taken at approximately the same time). *Id.* at 34.

iPhoto also includes an "Albums" feature that organizes subsets of photos for easy access and viewing. *Id.* at 55. Figure 2-13 is a cropped screenshot of an Albums user interface. *Id.* at 59. Figure 2-13 is reproduced below.




Figure 2-13, above, shows a group of photos either manually or automatically organized into an album. *Id.*

As previously described, iPhoto's Places feature associates longitude and latitude coordinates into each taken photo. *Id.* at 101. Figure 4-16 is a user interface of a Places user interface. Figure 4-16 is reproduced below.




Figure 4-16, above, shows a series of lists in the top part of the window, and the actual photos in each list underneath. *Id.* at 108–110.

iPhoto also includes a search feature that allows a user to search photos based on a user-entered phrase. *Id.* at 79. Figure 3-2 is a screenshot of a user interface that provides a search feature. Figure 3-2 is reproduced below.




Figure 3-2, above, shows a user interface that provides a search feature. *Id.* at 80. A user types a phrase in a search box, and, as the user types the phrase, iPhoto hides all photos except the photos that have the typed phrase somewhere in their titles, keywords, descriptions, faces, places, file names, or Event titles. *Id.*

iPhoto also allows a user to add additional information to a photo. *Id.* at 106. Figure 4-14 is a screenshot of a photo's "Info" box. Figure 4-14 is reproduced below.




Figure 4-14, above, shows a photo's Info box. *Id.* The Info box stores information including names, dates, and ratings. *Id.* at 107. The Info box also allow a user to use the stored information to search for the photo and to add the photo to an album. *Id.* The Info box also displays a map. *Id.*

*b) Engst (Ex. 1006)*

Engst is titled "Visual QuickStart Guide iPhoto '09" and also describes, explains, and provides directions on how to use Apple's iPhoto software program. Ex. 1006, 1.

According to Engst, iPhoto includes an "organize mode," where the organize mode includes a user interface that displays a "source pane," and the source pane allows a user to create photos and work with photo

collections. *Id.* at 30–31. Figure 3.2 is a screenshot of iPhoto's organize mode, which includes a source pane and a Photos view. *Id.* at 31. Figure 3.2 is reproduced below.



Figure 3.2

Figure 3.2, above, shows the controls available in organize mode. *Id.* The organize mode displays photos and photo metadata associated with a specific event, where the photo metadata includes: title, rating, and keywords. *Id.*

Engst also describes the Faces feature of iPhoto. *Id.* at 64. Engst describes that iPhoto offers a number of different views, depending on whether a user is naming faces found in a photo, browsing through photos including identified faces, or training iPhoto to recognize a face in a photo.

*Id.* Figure 4.1 is a screenshot of a naming view. *Id.* Figure 4.1 is reproduced below.



Figure 4.1, above, shows that the naming view magnifies a photo and displays a name lozenge under any faces iPhoto has detected within the photo. *Id.*

Figure 4.2 is a screenshot of a Faces user interface. *Id.* Figure 4.2 is reproduced below.




Figure 4.2, above, shows a Faces user interface, selectable from a source pane, that displays a photo of each named person. *Id.*

Figure 4.3 is a screenshot of a user interface that displays all photos identified as containing a selected person. *Id.* Figure 4.3 is reproduced below.



Figure 4.3, above, shows a user interface, selectable from the Faces user interface via a "double-click" of a person's snapshot, that displays all photos that have been identified as containing the selected person. *Id.*

Figure 4.4 is a screenshot of a user interface that displays all photos identified as either containing a selected person or potentially containing the selected person. *Id.* Figure 4.4 is reproduced below.



Figure 4.4, above, shows a user interface, selectable from the Faces user interface via a "double-click" of a person's snapshot, that displays all photos that have been identified as either containing the selected person or potentially containing the selected person. *Id.* The user interface includes a "Confirm Name" button that, when selected by a user, allows a user to confirm that a photo either contains the selected person or does not contain the selected person. *Id.*

Engst further describes that iPhoto presents basic information about photos in two places: an "Information dialog" and an "Information pane." *Id.* at 61. Figure 3.62 is a screenshot of an Information dialog. Figure 3.62 is reproduced below.




Figure 3.62, above, shows the Information dialog of a selected photo. *Id.* The information dialog displays the following fields: title; date; time; rating; keyword; kind; size; description; and location. *Id.* The information dialog also displays a map showing the location. *Id.*

Figure 3.63 is a screenshot of an Information pane. Figure 3.63 is reproduced below.




Figure 3.63, above, shows the Information pane of a selected photo. *Id.* The information pane displays the following fields: title; date; time; rating; keyword; kind; size; and description. *Id.*

*c) Belitz (Ex. 1008)*

Belitz is titled "User Interface, Device and Method for Displaying Special Locations on a Map," and describes a "user interface comprising a controller configured to display a map and to display at least one marked location on said map." Ex. 1008, codes (54), (57). Figures 4a, 4b, and 4c are screenshots of a user interface, and are reproduced below. *Id.* ¶ 36.




Fig. 4a

Fig. 4b




Fig. 4c

Figures 4a, 4b, and 4c are screenshots of display 403 of a user interface. *Id.* ¶¶ 51, 55, 60. In the screenshot of display 403 illustrated in Figure 4a, a map 409 is displayed of a town. *Id.* ¶ 51. A location 408 is marked by a graphical object 410. *Id.* The graphical object 410 has a visual representation 411 which is a photograph (*i.e.*, photo) that is associated with the location. *Id.* ¶ 52.

In the screenshot of display 403 illustrated in Figure 4b, the map 408 has been zoomed in showing the area in greater detail. *Id.* ¶ 55. When

displaying the zoomed in map 409, the controller is configured to determine whether the graphical objects overlap or not, and the graphical object 410 displayed in Figure 4a which comprised thirteen other graphical objects has been split up into four graphical objects 410a, 410b, 410c, and 410d. *Id.* ¶ 55.

In the screenshot of display 403 illustrated in Figure 4c, a graphical object 410c has been selected by a user. *Id.* ¶ 60. A popup window 413 is displayed over or instead of the graphical object 410c. *Id.* The popup window shows at least some of the visual representations 411 of the graphical object 410c. *Id.*

*d) Ripps (Ex. 1009)*

Ripps is titled "Method and System for Generating a Family Tree" and discloses a method and system for generating a graphical output display of a family tree and a graphical output display of a chronological timeline, which are displayed in conjunction with each other. Ex. 1009, codes (54) and (57). Figure 3 depicts an input screen with a set of data being input to a computer program. *Id.* ¶ 20. Figure 3 is reproduced below.



FIG. 3

Figure 3, above, shows a data input screen which focus on family relationships and other secondary data. *Id.* ¶ 41. Data describing the family relationships is input into the data input screen. *Id.* ¶¶ 41–49.

Figure 5A depicts another data input screen that includes a family tree that is generated based on the data input into the input screen of Figure 3. *Id.* ¶¶ 22–23, 49–50. Figure 5A is reproduced below.




FIG. 5A

Figure 5A, above, shows a data input screen that displays a constructed timeline chart with a fully constructed family tree. *Id.* ¶ 50. This data input screen allows additional images, in the form of historical photographs and artworks, to be added to the program output. *Id.*

*3. Obviousness Based on Pogue and Engst (Ground 1A)*

Petitioner contends claims 1–25 and 27–34 are unpatentable under 35 U.S.C. § 103(a) over Pogue and Engst. Pet. 13–83. Claims 1 and 29 are independent and recite substantially similar limitations, with claim 1 directed to a method and claim 29 directed to a system. *See* Ex. 1001, 35:2–54, 37:42–38:35. Claim 1 is representative.

Patent Owner disputes Petitioner's contentions and provides arguments contesting Petitioner's evidence of obviousness, the rationale to combine the teachings of Pogue and Engst, and certain claim limitations.

We first address the rationale to combine Pogue and Engst and then consider the issues contested by Patent Owner with respect to the claims.

*a) Rationale to Combine Pogue and Engst*

Petitioner asserts that a person of ordinary skill in the art "would have found it obvious to combine Pogue and Engst (collectively "iPhoto '09" or "iPhoto")." Pet. 17 (citing Ex. 1003 ¶ 77). "Among other things," Petitioner states, "both references (as well as the '823 Patent) come from the same field of endeavor: 'managing and using digital files such as photographs.'" Pet. 17 (citing Ex. 1001, 1:19–20; Ex. 1005, 2, 4; Ex. 1006, 1, 8). "More critically," Petitioner asserts, "Pogue and Engst describe the exact same digital photograph software developed by Apple—namely iPhoto '09—and its features include organizing digital image files by criteria, such as 'Faces' and 'Places.'" Pet. 17–18 (citing Ex. 1005, 2, 89, 93, 110; Ex. 1006, 2, 30, 64, 72; Ex. 1003 ¶ 77).

Petitioner points to Dr. Greenspun's testimony, who states that a person of ordinary skill in the art "would have combined Pogue and Engst for various reasons." Pet. 18 (citing Ex. 1003 ¶ 77). "For instance," Petitioner explains, "each of Pogue and Engst are publications that serve as the manual for Apple's iPhoto '09 software." Pet. 18 (citing Ex. 1005, 2–4 ("This book was born to serve as the iPhoto ['09] manual."); *see also* Ex. 1006, 1 (Explaining that this book is meant to serve as the "manual iPhoto ['09] lacks."); Ex. 1003 ¶ 77). "That is," Petitioner explains, "Pogue and Engst describe the same iPhoto '09 software, thereby providing a [a person of ordinary skill in the art] with an express motivation to combine their teachings as a single, comprehensive documentation describing the various features of iPhoto '09." Pet. 18 (citing Ex. 1003 ¶ 77). Petitioner explains that "[t]he publications thus detail various aspects of the iPhoto '09 software

and provide an explicit motivation to combine." Pet. 18 (citing *Cimline, Inc. v. Crafco, Inc.*, 413 F. App'x 240, 245 (Fed. Cir. 2011) (for determining if there is a motivation to combine a "fact finder may rely on the prior art references themselves"). "Aside from the express teaching to combine," Petitioner asserts, "a motivation to combine may be found based on the 'background knowledge, creativity, and common sense of [a] person of ordinary skill.'" Pet. 18 (citing *Cimline Inc.*, 413 F. App'x at 240, 245) (alteration in original).

"For these reasons," Petitioner argues, a person of ordinary skill in the art "would have understood each of these publications as detailing the various features of the same iPhoto '09 software, and therefore would have been motivated to combine the teachings of Pogue and Engst and consider their teachings together." Pet. 19 (citing Ex. 1003 ¶ 78). "Indeed," Petitioner argues, "a [person of ordinary skill in the art] (e.g., an employee of a competitor or a potential customer) would have been motivated to learn as much as possible about the iPhoto '09 software for competitive intelligence, customer acceptance, usability, and/or other reasons relevant to those persons." Pet. 19 (citing Ex. 1003 ¶ 78). "With these motivations," Petitioner asserts, "and particularly because iPhoto '09 did not include an official manual from Apple, a [person of ordinary skill in the art] would have been motivated to seek out multiple descriptions of the iPhoto '09 software and would have found it obvious to consider the teachings of Pogue and Engst together." Pet. 19 (citing Ex. 1003 ¶ 78).

In its Response, Patent Owner argues that "Petitioner never explained why a [person of ordinary skill in the art] would combine particular aspects of Pogue and Engst to arrive at the inventions claimed in the '823 patent." PO Resp. 55 (citing Pet. 17–19). For example, Patent Owner argues that

"Petitioner offers no analysis as to why a [person of ordinary skill in the art] would have been motivated to combine Engst's alleged 'first-person view' and 'first digital file' teachings with the 'Info box' teachings of Pogue to achieve limitations [1c] – [1d]." PO Resp. 53–54. Patent Owner argues that "Petitioner's proposed combination of Pogue and Engst is akin to saying that it would have been obvious to combine two prior art patents into a third prior art patent containing both of the original patents' disclosures." PO Resp. 54.

In its Reply, Petitioner points out that "Dr. Greenspun previously provided various reasons why a [person of ordinary skill in the art] would have been motivated to combine the teachings of Pogue and Engst, among other things, because a [person of ordinary skill in the art] would have viewed each of Pogue and Engst as describing related but different aspects of the iPhoto '09 software and thus would have been led to combine their respective teachings." Pet. Reply 21 (citing Ex. 1003 ¶¶ 77–78). Petitioner also point out that "[a] motivation to combine may be found" in "interrelated teachings of multiple patents," such as those provided by Pogue and Engst." Pet. Reply 21 (quoting *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1374 (Fed. Cir. 2019)) (alteration in original).

Petitioner argues that "[s]imilar to the combination at issue in *Realtime Data*, the Petition relies on Engst simply 'to demonstrate that a person of ordinary skill in the art would have understood that the [iPhoto functionality] disclosed in [Pogue] was, in fact, a type of [functionality]' that meets the Challenged Claims." Pet. Reply 21–22 (quoting *Realtime Data*, 912 F.3d at 1372–1373) (second, third, and fourth alterations in original). "In these circumstances," Petitioner argues, "there is 'no obligation to find a

motivation to combine.'" Pet. Reply 22 (quoting *Realtime Data*, 912 F.3d at 1373).

Petitioner asserts that "the Petition 'brings in [Engst] to provide a more explicit teaching of [the iPhoto functionality]' described in Pogue and 'a person of ordinary skill in the art would have looked to [Engst]' because Engst discloses features that 'share striking similarities' to the features of Pogue." Pet. Reply 22 (quoting *Realtime Data*, 912 F.3d at 1374) (alterations in original). "Indeed," Petitioner asserts, "Engst and Pogue offer disclosure of the same features of the same iPhoto '09 product. With this background, the motivation to combine is readily apparent." Pet. Reply 22.

In its Sur-reply, Patent Owner argues that "Petitioner's obviousness theory is flawed because Petitioner did not explain why a [person of ordinary skill in the art] would have combined specific features from Pogue and Engst to arrive at the claimed invention." PO Sur-reply 20. Patent Owner argues that "the Petition relies on Engst to provide teachings of features not described in Pogue," and "it is not enough for Petitioner to say that Pogue and Engst are related and can be combined –Petitioner must show that the claimed invention is obvious." PO Sur-reply 22.

For purposes of obviousness, a reason to combine teachings from the prior art "may be found in explicit or implicit teachings within the references themselves, from the ordinary knowledge of those skilled in the art, or from the nature of the problem to be solved." *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (citing *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998)). Indeed, "[u]nder the correct [obviousness] analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*, 550 U.S. at 420.

Patent Owner argues that Petitioner's case is flawed because "Petitioner never explained why a [person of ordinary skill in the art] would combine particular aspects of Pogue and Engst to arrive at the inventions claimed in the '823 patent." *See* PO Resp 55; *see also* PO Sur-reply 20. But "the [obviousness] analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR*, 550 U.S. at 418. Moreover, "an analysis of obviousness . . . may include recourse to logic, judgment, and common sense available to the person of ordinary skill in the art that do not necessarily require explication in any reference or expert opinion." *Perfect Web Technologies, Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009).

Here, Petitioner asserts that Pogue and Engst "describe the same iPhoto '09 software, thereby providing a [person of ordinary skill in the art] with an express motivation to combine their teachings as a single, comprehensive documentation describing the various features of iPhoto '09. The publications thus detail various aspects of the iPhoto '09 software and provide an explicit motivation to combine." Pet. 18 (citing Ex. 1003 ¶ 77). Petitioner also asserts that a person of ordinary skill in the art "would have understood each of these publications as detailing the various features of the same iPhoto '09 software, and therefore would have been motivated to combine the teachings of Pogue and Engst and consider their teachings together." Pet. 19 (citing Ex. 1003 ¶ 78).

Petitioner also asserts that a person of ordinary skill in the art "(e.g., an employee of a competitor or a potential customer) would have been motivated to learn as much as possible about the iPhoto '09 software for competitive intelligence, customer acceptance, usability, and/or other

reasons relevant to those persons." Pet. 19. Petitioner further argues that "because iPhoto '09 did not include an official manual from Apple, a [person of ordinary skill in the art] would have been motivated to seek out multiple descriptions of the iPhoto '09 software and would have found it obvious to consider the teachings of Pogue and Engst together." Pet. 19.

Petitioner further asserts that a person of ordinary skill in the art would have found it obvious to combine Pogue and Engst because "Pogue and Engst describe the exact same digital photograph software developed by Apple—namely iPhoto '09—and its features include organizing digital image files by criteria, such as 'Faces' and 'Places.'" Pet. 17–18 (citing Ex. 1005, 2, 89, 93, 110; Ex. 1006, 2, 30, 64, 72; Ex. 1003 ¶ 77). Petitioner also points out that both Pogue and Engst indicate that their publication was intended to serve as the manual for Apple's iPhoto '09 software. *See* Ex. 1005, 2–4 ("This book was born to serve as the iPhoto ['09] manual."); *see also* Ex. 1006, 1 (Explaining that this book is meant to serve as the "manual iPhoto ['09] lacks."); Ex. 1003 ¶ 77. Petitioner's arguments directed to a rationale for combining Pogue and Engst are supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 77–78.

Although Patent Owner provides a different point of view and argues that Petitioner is incorrect, based on the entirety of this record, Petitioner's arguments and evidence show that a person of ordinary skill in the art at the time of the claimed invention would have had adequate reasons for combining Pogue and Engst in the manner explained in the Petition and for making the design choices that Petitioner describes. *See, e.g.*, *id.* ¶¶ 99–100 (Dr. Greenspun opining on a person of ordinary skill in the art modifying the display of digital files in the disputed "*first detail view*").

Based on the complete record, we determine that Petitioner has shown by a preponderance of the evidence that a person of ordinary skill in the art would have had sufficient reasons for combining Pogue and Engst in the manner described by Petitioner.

*b) Independent Claims 1 and 29 – Contested Limitations*

For independent claims 1 and 29, Patent Owner substantively contests Petitioner's evidence and arguments with respect to limitations [1d]/[29f] ("*first detail view*"), and [1g]/[29i] ("*locations view*"). *See* PO Resp. 37–51. We discuss these contested limitation below.

*(1) Limitations [1d]/[29f] ("first detail view")*

Limitation [1d] recites:

> [1d] *responsive to an input that is indicative of a selection associated with the first digital file, causing a first detail view to be displayed on the interface, the first detail view including (i) the first digital file, (ii) first information associated with the first digital file and (iii) a first map image associated with the first digital file, the first digital file having a first size in the first person view and a second size in the first detail view, wherein the second size is greater than the first size;*

Ex. 1001, 35:15–25. Limitation [29f] is similar. *See id.* at 37:60–38:3.

For this limitation, Petitioner relies on both Pogue and Engst's description of the selection of an "info box" that Petitioner asserts "can serve as an input that is indicative of a selection associated with the first digital file." Pet. 28 (citing Ex. 1005, 88; Ex. 1006, 61; Ex. 1003 ¶ 94). According to Petitioner, "[t]he info box icon 'appears when you wave the mouse over the lower-right corner of ***any photo*** in the library.'" Pet. 28 (citing Ex. 1005, 88, 103). "Alternatively," Petitioner explains, "a user can 'select one

or more photos and choose Get Info . . . from the File menu.'" Pet. 28 (citing Ex. 1006, 61).

Petitioner provides annotated Figures 4.3 and 3.63 from Engst, shown below.




Petitioner's annotated Figure 4.3 from Engst, shown above on top, is designated by Petitioner as a "First person view" that depicts "all the photos that have been identified as containing that person," according to Petitioner. Pet. 26–27. Petitioner's annotated Figure 3.63 from Engst, shown above on the bottom, depicts an "info box," that "appears when you wave the mouse over the lower-right corner of ***any photo*** in the library," according to Petitioner. Pet. 28 (citing Ex. 1005, 88, 103).

Petitioner explains that "[s]electing the info box in any one of [the] digital files in the first person view causes a first detail view (FIG. 3.62, FIG. 4-14) to be displayed on the interface." Pet. 29 (citing Ex. 1006, 61; Ex. 1005, 107; Ex. 1003 ¶ 96).

Petitioner provides annotated Figures 3.63 and 3.62 from Engst, shown below.




Petitioner's annotated Figure 3.62 from Engst, shown above on the bottom, is designated by Petitioner as a "First detail view", and shows a

satellite map along with information about the selected photo, including the digital file ("*the first digital* file") associated with the info box selected. Pet. 29–30.

According to Petitioner, "[t]he first detail view includes (i) the first digital file, (ii) first information associated with the first digital file, and (iii) a first map image associated with the first digital file." Pet. 31. To show this, Petitioner provides Pogue's Figure 4-14 annotated by Petitioner below.




Petitioner's annotated Figure 4-14 from Pogue, above, is designated a "Detail view" and shows, according to Petitioner, a "First digital file," a "First information," and a "First map image." Pet. 31.

According to Petitioner, Pogue's Figure 4-14 includes

> the first digital file's name ("Netbun"), date ("January 30, 2009"), rating (five stars), address ("201 Spear St"), and comments ("Harry checks his Twitter feeds") correspond to the claimed first information. [Ex.] 1005, 107; [Ex.] 1006, 61; [Ex.] 1003 ¶ 97. Additionally, the first map image ("a map showing

> the location") includes a location pin that corresponds to "201 Spear St," the location associated with the first digital file, e.g., the location where the first digital file was taken. *Id*.

Pet. 31.

Petitioner concedes that the references do not "expressly teach that a second size (size of the first digital file in the first detail view) is greater than a first size (size of the first digital file in the first person view)." Pet. 32. Petitioner explains, however, that the references describe using "the slider in the bottom-right corner of the iPhoto window to increase or decrease the size and number of headshots in a row." Pet. 32 (citing Ex. 1005, 93, Fig. 4-3; Ex. 1006, 31, Fig. 3.2; Ex. 1003 ¶ 98).

Petitioner further explains that

> a user can scroll the slider to the left to further reduce the first size, thereby making it smaller than the second size (if it's not already smaller). *Id.* This would allow the user to, for instance, view a greater number of thumbnail images in the first person view without having to scroll down. *Id.* For example, as shown below, the second size is greater than the first size when the slider in the first person view is adjusted to zoom out ("Drag the slider all the way to the left, and you get micro-thumbnails so small that you can fit hundreds of them in the iPhoto window"). [Ex.] 1005, 42, 93; [Ex.] 1006, 61; [Ex.] 1003 ¶ 98.

Pet. 32–33.

To illustrate, Petitioner provides annotated Figures 4.3 (below left) and 3.62 (below right) from Engst.




Petitioner's annotated Figure 4.3 from Engst (above left) is designated as "First person view" and indicates that the slider is "zoomed out". Petitioner's annotated Figure 3.62, also from Engst, (above right) is designated as "First detail view" and indicates that "Second size is greater out." Pet. 33.

Petitioner also argues that a person of ordinary skill in the art

> would have found it obvious to display the first digital file in the first detail view to be larger than the thumbnails in the first person view, because, *inter alia*, the first detail view displays a single digital file (the first digital file), as opposed to many thumbnails as in the first person view ("all the photos that have been identified as containing [the first] person"). [Ex.] 1006, 64; [Ex.] 1003 ¶ 99.

Pet. 33.

In addition, Petitioner also argues that

> the first detail view provides greater granularity for a user looking for "various bits of information" about the first digital file. [Ex.] 1005, 103; [Ex.] 1003 ¶ 99. Thus, a [person of ordinary skill in the art] would have found it obvious that the second size would be greater than the first size to provide such detailed information. [Ex.] 1003 ¶ 99. In fact, when a large number of images are associated with the first person, a [person of ordinary

> skill in the art] would have found it obvious for the thumbnail size of the images associated with the first person to be relatively small to enable presentation of the large number of images in iPhoto's first person view. [Ex.] 1003 ¶ 99. In this case, upon selection of the info box associated with one of the relatively small thumbnails, a [person of ordinary skill in the art] would have found it obvious that the version of the image presented in the pop-up Info Box is presented in a larger size than the relatively small thumbnail selected. [Ex.] 1003 ¶ 99. Indeed, because the pop-up Info Box would occupy a larger area of the interface than the thumbnail images and is directed to providing information about the selected thumbnail image, a [person of ordinary skill in the art] would have found it obvious for the image presented in the Info Box to be larger than the thumbnail in the first person view. [Ex.] 1003 ¶ 99.

Pet. 33–34.

In its Response, Patent Owner argues that "Petitioner's assumption that the 'info box' would appear for 'any photo in the library,' including photos within the alleged 'first person view,' is faulty because this is simply not true for every photo in every view in the library." PO Resp. 51 (citing Ex. 2006, 98:23–99:25, 100:3–101:7). Patent Owner argues that "there is at least one mode within Faces (which contains the alleged first person view) in which the 'info box' does ***not*** appear when waving the mouse over the corner of a photo." PO Resp. 50 (citing Ex. 2006, 98:23–99:25, 100:3–101:7).

To illustrate this point, Patent Owner provides an annotated version of Figure 4.12 from Engst, shown below.



EX1006, FIG. 4.12 (annotated)

Patent Owner's Annotated Figure 4.12, shown above, is a screen shot of two photos shown side-by-side in confirmation mode, which allows a user to click already-recognized photos to fix mistaken recognition. Ex. 1006, 67. A red box (annotation) has been placed by Patent Owner around the mouse cursor's pointer shown in the left photo. Patent Owner asserts that the "info box" does not appear "when waving the mouse over the corner of [the] photo." PO Resp. 50.

Other than this issue regarding the "info box," Patent Owner does not contest Petitioner's evidence with respect to the other portions of limitations [1d] and [29f]. *See* PO Resp. 48–51.

In its Reply, Petitioner points out that Patent Owner only provides attorney argument directed at the "info box," and does not cite to any support from its expert, Dr. Reinman. Pet. Reply 20 (citing PO Resp. 48–51). Petitioner also points out that Patent Owner "does nothing to rebut the Petition's alternative argument that the detailed information view for the

photograph is displayed when the user 'select[s] one or more photos and choose[s] Get Info [] from the File menu.'" Pet. Reply 20 (citing Ex. 1006, 61) (alterations in original). Petitioner also criticizes Patent Owner's annotated Figure 4.12, arguing that "the mouse is certainly not on the lower-right corner." Pet. Reply 19 (citing Ex. 1027 ¶¶ 18–19).

In its Sur-reply, Patent Owner argues with respect to its annotated Figure 4.12 that the mouse "is in the bottom right quadrant." PO Sur-reply 23 (citing Pet. Reply 19–20; Ex. 2025, 122:14–23). Patent Owner also argues that "there are examples . . . where the 'info box' is visible when the mouse is positioned a similar distance from the lower-right corner as the mouse in FIG. 4.12 of Engst, confirming that it is not present in Engst's FIG. 4.12." PO Sur-reply 24 (citing Ex. 2025, 123:7–124:9, 125:24–126:2).

We disagree with Patent Owner. Patent Owner's argument that "there is at least one mode within Faces (which contains the alleged first person view) in which the 'info box' does ***not*** appear when waving the mouse over the corner of a photo" is unavailing. First, this is mere attorney argument, which is entitled to little weight, and is not supported or corroborated by the testimony Dr. Reinman. *See, e.g.*, Ex. 2020 ¶¶ 98–121; *see Icon Health & Fitness, Inc. v. Strava Inc.*, 849 F.3d 1034, 1046 (Fed. Cir. 2017) ("Attorney argument is not evidence or explanation in support of a conclusion."); *Invitrogen Corp. v. Clontech Lab., Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony.").

Whether or not "there is at least one mode within Faces . . . in which the 'info box' does ***not*** appear when waving the mouse over the corner of a photo," as Patent Owner argues is beside the point, because "[e]ven if a

reference discloses an inoperative device, it is prior art for all that it teaches." *Beckman Instruments v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989).

Here, Pogue expressly teaches that the info box icon "appears when you wave the mouse over the lower-right corner of any photo in the library." Ex. 1005, 103. Pogue also confirms and teaches this feature visually in Figure 4-8, shown below.




Pogue's Figure 4-8, shown above, is a head and shoulders photograph of a person labelled "Lou," showing a mouse cursor arrow over the lower right-hand corner of the photo with the info-box icon visible. *Id.* at 98. With respect to Figure 4-8, Pogue explains that one can "[w]ave the mouse over the lower-right corner of any face and click the [info-box] icon to spin the picture around so you can edit its info box." *Id.* Dr. Greenspun's testimony corroborates this understanding. *See* Ex. 1027 ¶¶ 18–20. Regardless of whether the info box actually shows up in all of the photos in the library, Pogue expressly teaches that the info box "appears when you wave the mouse over the lower-right corner." Ex. 1005, 103.

Moreover, Patent Owner's argument does not address the alternative teaching of the recited limitation in the prior art identified by Petitioner,

where a user can select "Get Info" directly from the file menu. *See* Ex. 1006, 61. Dr. Greenspun's testimony corroborates this feature. *See* Ex. 1003 ¶ 94 (quoting Ex. 1006, 61) ("Alternatively, a user can 'select one or more photos and choose Get Info [] from the File menu.'" (alteration in original)); Ex. 1027 ¶ 18.

Based on the arguments and evidence of record, we determine that Petitioner has demonstrated that the asserted prior art meets limitations [1d]/[29f] ("*first detail view*") of the '823 Patent.

(2) *Limitations [1g]/[29i] ("locations view")*

Limitation [1g] recites: "*responsive to a second input within the search-filter view, causing the interface to display a locations view including a first name associated with a first location, and a second name associated with a second location*." Ex. 1001, 35:39–43. Limitation [29i] is similar. *See id.* at 38:19–23.

Petitioner explains that

> iPhoto '09 provides, within the search-filter view, a locations view that displays digital image files associated with a selected location. [Ex.] 1005, 110; [Ex.] 1003, ¶76. The locations view can be displayed with an interactive map with red pins marking "every place on the map where you've got geotagged photos," as shown in FIG. 4-15.

Pet. 16 (citing Ex. 1005, 108; Ex. 1003 ¶ 76).

Petitioner provides two annotated images to illustrate the identified "*locations view*" in the prior art. The first image is an annotated Figure 4-16 from Pogue, shown below.




SAMSUNG-1005, FIG. 4-16

Petitioner's annotated Figure 4-16, shown above, is a screen-shot of an i-Photo Places Browser view window annotated by Petitioner as "Locations view" in red, which displays lists of geographic information across the top, a series of photo images in the center, an icon tool bar across the bottom, and a source pane along the left identifying the "Second input" in red. In this screen shot the "Browser button" is identified in the lower icon tool bar. Pet. 16.

Petitioner's second image illustrating a "*locations view (map)*" is annotated Figure 4-15 from Pogue, shown below.




SAMSUNG-1005, FIG. 4-15

Petitioner's annotated Figure 4-15, shown above, is a screen-shot of an iPhoto Places World view window annotated by Petitioner as "Locations view (map)" in red, which displays a global map in the center with several colored pins placed at various geographic locations, an icon tool bar across the bottom, and a source pane along the left. In this screen shot the "Globe icon" is identified in the lower icon tool bar. Pet. 17.

Petitioner explains that "iPhoto describes a second input within the search-filter view." Pet. 40. "For example," Petitioner explains, "selection of the 'Places' tab in the source pane is the second input that causes the interface to display a locations view." Pet. 40 (citing Ex. 1005, 110; Ex. 1003 ¶ 105). Petitioner asserts that "[t]he locations view includes a first name associated with a first location and a second name associated with a second location." Pet. 41.

Petitioner explains that

> iPhoto describes a panel within the locations view: "the column farthest to the left has the big overall location: the individual countries where you have tagged photos. As you move to the right, countries get divided into states or provinces, which get narrowed down to cities or towns." [Ex.] 1005, 109. As shown in FIG. 4-16, for example, "Mississippi" is the first name associated with the first location (which can be narrowed down further to "Lighthouse"), and "Pennsylvania" is the second name associated with the second location. [Ex.] 1005, 110; [Ex.] 1003 ¶ 106.

Pet. 41.

In its Response, Patent Owner argues that "Pogue does ***not*** disclose causing the display of the Browser View (alleged locations view) responsive to selecting the Places tab in the source pane to the left (alleged second input)." PO Resp. 39. "Instead," Patent Owner argues, "Pogue discloses causing the display of the Browser View (alleged locations view) responsive to selecting the Browser button at the bottom of the interface." PO Resp. 39–40 (citing Ex. 2020 ¶ 102).

Patent Owner also argues that "selecting the Browser button is ***not*** a "second input ***within the search-filter view***" as required by claims 1 and 29." PO Resp. 40 (citing Ex. 2020 ¶ 103). "Rather," Patent Owner argues, "selecting the Browser button is an input within the World View, which Petitioner and Dr. Greenspun allege corresponds to the 'map view' in claims 25 and 32." PO Resp. 40–41 (Ex. 2020 ¶¶ 99–100, 103; Pet. 76–77; Ex. 1003 ¶ 150; Ex. 2006, 137:19–22). Patent Owner points out that "[c]licking the Places tab is 'within the search-filter view,' but the Browser View is not displayed 'responsive to' that input." PO Resp. 42 (citing Ex. 2020 ¶ 103).

In its Reply, Petitioner argues that even if

> going from the search-filter view . . . to the locations view requires two separate clicks as MemoryWeb alleges, the display

> of the locations view is nonetheless "responsive to" the selection of the "Places" tab in the search-filter view, particularly because . . . the '823 patent does not preclude intervening user actions in a "responsive to" relationship.

Pet. Reply 15–16 (citing Ex. 1027 ¶¶ 6–10, 15).

Petitioner also argues that Engst "discloses that selecting 'Places' can directly lead to either the map view or the locations view, depending on which of the two corresponding buttons (*i.e.*, the World View button or the Browser View button) was previously selected by the user." Pet. Reply 16 (citing Ex. 1006, 72; Ex. 1027 ¶ 16). Petitioner asserts that "Dr. Reinman acknowledged during deposition that transitioning directly from the search-filter view to the locations view (as opposed to the map view) would be 'plausible' in view of such disclosure." Pet. Reply 17 (citing Ex. 1029, 58:2–17).

In its Sur-reply, Patent Owner argues that a person of ordinary skill in the art "would consider displaying the alleged locations view (the third event) responsive to selecting the Browser button (the second event) – not selecting the Places tab (the first event)," pointing to Dr. Greenspun's testimony. PO Sur-reply 17–18 (citing Ex. 2025, 99:21–100:24). Patent Owner also argues that "Petitioner never relied on Engst for this claim limitation and cannot do so now." PO Sur-reply 19. Nonetheless, Patent Owner argues that "Engst instructs users to select the 'Places' tab to see the World View and to select the Browser button to see the alleged locations view . . . confirm[ing] that selecting the Browser button is necessary to display the alleged locations view." PO Sur-reply 20 (citing Ex. 1006, 76–77; Ex. 2025, 118:16–119:21).

Here, Patent Owner concedes that the recited "*second input*" identified by Petitioner in the prior art is "within the search-filter view." *See* Pet. 40

("selection of the "Places" tab in the source pane is the second input that causes the interface to display a locations view"); PO Resp. 42 ("[c]licking the Places tab is 'within the search-filter view'"). The dispute between the parties with respect to this limitation is whether the prior art teaches that the "*locations view*" identified by Petitioner is displayed "*responsive to*" the second input.

The parties do not agree on the meaning of the term "responsive to," as discussed in Section II.C.1, above. However, it is not necessary for us to construe this term in order to resolve whether the prior art meets this limitation because even if we adopt Patent Owner's more restrictive view of this term, one requiring a direct cause-effect relationship between the "*second input*" and the display of the "*locations view*," the prior art still meets the limitation.

In response to Patent Owner's argument that "Pogue does ***not*** disclose causing the display of the Browser View (alleged locations view) responsive to selecting the Places tab in the source pane to the left (alleged second input)" (PO Resp. 39), Dr. Greenspun testifies that "there is nothing in either Pogue or Engst to suggest that iPhoto always defaults to first showing the 'map view' after clicking the Places tab, such that the 'Browser button' must necessarily be clicked again," as Patent Owner contends. Ex. 1027 ¶ 16 (citing Ex. 2006, 128:12–131:6). Dr. Greenspun testifies that "Pogue mentions that the World View button (*i.e.*, 'globe icon') should be clicked to get to the map view, further suggesting that there will be instance[s] in which the system does not default to showing the map view (meaning that the locations view was shown first)." *Id.* ¶ 17 (citing Ex. 1005, Fig. 4-15).

Dr. Greenspun also points out that Engst supports this understanding that "selecting 'Places' can directly lead to ***either*** the map view or the locations view, depending on which of the two corresponding buttons (*i.e.*,

the World View button or the Browser View button) was previously selected by the user." *Id.* ¶¶ 16–17 (citing Ex. 1006, 72, 76). Dr. Reinman agrees that this behavior "is not foreclosed by this description in Engst" and "would be a plausible implementation of iPhoto." Ex. 2020 ¶ 112.

We credit Dr. Greenspun testimony, which provides a reasoned and supported explanation of the teachings of Pogue and Engst and how they would be understood by a person of ordinary skill in the art. The weight of the evidence shows that Patent Owner's argument that the prior art, in particular Pogue, "does ***not*** disclose causing the display of the Browser View (alleged locations view) responsive to selecting the Places tab in the source pane to the left (alleged second input)" (PO Resp. 39), is incorrect. Based on the evidence of record, a person of ordinary skill in the art would understand that iPhoto, as described by Pogue, and corroborated by Engst, does not default to showing the World view as Patent Owner contends, but that selecting the "Places" tab on the source pane can directly lead to either the "*Locations view*" (Browser view window shown in Pogue 4-16) or the "*Locations view (map)*" (World view window shown in Pogue 4-15) identified by Petitioner. *See* Pet. 16–17.

Based on the arguments and evidence of record, we determine that Petitioner has demonstrated that the asserted prior art meets limitations [1g]/[29i] ("*locations view*") of the '823 Patent.

*c) Independent Claims 1 and 29 - Uncontested Limitations*[4]

Patent Owner does not substantively contest Petitioner's evidence and arguments directed to the following portions of independent claims 1 and 29.

---

[4] Although we may use the general term "limitation" to identify the portions of independent claims 1 and 29, including the preambles, we make no determination as to whether the preambles of these claims are limiting.

*See* PO Resp. 37–57. We consider Petitioner's evidence and arguments with respect to these limitations below.

*(1) [1pre]/[29pre] ("preamble")*

The preamble of independent claim 1 recites: "*[a] method comprising*." Ex. 1001, 35:2. The preamble of independent claim 29 recites: "*[a] digital file storage system comprising*." *Id.* at 37:42.

For the preamble of claim 1, Petitioner directs us to Engst, which, according to Petitioner "describes a method of 'organizing and keeping track of all these photos' including 'software to help you import, organize, edit, and share your photos.'" Pet. 19 (citing Ex. 1006, 1; Ex. 1003 ¶ 85).

For the preamble of claim 29, Petitioner directs us to Pogue, which, according to Petitioner, "describes a digital file storage system, e.g., 'a Mac that has a G4, G5, or Intel chip, Mac OS X 10.5.6 or later, and 1 gigabyte of memory or more.'" Pet. 79 (citing Ex. 1005, 10; Ex. 1003 ¶ 154). "The Mac also includes a hard drive as part of iPhoto's digital file storage system." Pet. 79.

Petitioner's arguments and evidence directed to these preambles is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 85, 154.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about the preambles of claim 1 and 29. *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in the preambles of independent claims 1 and 29.

*(2) [29a] ("storage medium")*

Limitation [29a] recites "*a non-transitory computer-readable storage medium storing a plurality of digital files and instructions*." Ex. 1001, 37:43–44.

For this limitation, Petitioner first directs us to Pogue, which according to Petitioner, explains how one can "[u]se this command to add photos to your iPhoto Library from your hard disk, a CD, or some other disk." Pet. 80 (citing Ex. 1005, 338) (alteration in original). Petitioner then argues that "[a] Mac's 'hard disk' that 'stores images' or 'hard drive' where 'the photos are safe' is a non-transitory storage medium that stores a plurality of digital files." Pet. 80 (citing Ex. 1005, 16; Ex. 1006, 11; Ex. 1003 ¶ 155). Petitioner argues that "iPhoto describes that iPhoto runs on the Mac, thus the Mac's hard drive includes the instructions to run iPhoto." Pet. 80. "Moreover," Petitioner argues, "the Mac's memory as discussed at [29pre] includes instructions that run the iPhoto software, and the memory is a part of the non-transitory computer-readable storage medium." Pet. 80 (citing Ex. 1003 ¶ 155).

Petitioner's arguments and evidence directed to this limitation is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶ 155.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitation [29a] ("*storage medium*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [29a].

*(3) [29b] ("processors")*

Limitation [29b] recites "*one or more processors configured to execute the instructions to:*" Ex. 1001, 37:45–46.

For this limitation, Petitioner cites to both Pogue and Engst and points out that "iPhoto describes one or more processors, e.g., 'a G4, G5, or Intel chip,' configured to execute the instructions, e.g., 'to run iPhoto.'" Pet. 80 (citing Ex. 1005, 10; Ex. 1006, 2; Ex. 1003 ¶ 156).

Petitioner's arguments and evidence directed to this limitation is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶ 156.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitation [29b] ("*processors*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [29b].

*(4) [1a]/[29c] ("search-filter view")*

Limitation [1a] recites "*causing an interface to display a search-filter view, the search-filter view permitting a user to filter a plurality of digital files based on one or more criteria.*" Ex. 1001, 35:3–5. Limitation [29c] is similar. *See id.* at 37:47–49.

For this limitation, Petitioner explains that

> iPhoto describes causing an interface to display a search-filter view. For example, as shown below, iPhoto's interface permits a user to filter a plurality of digital files based on multiple criteria, e.g., 'Events,' 'Faces,' 'Places,' and 'Albums.'" [Ex.] 1005, 46, 59, 93, 97, 110; [Ex.] 1006, 30-31, 64; [Ex.] 1003 ¶ 86. Among the criteria, the 'Faces' tab in the source pane 'analyzes your photos and groups your collections based on the people who are in them.' [Ex.] 1005, 2; [Ex.] 1003 ¶ 86.

Pet. 20.

Petitioner provides an annotated version of Pogues' Figure 4-3, below.




Petitioner's annotated version of Pogues' Figure 4-3, above, is designated by Petitioner as "search-filter view", and depicts a computer software display window showing several photographs of people's faces with a vertical listing of "criteria" along the left-hand side of the window. Pet. 20 (citing Ex. 1005, Fig. 4-3).

Petitioner also explains that "[i]n addition to filtering by 'Faces,' iPhoto's search-filter view permits a user to filter based on location, event, and album." Pet. 21 (citing Ex. 1005, 46, 59, 110; Ex. 1003 ¶ 87). Petitioner explains that "[i]n addition to filtering, iPhoto describes a 'Search box below the window,' where a user can search 'the Event, album, folder, or whatever.'" Pet. 23 (citing Ex. 1006, 94–95; Ex. 1003 ¶ 88).

Petitioner argues that "[b]y providing filter functionality and search functionality as discussed above, iPhoto's interface is caused to provide a search-filter view." Pet. 24 (citing Ex. 1003 ¶ 89). "In addition," Petitioner points out that "iPhoto's search-filter view permits a user to filter a plurality of digital files based on one or more criteria (e.g., Events, Faces, Places, and Albums)." Pet. 24.

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 86–89, 157.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1a]/[29c] ("*search-filter view*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1a]/[29c].

*(5) [1b]/[29d] ("people view")*

Limitation [1b] recites "*responsive to a first input within the search-filter view, causing the interface to display a people view including a first image associated with a first person and a second image associated with a second person*." Ex. 1001, 35:6–9. Limitation [29d] is similar. *See id.* at 37:50–54.

For this limitation, Petitioner explains that "iPhoto describes a first input within the search-filter view, for example an input selecting the 'Faces' tab." Pet. 24 (citing Ex. 1005, 2, 89; Ex. 1006, 30). "Responsive to selection of the 'Faces' tab in the source pane," Petitioner explains, "iPhoto causes the interface to display a people view (referred to as the 'Faces corkboard')." Pet. 25 (citing Ex. 1006, 64; Ex. 1003 ¶ 90). "For example," Petitioner points out, "iPhoto allows a user to 'Click Faces in the source

pane to display the Faces corkboard, which shows a snapshot for each person you've named (Figure 4.2).'" Pet. 25.

Petitioner explains that

> iPhoto's people view includes a first image associated with a first person and a second image associated with a second person. For example, a thumbnail of Tonya can be the first image associated with a first person (Tonya), and a thumbnail of Truck can be the second image associated with a second person (Truck).

Pet. 25 (citing Ex. 1003 ¶ 91).

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 90–91, 158.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1b]/[29d] ("*people view*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1b]/[29d].

*(6) [1c]/[29e] ("first person view")*

Limitation [1c] recites "*responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including a first digital file associated with the first person*." Ex. 1001, 35:10–14. Limitation [29e] is similar. *See id.* at 38:55–59.

For this limitation, Petitioner explains that

> iPhoto describes an input that is indicative of a selection associated with the first person. For example, in iPhoto, a user can "double-click a person's snapshot to display all the photos that have been identified as containing that person." [Ex.] 1006, 64; [Ex.] 1003 ¶ 92. In this example, the "double-click" of the person's snapshot is the input that is indicative of a selection

> associated with the first person and, responsive to this input, iPhoto causes a first person view to be displayed on the interface, which includes "all the photos that have been identified as containing that person." *Id.*
>
> The first person view also includes a first digital file associated with the first person. For example, selecting Tonya's snapshot in the people view causes a first person view of all the photos associated with Tonya—*e.g.*, all photos in which Tonya appears—on the interface. [Ex.] 1006, 64; [Ex.] 1003 ¶ 93. Of course, the same concept holds true for all other people shown in the people view. *Id.* In this way, as illustrated below in FIGS. 4.2 and 4.3 below, iPhoto receives a selection of a first person from the people view and then displays a first person view that includes digital files associated with the first person. *Id.*

Pet. 26.

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 92–93, 159.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1c]/[29e] ("*first person view*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1c]/[29e].

*(7) [1e]/[29g] ("second person view")*

Limitation [1e] recites "*responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including a second digital file associated with the second person*." Ex. 1001, 35:26–30. Limitation [29g] is similar. *See id.* at 38:4–9.

For this limitation, Petitioner refers to its evidence and arguments for limitations [1b] and [1c]. Pet. 36. Petitioner also explains that

> iPhoto describes an input that is indicative of a selection associated with the second person, e.g., double-clicking a second person's snapshot in the people view. [Ex.] 1006, 64; [Ex.] 1003, ¶ 102. Any one of the person's snapshots in the people view is a second image associated with a second person that is different than the first person referenced in [1c]. *Id.* Furthermore, a [person of ordinary skill in the art] would have found it obvious that operations applied to a first image associated with a first person (as discussed at [1c]) are equally applicable to a second image associated with a second person, including causing a second person view to be displayed on the interface. *Id.*

Pet. 37–38.

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 101–103, 161.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1e]/[29g] ("*second person view*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1e]/[29g].

*(8) [1f]/[29h] ("second detail view")*

Limitation [1f] recites:

> *responsive to an input that is indicative of a selection associated with the second digital file, causing a second detail view to be displayed on the interface, the second detail view including (i) the second digital file, (ii) second information associated with the second digital file and (iii) a second map image associated with the second digital file.*

Ex. 1001, 35:31–38. Limitation [29h] is similar. *See id.* at 38:10–17.

For this limitation, Petitioner refers to its evidence and arguments from limitation [1d]. Pet. 40. Petitioner also asserts that "iPhoto describes

an input that is indicative of a selection associated with the second digital file; for example, any one of the digital files in the second person view is the second digital file." Pet. 40 (citing Ex. 1006, 64; Ex. 1003 ¶ 104). "Furthermore," Petitioner argues, a person of ordinary skill in the art "would have found it obvious that operations applied to a first digital file associated with a first person (as discussed at [1d]) are equally applicable to a second image associated with a second person, including causing a second detail view to be displayed on the interface." Pet. 40 (citing Ex. 1005, 88, 103, 122). Petitioner asserts that "[a]s discussed at [1d], the second detail view would include (i) the second digital file, (ii) second information associated with the second digital file, and (iii) a second map image associated with the second digital file." Pet. 40 (citing Ex. 1003 ¶ 104).

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 104, 162.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1f]/[29h] ("*second detail view*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1f]/[29h].

*(9) [1h]/[29j] ("first set digital files")*

Limitation [1h] recites "*responsive to an input that is indicative of a selection associated with the first location, causing a first set of digital files to be displayed on the interface, each digital file in the first set of digital files being associated with the first location*." Ex. 1001, 35:39–43. Limitation [29j] is similar. *See id.* at 38:19–23.

For this limitation, Petitioner explains that

> iPhoto describes an input that is indicative of a selection associated with the first location. For example, 'to see all the photos you've taken in the United States, for example, click United States in the left column.' [Ex.] 1005, 109. A user may click 'the state's name' to 'see all the photos taken in a particular state,' which represents a selection associated with the first location (e.g., 'Mississippi' as discussed at [1g]).

Pet. 42 (citing Ex. 1005, 109; Ex. 1003 ¶ 107).

Petitioner also explains that

> iPhoto describes causing a first set of digital files to be displayed on the interface: 'The photos from each set appear in the iPhoto window, so you can see them as you click through the columns.' [Ex.] 1005, 110. Each digital file in the first set of digital files is associated with the first location, e.g., 'all the photos taken in a particular state.'

Pet. 42 (citing Ex. 1005, 109; Ex. 1003 ¶ 108).

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 107–108, 163.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1h]/[29j] ("*first set digital files*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1h]/[29j].

*(10) [1i]/[29k] ("second set digital files")*

Limitation [1i] recites "*responsive to an input that is indicative of a selection associated with the second location, causing a second set of digital files to be displayed on the interface, each digital file in the second set of*

*digital files being associated with the second location*." Ex. 1001, 35:39–43. Limitation [29k] is similar. *See id.* at 38:19–23.

For this limitation, Petitioner refers to its arguments and evidence for limitation [1h]. Pet. 43. Petitioner also explains that

> iPhoto describes multiple locations because multiple locations are displayed in the columns in the locations view; any one of the locations (e.g., as annotated below) displayed in the column is a second location, as long as it is different from a first location (e.g., 'Mississippi'). [Ex.] 1005, 109–110; [Ex.] 1003 ¶ 109. A [person of ordinary skill in the art] would have found it obvious that, similar to how the first set of digital files is displayed on the interface, a second set of digital files associated with the second location is displayed on the interface. *Id.*

Pet. 43.

Petitioner's arguments and evidence directed to these limitations is supported by the testimony of Dr. Greenspun. *See* Ex. 1003 ¶¶ 109, 164.

Patent Owner does not present evidence or arguments specifically directed to Petitioner's assertions about limitations [1i]/[29k] ("*second set digital files*"). *See generally* PO Resp.

Based on the complete record, we are persuaded that Petitioner has demonstrated that the asserted prior art meets the subject matter recited in limitation [1i]/[29k].

*d) Conclusion on Independent Claims 1 and 29*

We have considered the evidence and arguments with respect to Petitioner's assertions that Pogue and Engst meet the limitations of independent claims 1 and 29, as well as the testimonial evidence of Drs. Greenspun and Reinman. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Pogue and Engst satisfy the subject matter recited by

independent claims 1 and 29 and that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

*e) Dependent Claims 2–25, 27–28, and 30–34*

Petitioner challenges dependent claims 2–25, 27–28, and 30–34 as obvious over Pogue and Engst. *See* Pet. 44–79, 82–83. Patent Owner only substantively disputes Petitioner's challenge to dependent claims 25 and 32, which we address below.

*(1) Dependent Claims 25 and 32*

Dependent claims 25 and 32 are similar, except that claim 25 is written as a method claim and claim 32 is written as a system claim. Claim 25 is exemplary. The claims read as follows:

> 25. *The method of claim 1, subsequent to causing the interface to display the search filter view, causing the interface to display a map view including (i) an interactive geographic map, (ii) a first indication on the interactive map that is associated with one or more digital files, and (iii) a second indication on the interactive map that is associated with one or more digital files.*

Ex. 1001, 37:22–28.

> 32. *The digital file storage system of claim 29, wherein, subsequent to the interface displaying the search filter view, the one or more processors are configured to execute the instructions to further cause the interface to display a map view including (i) an interactive geographic map, (ii) a first indication on the interactive map that is associated with one or more digital files, and (iii) a second indication on the interactive map that is associated with one or more digital files.*

*Id.* at 38:49–57.

With respect to claim 25, Petitioner asserts that "iPhoto describes displaying a map view, upon selection of "Places" in the source pane and "click[ing] the globe icon to see your photo locations in World view." Pet.

76 (citing Ex. 1005, 108; Ex. 1003 ¶ 150) (alteration in original). "The map view," Petitioner explains, "includes an interactive geographic map (below), and first and second indications ('red pins mark every place on the map where you've got geotagged photos')." Pet. 76. Petitioner asserts that "iPhoto's map is interactive, at least because the map can be 'zoom[ed] in or out by dragging the slider in the bottom-right corner of the iPhoto window.'" Pet. 76 (alteration in original). Petitioner asserts that "[t]he first and the second indications are associated with one or more digital files: 'little red pins representing all the pictures you've geotagged. To see the photos attached to a pin, point to that pin and click the > next to the place name.'" Pet. 76.

Petitioner's annotated version of Pogue's Figure 4-15 is shown below.




SAMSUNG-1005, FIG. 4-15

Figure 4-15, above, is a screen shot of an iPhoto Places World view window annotated by Petitioner as "Map view" in red across the top, which displays an interactive geographic map in the center with several colored pins placed at various geographic locations, two of which are identified as "First indication" and "Second indication" in red. In an icon tool bar running across the bottom, the "Globe icon" is identified in red. A source pane runs vertically along the left. Pet. 77.

In its Response, Patent Owner argues that

> the "locations view" and "map view" are separate and distinct views. *Supra*, §V.B. Accordingly, even if Dr. Greenspun's new opinion that the Pogue/Engst World View corresponds to the claimed "locations view" is accepted (which it should not be), then he has not identified separate and distinct "locations" and "map" views in Pogue/Engst. EX2020, ¶¶124-125; EX1003, ¶¶106, 150. In other words, the same World View from Pogue/Engst cannot be both the "locations view" and the "map view" in the claims.

PO Resp. 56–57 (citing Ex. 2020 ¶¶ 124–125; PO Resp. § VI.B.1.b.).

We disagree with Patent Owner. There is no prohibition against a single embodiment in the prior art satisfying more than one claim limitation. *See, e.g.*, *Google LLC v. Personal Audio, LLC*, 2017-1162; -1166; -2110; at 12 (Fed. Cir. Aug. 1, 2018) (non-precedential). In *Google*, the Federal Circuit explained that

> We find no error in the Board's legal analysis. The Board agreed with Google's argument that the "skip" and "go" commands can be rendered obvious by the same portions of prior art. The Board's holding is consistent with the principle that in infringement or obviousness analysis, a single element, feature, or mechanism can ordinarily satisfy multiple claim limitations, including by performing multiple claimed functions. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231–32 (Fed. Cir. 2011); *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir.

> 2009); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1305 (Fed. Cir. 1999) ("[A] particular means may perform more than one function."); *In re Kelley*, 305 F. 2d 909, 915-16 (CCPA 1962) (same).

*Id.* (alteration in original).

Petitioner identifies two versions of the claimed "*locations view*" in Pogue, one version showing the iPhoto Places Browser view window ("*locations view*" Fig. 4-16) and a second version showing the iPhoto Places World view window ("*Locations view (map)*" Fig. 4-15). *See* Pet. 16–17 (showing screen shots of Ex. 1005, Figs. 4-16, 4-15). With respect to these versions, Petitioner explains that

> as shown in FIG. 4-16 of Pogue, iPhoto '09 provides, within the search-filter view, *a locations view that displays digital image files* associated with a selected location. SAMSUNG-1005, 110; SAMSUNG-1003, ¶76. *The locations view can be displayed with an interactive map* with red pins marking "every place on the map where you've got geotagged photos," as shown in FIG. 4-15.

Pet. 16 (citing Ex. 1005, 108; Ex. 1003 ¶ 76) (emphasis added).

Petitioner's prior art evidence is not inconsistent with the '823 Patent. As we explain in Section II.C.2, above, the '823 Patent does not expressly identify a "*map view*" as that term is recited in claims 25 and 32, but it does identify several "*location views*" that display maps, in particular, Figures 5 and 41. *See* Ex. 1001, Figs 5, 41, 3:3–4, 4:3–4). Patent Owner appears to implicitly recognize the dual nature of these figures in the '823 Patent as it identifies both of these "*location view*" figures as "*map views*." *See* PO Resp. 11–12. Our review of the evidence in this case, and in particular the '823 Patent as a whole, leads us to conclude that a person of ordinary skill in the art would understand that the "*map view*" recited in dependent claims 25 and 32 is a "Location Application View" where selected digital files are

displayed on a geographical map indicating where the digital files were taken or originated.

Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the asserted prior art satisfies the subject matter recited by dependent claims 5 and 32, and that a person of ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

*(2) Dependent Claims 2–24, 27–28, 30–31, 33–34*

Petitioner challenges dependent claims 2–24, 27–28, 30–31, and 33–34 as obvious over Pogue and Engst. *See* Pet. 44–83. Dr. Greenspun provides testimony supporting Petitioner's challenges of these claims. *See* Ex. 1003 ¶¶ 110–172.

Patent Owner does not substantively address Petitioner's challenges to these dependent claims other than to argue that "[b]ecause Petitioner has failed to carry its burden under Ground 1A as to claims 1 and 29, Petitioner has also failed to do so in relation to dependent claims 2-25, 27-28, and 30-34 as they incorporate the same limitations." PO Resp. 56. Dr. Reinman also does not specifically address Petitioner's evidence or arguments directed to these dependent claims. *See* Ex. 2020 ¶¶ 97–125.

We have considered Petitioner's evidence and arguments with respect to these uncontested dependent claims, as well as the testimonial evidence of Dr. Greenspun, which stands unrebutted. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the asserted prior art satisfies the subject matter recited by dependent claims 2–24, 27–28, 30–31, and 33–34, and that a person of

ordinary skill in the art would have had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

*4. Obviousness Based on Pogue, Engst, and Belitz (Ground 1B)*

Petitioner contends that dependent claim 26 is unpatentable as obvious under 35 U.S.C. § 103 over Pogue, Engst, and Belitz. Pet. 83–89.

Claim 26 recites: "*The method of claim 25, wherein the first indication on the interactive geographic map is a third image and the second indication on the interactive geographic map is a fourth image*." Ex. 1001, 37:29–32.

Petitioner asserts that "iPhoto displays the first and the second indications by 'red pins' and does not expressly describe displaying the first and the second indications by images. Pet. 85 (citing Ex. 1005, 108; Ex. 1003 ¶ 174). "However," Petitioner asserts, "Belitz describes displaying thumbnail images (e.g., 'a graphical object 410') on the interactive geographic map (e.g., 'the map 409')." Pet. 85 (citing Ex. 1008 ¶¶ 51–52, Figs. 4a–4b). Petitioner argues that a person of ordinary skill in the art "would have found it obvious to combine iPhoto and Belitz to display third and fourth images on the interactive geographic map by a simple substitution." Pet. 85 (citing Ex. 1003 ¶ 174). Petitioner asserts that "[b]oth iPhoto and Belitz address the same problem (also purportedly solved by the '823 patent): 'managing and using digital files such as digital photographs.'" Pet. 85–86 (citing Ex. 1001, 1:17–20; Ex. 1005, 2, 4; Ex. 1006, 1, 8; Ex. 1008 ¶¶ 2–5). "Moreover," Petitioner continues, "iPhoto and Belitz describes analogous techniques—both describe use of an interactive map with user-selectable markers (location pins or thumbnail images) specifying the locations of photos and/or videos, and use of those markers to retrieve the digital photos and/or videos linked to those locations." Pet. 86 (citing

Ex. 1005, 108–109; Ex. 1006, 72–73; Ex. 1008 ¶¶ 39, 50–55, 62). "With this background," Petitioner argues, a person of ordinary skill in the art "would have readily turned to Belitz when reviewing iPhoto and would have found it obvious to incorporate features of Belitz in iPhoto." Pet. 86 (citing Ex. 1003 ¶ 174).

Petitioner points to Dr. Greenspun's testimony that a person of ordinary skill in the art would have combined iPhoto and Belitz in two, alternative ways. Pet. 86. "First," Petitioner asserts, a person of ordinary skill in the art "would have found it obvious to replace the location pins on iPhoto's map view (shown in FIG. 4-15) with the thumbnails used in Belitz's map view." Pet. 86 (citing Ex. 1003 ¶ 175). "Adopting the thumbnail images of Belitz in iPhoto's interactive geographic map," Petitioner argues, "would have resulted in an interactive map that includes a third image and a fourth image." Pet. 86. Petitioner argues that a person of ordinary skill in the art "would have been motivated to make this modification because Belitz teaches that 'it would be useful to be able to present a user with an overview of associated images to special locations which enables [the] user to clearly see the associations.'" Pet. 86 (citing Ex. 1008 ¶¶ 4, 15) (alteration in original). Petitioner also argues that a person of ordinary skill in the art "would have considered Belitz's thumbnail technique to be a known and predictable alternative to iPhoto's location pins, and that using thumbnails could appeal to certain users, thereby improving usability for such users." Pet. 86–87 (citing Ex. 1003 ¶ 175). "For example," Petitioner argues, a person of ordinary skill in the art "would have known, prior to the Critical Date, that certain users preferred interactive maps that used thumbnails to identify the locations of photos." Pet. 87 (citing Ex. 1019, 4).

Petitioner's annotated Figure 4-15 is shown below.




SAMSUNG-1005, FIG. 4-15

Petitioner's annotated Figure 4-15, above, is a screen shot of an iPhoto Places World view window annotated as "Map view" in red across the top, which displays an interactive geographic map in the center with several colored pins placed at various geographic locations, two of which are identified as "First indication" and "Second indication" in red. In an icon tool bar running across the bottom, the "Globe icon" is identified in red. A source pane runs vertically along the left.

"Second," Petitioner argues, "as an alternative way of viewing the combination of iPhoto and Belitz, a [person of ordinary skill in the art] would have found it obvious to use Belitz's interactive geographic map in place of iPhoto's interactive map." Pet. 88 (citing Ex. 1003 ¶ 176). Petitioner argues that a person of ordinary skill in the art "would have been

motivated to use Belitz's interactive map in place of iPhoto's interactive map to gain the benefits of Belitz's interactive map (e.g., improving user experience and content awareness by providing the user with a preview of the digital photographs and/or videos associated with the corresponding location, without having to click on a location pin as described by iPhoto) and would have found it obvious as a simple substitution of one known map for displaying digital image files (iPhoto's map) for another (Belitz's map)." Pet. 88.

"Both ways of combining iPhoto and Belitz." Petitioner argues, "would require only routine knowledge of software technologies (e.g., application programming interfaces and/or substituting one known graphical element or interface for another), which were well within the skill of a [person of ordinary skill in the art] prior to the Critical Date." Pet. 88 (citing Ex. 1003 ¶ 177). Petitioner argues that a person of ordinary skill in the art "would have viewed the implementation of (1) iPhoto's map view in a manner that applied Belitz's thumbnail images and (2) substituting iPhoto's map views with Belitz's map view as merely the predictable result of combining known prior art elements according to known methods." Pet. 88. "The resulting combination," Petitioner argues, "does not change the hallmark aspects of either of these references because the resulting combination provides a photo/video management system designed to enable a user to efficiently find photos/videos of interest, for example, based on location." Pet. 88–89. "Indeed," Petitioner argues, "the combination retains an interactive map with user-selectable markers specifying the locations of photos and/or videos, and use of those markers to retrieve the digital photos and/or videos linked to those locations." Pet. 89 (citing Ex. 1005, 108–109; Ex. 1006, 72–73; Ex. 1008 ¶¶ 39, 50–55, 62).

In its Response, Patent Owner argues that a person of ordinary skill in the art "would not modify Pogue/Engst with Belitz in [the] way" described by Petitioner, because "[r]eplacing the red pins with thumbnails clutters the interface and obscures much of the underlying map." PO Resp. 58–60 (citing Ex. 2020 ¶¶ 128–132). Patent Owner argues that "Belitz discourages a [person of ordinary skill in the art] from modifying the Pogue/Engst World View in a way that causes the thumbnails to 'overlap' and cause the view to 'become cluttered,' thereby making it 'difficult to discern between the various objects' so that 'the user is not provided with a good view of what location is associated with what.'" PO Resp. 61 (citing Ex. 1008 ¶¶ 2, 54; Ex. 2020 ¶ 133). Patent Owner argues that "Petitioner fails to meet its burden because it does not specifically identify anything desirable about its proposed combination and ignores the numerous drawbacks to the combination." PO Resp. 63.

Patent Owner also argues that a person of ordinary skill in the art would not use "Belitz's interactive geographic map in place of iPhoto's interactive map." PO Resp. 67 (citing Ex. 2020 ¶ 140). Patent Owner argues that a person of ordinary skill in the art "would not replace the Pogue/Engst world map with Belitz's Roskilde map," because "[i]f the world map were replaced with a map of a single town (Roskilde), there would be no way to position indications for images associated with another other location in the world." PO Resp. 69 (citing Ex. 2020 ¶ 149). Patent Owner also argues that "replacing the Pogue/Engst World View map with Belitz's map would remove numerous benefits afforded by the Pogue/Engst World View map." PO Resp. 69 (citing Ex. 2020 ¶ 141). Patent Owner argues that "replacing the Pogue/Engst World View with Belitz's map would worsen the user experience," for example by "remov[ing] the benefits

associated with the navigational methods available in iPhoto." PO Resp. 69–71 (citing Ex. 2020 ¶¶ 142–144).

In its Reply, Petitioner disagrees with Patent Owner, pointing out that Belitz "teach[es] that 'it would be useful to be able to present a user with an overview of associated images to special locations which enables [the] user to clearly see the associations,'" and "Belitz provides a way for iPhoto to provide both location and image preview information all at once for multiple locations on the map," thus "improv[ing] user experience and overall content awareness by providing the user with a preview of the digital files associated with multiple corresponding locations." Pet. Reply 22–23 (citing Ex. 1027 ¶ 21); Ex. 1003 ¶ 175 (citing Ex. 1008 ¶¶ 4, 15).

In its Sur-reply, Patent Owner asserts that Petitioner mischaracterizes Dr. Reinman's testimony and that Dr. Reinman's testimony in another proceeding is irrelevant. PO Sur-reply 25. Patent Owner also argues that Dr. Greenspun failed to weigh benefits and drawbacks in his obviousness analysis, such that Petitioner failed to meet its burden to show that a person of ordinary skill in the art would have combined the asserted prior art. PO Sur-reply 26.

We are persuaded that a person of ordinary skill in the art would have sufficient reason to combine the asserted art in the manner proposed by Petitioner. Petitioner explains that a person of ordinary skill in the art would have found it beneficial to replace the location pins on iPhoto's map view with the thumbnails used in Belitz's map view as they would have been motivated to make this modification because Belitz teaches that it would be useful to be able to present a user with an overview of associated images to special locations that enables the user to clearly see the associations. Pet. 86 (citing Ex. 1008 ¶¶ 4, 15; Ex. 1003 ¶ 175).

Petitioner also describes an alternative combination of iPhoto and Belitz, whereby a person of ordinary skill in the art would have found it beneficial to use Belitz's interactive geographic map in place of iPhoto's interactive map in order to gain the benefits of Belitz's interactive map by providing the user with a preview of the digital photographs and/or videos associated with the corresponding location, without having to click on a location pin as described by iPhoto. Pet. 88 (citing Ex. 1003 ¶ 176).

Petitioner explains that both ways of combining iPhoto and Belitz would require only routine knowledge of software technologies (e.g., application programming interfaces and/or substituting one known graphical element or interface for another), which were well within the skill of a person of ordinary skill in the art providing predictable results by combining known prior art elements according to known methods. Pet. 88 (citing Ex. 1003 ¶ 177). Petitioner points out that the combination retains an interactive map with user-selectable markers specifying the locations of photos and/or videos, and use of those markers to retrieve the digital photos and/or videos linked to those locations. Pet. 89 (citing Ex. 1005, 108–109; Ex. 1006, 72–73; Ex. 1008 ¶¶ 39, 50–55, 62).

Patent Owner criticizes Petitioner's combination, arguing that the resulting combination would "become cluttered," thereby making it "difficult to discern between the various objects" so that "the user is not provided with a good view of what location is associated with what." PO Resp. 61 (citing Ex. 1008 ¶¶ 2, 54; Ex. 2020 ¶ 133). Patent Owner also argues that that "replacing the Pogue/Engst World View with Belitz's map would worsen the user experience," by "remov[ing] the benefits associated with the navigational methods available in iPhoto." PO Resp. 69–71 (citing Ex. 2020 ¶¶ 142–144).

We disagree with Patent Owner. As Dr. Greenspun points out, "displaying images instead of pins in iPhoto would have improved usability and convenience for many users of iPhoto. For instance, while the pins in iPhoto simply convey location information, thumbnail images as in Belitz convey both location and image preview information all at once for multiple locations on the map." Ex. 1027 ¶ 21. Dr. Greenspun explains that "[t]his would help improve user experience and overall content awareness by additionally providing the user with a preview of the digital files associated with multiple locations." *Id.*

Dr. Greenspun further explains that a person of ordinary skill in the art "would have recognized that the benefits of viewing location-specific thumbnail images may be achieved in one instance, while the benefits of viewing location-specific cluster maps may be achieved in another. A [person of ordinary skill in the art] would have found each of these options as obvious designs to pursue in view of the disclosures of Pogue, Engst, and Belitz." *Id.* ¶ 23. We agree with Petitioner that the proposed combination retains an interactive map with user-selectable markers specifying the locations of photos and/or videos, and use of those markers to retrieve the digital photos and/or videos linked to those locations. *See* Pet. 89 (citing Ex. 1005, 108–109; Ex. 1006, 72–73; Ex. 1008 ¶¶ 39, 50–55, 62).

We have considered the evidence and arguments with respect to Petitioner's assertions that the asserted art meets the limitations of dependent claim 26, as well as the testimonial evidence of Drs. Greenspun and Reinman. Based on the complete record, we are persuaded that Petitioner has demonstrated by a preponderance of the evidence that the combined teachings of Pogue, Engst, and Belitz satisfies the subject matter of dependent claim 26 and that a person of ordinary skill in the art would have

had sufficient reason to combine the teachings of the asserted art in the manner described in the Petition.

*5. Obviousness Based on Pogue, Engst, and Ripps (Ground 1C)*

Petitioner contends that claims 12–14 are unpatentable as obvious under 35 U.S.C. § 103 over Pogue, Engst, and Ripps. Pet. 89–94. Because we have determined that these claims are unpatentable based on other grounds, we do not reach Petitioner's arguments based on this ground.

*F. Motion to Exclude*

Patent Owner filed a Motion to Exclude Exhibits 1003, 1010, 1028, and 1030–1033. Paper 31. Petitioner opposes the motion. Paper 32. For the reasons explained below, we deny Patent Owner's motion.

Patent Owner first moves to exclude Exhibits 1030–1033, which Patent Owner identifies as the deposition transcripts of Dr. Reinman and Dr. Greenspun from other proceedings. Paper 31, 2–6. Patent Owner objects to these exhibits as inadmissible hearsay. *Id.*

Petitioner opposes Patent Owner's motion, arguing that prior testimony of Dr. Reinman and Dr. Greenspun is admissible and should not be excluded. Paper 32, 1–4.

We do not rely on Exhibits 1030–1033 in making our final determination in this case. Accordingly, Patent Owner's motion to exclude Exhibits 1030–1033 is denied as moot.

Patent Owner next moves to exclude Exhibit 1003, the declaration of Dr. Greenspun, in its entirety, arguing that portions of Dr. Greenspun's declaration were copied from a third-party's position in a separate proceeding. Paper 31, 6–11. Petitioner opposes Patent Owner's motion, arguing that Patent Owner mischaracterizes Dr. Greenspun's declaration and

provides alternative explanations for Patent Owner's observations. Paper 32, 4–7.

Patent Owner's objections to Dr. Greenspun's testimony go more to credibility and weight than to admissibility. We are in an adequate position to assess the credibility of Dr. Greenspun's testimony and to assign the appropriate weight to it. Accordingly, Patent Owner's motion to exclude Exhibit 1003 is denied.

Finally, Patent Owner moves to exclude Exhibits 1010 and 1028, the declarations of Ms. Munford. Patent Owner objects to these declarations, arguing that they are unreliable and fail to comply with Board's rules. Paper 31, 11–15. Petitioner opposes Patent Owner's motion, arguing that Ms. Munford's testimony is admissible. Paper 32, 7–9. As we pointed out with respect to Dr. Greenspun's testimony, Patent Owner's objections go more to credibility than to admissibility, and we are in an adequate position to assess the credibility of Ms. Munford's testimony and to assign the appropriate weight to it. We are also not persuaded that the declarations are noncompliant with our rules. Accordingly, Patent Owner's motion to exclude Exhibits 1010 and 1028 is denied.

## III. CONCLUSION

For the foregoing reasons, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1–34 of U.S. Patent No. 11,163,823 B2 are unpatentable on the bases set forth in the following table.

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–25, 27–34 | 103 | Pogue, Engst | 1–25, 27–34 | |
| 26 | 103 | Pogue, Engst | 26 | |
| 12–14 | 103 | Pogue, Engst, Ripps[5] | | |
| **Overall Outcome** | | | 1–34 | |

[5] Because each of these challenged claims is held unpatentable on other grounds, we do not reach this ground in the Petition.

## IV. ORDER[6]

In consideration of the foregoing, it is hereby

ORDERED that Petitioner has demonstrated by a preponderance of the evidence that claims 1–34 of U.S. Patent No. 11,163,823 B2 are unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is denied; and

FURTHER ORDERED that because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[6] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Final Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FOR PETITIONER:

Walter Renner
Jeremy Monaldo
Hyun Jin In
axf-ptab@fr.com
jjm@fr.com
in@fr.com

FOR PATENT OWNER:

Jennifer Hayes
George Dandalides
Matthew Werber
jenhayes@nixonpeabody.com
gdandalides@nixonpeabody.com
mwerber@nixonpeabody.com

US011163823B2

(12) **United States Patent**
**Desmond et al.**

(10) **Patent No.: US 11,163,823 B2**
(45) **Date of Patent: *Nov. 2, 2021**

(54) **METHOD AND APPARATUS FOR MANAGING DIGITAL FILES**

(71) Applicant: **Memoryweb, LLC**, Glen Ellyn, IL (US)

(72) Inventors: **Christopher J. Desmond**, Glen Ellyn, IL (US); **Nancy L. Desmond**, Glen Ellyn, IL (US); **L. Michael Taylor**, Chicago, IL (US)

(73) Assignee: **Memoryweb, LLC**, Glen Ellyn, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 226 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/536,300**

(22) Filed: **Aug. 8, 2019**

(65) **Prior Publication Data**

US 2019/0370285 A1 Dec. 5, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/375,927, filed on Dec. 12, 2016, now Pat. No. 10,423,658, which is a
(Continued)

(51) **Int. Cl.**
***G06F 16/58*** (2019.01)
***G06F 16/51*** (2019.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G06F 16/5866*** (2019.01); ***G06F 16/51*** (2019.01); ***G06F 16/901*** (2019.01); ***G06F 16/907*** (2019.01); *G06F 3/0481* (2013.01)

(58) **Field of Classification Search**
CPC ... G06F 16/5866; G06F 16/907; G06F 16/901
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,450,504 A 9/1995 Calia
5,694,514 A 12/1997 Evans
(Continued)

FOREIGN PATENT DOCUMENTS

CN 102591922 B 10/2015
EP 2466869 A3 2/2017
(Continued)

OTHER PUBLICATIONS

Marco et al., "Location privacy and public metadata in social media platforms: attitudes, behaviors and opinions", Springer Science + Business Media New York 2014, 31 pages.*
(Continued)

*Primary Examiner* — Loc Tran
(74) *Attorney, Agent, or Firm* — Nixon Peabody LLP

(57) **ABSTRACT**

A computer-implemented method of associating digital tags with digital files comprises storing a plurality of digital files having embedded therein content data and metadata including tags; receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and displaying, on a video display device associated with the client device, a first indication of the first tag label.

**34 Claims, 50 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 14/193,426, filed on Feb. 28, 2014, now Pat. No. 9,552,376, which is a continuation-in-part of application No. 13/157,214, filed on Jun. 9, 2011, now Pat. No. 9,098,531.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 16/901*** | (2019.01) |
| ***G06F 16/907*** | (2019.01) |
| *G06F 3/0481* | (2013.01) |

(56) **References Cited**

U.S. PATENT DOCUMENTS


5,835,616 A 11/1998 Lobo
5,850,470 A 12/1998 Kung
5,982,912 A 11/1999 Fukui
6,002,401 A 12/1999 Baker
6,134,339 A 10/2000 Luo
6,246,779 B1 6/2001 Fukui
6,301,370 B1 10/2001 Steffens
6,629,104 B1 9/2003 Parulski
6,697,502 B2 2/2004 Luo
6,714,215 B1 3/2004 Flora
6,728,401 B1 4/2004 Hardeberg
6,940,545 B1 9/2005 Ray
6,965,693 B1 11/2005 Kondo
7,003,135 B2 2/2006 Hsieh
7,190,829 B2 3/2007 Zhang
7,372,976 B2 5/2008 Rhoad
7,461,099 B1 12/2008 Sharpe
7,474,317 B2 1/2009 Dolph
7,475,060 B2 1/2009 Toyama
7,480,669 B2 1/2009 Lo
7,522,701 B2 4/2009 Jensen
7,587,671 B2 9/2009 Saft et al.
7,634,662 B2 12/2009 Monroe
7,646,895 B2 1/2010 Haupt
7,694,236 B2 4/2010 Gusmorino
7,702,185 B2 4/2010 Keating
7,804,982 B2 9/2010 Howard
7,822,746 B2 10/2010 Svendsen
7,840,344 B2 11/2010 Sloo
7,840,892 B2 11/2010 Pyhalammi
7,860,846 B2 12/2010 Takahashi
7,916,905 B2 3/2011 Yen
7,929,771 B2 4/2011 Ko
7,948,502 B2 5/2011 Stanton
7,962,467 B2 6/2011 Howard
7,965,908 B2 6/2011 Hayashi
7,970,240 B1 6/2011 Chao
7,991,283 B2 8/2011 Chen
8,001,124 B2 8/2011 Svendsen
8,015,144 B2 9/2011 Zheng
8,024,317 B2 9/2011 Nair
8,032,508 B2 10/2011 Martinez
8,055,675 B2 11/2011 Higgins
8,060,492 B2 11/2011 Nair
8,069,142 B2 11/2011 Davis
8,073,461 B2 12/2011 Altman
8,086,048 B2 12/2011 Naaman
8,086,867 B2 12/2011 Freeman
8,108,778 B2 1/2012 Athsani
8,121,408 B2 2/2012 Omori
8,144,232 B2 3/2012 Larson
8,150,844 B2 4/2012 Redstone
8,150,967 B2 4/2012 King
8,165,352 B1 4/2012 Mohanty
8,166,016 B2 4/2012 Higgins
8,166,168 B2 4/2012 Hayashi
8,171,388 B2 5/2012 Zaltzman
8,175,340 B2 5/2012 Tsuitsui
8,230,338 B2 7/2012 Dugan
8,239,784 B2 8/2012 Hotelling
8,255,379 B2 8/2012 Govindachetty
8,264,570 B2 9/2012 Karimoto
8,271,506 B2 9/2012 Martinez
8,281,027 B2 10/2012 Martinez
8,285,483 B2 10/2012 Amer-Yahia
8,307,029 B2 11/2012 Davis
8,315,959 B2 11/2012 Zheng
8,326,000 B2 12/2012 Jung
8,332,402 B2 12/2012 Forstall
8,358,811 B2 1/2013 Adams
8,359,314 B2 1/2013 Svendsen
8,364,611 B2 1/2013 Tendjoukian
8,380,039 B2 2/2013 Luo
8,386,506 B2 2/2013 Martinez
8,390,702 B2 3/2013 Bhatt
8,401,771 B2 3/2013 Krumm
8,402,356 B2 3/2013 Martinez
8,416,312 B2 4/2013 Matsunaga
8,429,156 B2 4/2013 Buchmueller
8,447,120 B2 5/2013 Ji
8,458,115 B2 6/2013 Cai
8,463,931 B2 6/2013 Evans
8,484,223 B2 7/2013 Ota
8,489,115 B2 7/2013 Rodriguez
8,490,011 B2 7/2013 Stapleton
8,493,495 B2 7/2013 D'Souza
8,503,791 B2 8/2013 Conwell
8,504,073 B2 8/2013 Svendsen
8,520,979 B2 8/2013 Conwell
D689,079 S 9/2013 Edwards
D689,080 S 9/2013 Edwards
D689,083 S 9/2013 Pasceri
D689,084 S 9/2013 Pasceri
D689,085 S 9/2013 Pasceri
8,538,811 B2 9/2013 Higgins
8,538,813 B2 9/2013 Kakarla
8,542,294 B2 9/2013 Bhatt
8,554,623 B2 10/2013 Higgins
8,560,390 B2 10/2013 Higgins
8,560,517 B2 10/2013 Yang
8,583,620 B2 11/2013 Govindachetty
8,583,668 B2 11/2013 Higgins
8,584,015 B2 11/2013 Osten
8,589,389 B2 11/2013 Bisdikian
8,589,486 B2 11/2013 Martinez
8,594,702 B2 11/2013 Naaman
8,606,021 B2 12/2013 Conwell
8,626,699 B2 1/2014 Xie
8,649,604 B2 2/2014 Steinberg
8,660,358 B1 2/2014 Bergboer
8,671,154 B2 3/2014 Davis
8,676,001 B2 3/2014 Brucher
8,698,762 B2 4/2014 Wagner
8,706,406 B2 4/2014 Kalaboukis
8,712,192 B2 4/2014 Thota
8,743,411 B2 6/2014 Bachman
8,745,133 B2 6/2014 Martinez
8,750,574 B2 6/2014 Ganong
8,762,285 B2 6/2014 Davis
D708,196 S 7/2014 Pasceri
D708,197 S 7/2014 Pasceri
D708,198 S 7/2014 Pasceri
8,769,099 B2 7/2014 Kalaboukis
8,769,393 B1 7/2014 Abhyanker
8,799,371 B2 8/2014 Davis
8,805,165 B2 8/2014 Luo
8,806,365 B2 8/2014 Stapleton
8,810,597 B2 8/2014 Akiya
8,811,775 B1 8/2014 Chao
8,813,107 B2 8/2014 Higgins
8,825,472 B2 9/2014 Raghuveer
8,831,352 B2 9/2014 Gao
8,845,855 B2 9/2014 Hubacek et al.
8,849,854 B2 9/2014 Kakarla
8,849,909 B2 9/2014 Farmer
D715,819 S 10/2014 Pasceri
8,880,535 B1 11/2014 Agarwal
8,880,568 B2 11/2014 Perczynski
8,890,888 B2 11/2014 Yu-Cheng
8,892,495 B2 11/2014 Hoffberg
8,914,342 B2 12/2014 Kalaboukis

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 8,923,889 | B2 | 12/2014 | Svendsen |
| 8,930,848 | B2 | 1/2015 | Lim |
| 8,949,212 | B1 | 2/2015 | Dhandapani |
| 8,954,425 | B2 | 2/2015 | Xiao |
| 8,966,121 | B2 | 2/2015 | Josefsberg |
| 8,972,177 | B2 | 3/2015 | Zheng |
| 8,998,422 | B1 | 4/2015 | Snavely |
| 9,009,177 | B2 | 4/2015 | Zheng |
| 9,014,511 | B2 | 4/2015 | Brucher |
| 9,015,617 | B2 | 4/2015 | Stapleton |
| 9,015,633 | B2 | 4/2015 | Takamura |
| 9,020,247 | B2 | 4/2015 | Adam |
| 9,031,953 | B2 | 5/2015 | Rathnavelu |
| 9,032,320 | B2 | 5/2015 | Crawford |
| 9,047,847 | B2 | 6/2015 | Hochmuth |
| 9,055,037 | B2 | 6/2015 | Evans |
| 9,063,226 | B2 | 6/2015 | Zheng |
| 9,076,259 | B2 | 7/2015 | Hourie |
| 9,092,409 | B2 | 7/2015 | Charaniya |
| 9,098,545 | B2 | 8/2015 | Abhyanker |
| 9,104,729 | B2 | 8/2015 | Dong |
| 9,104,915 | B2 | 8/2015 | Conwell |
| 9,110,903 | B2 | 8/2015 | Martinez |
| 9,135,751 | B2 | 9/2015 | Moore |
| 9,151,618 | B2 | 10/2015 | Amer-Yahia |
| 9,152,849 | B2 | 10/2015 | Ganong |
| 9,158,794 | B2 | 10/2015 | Higgins |
| 9,160,802 | B2 | 10/2015 | Svendsen |
| 9,172,666 | B2 | 10/2015 | Murdock |
| D742,405 | S | 11/2015 | Choi |
| 9,202,200 | B2 | 12/2015 | Stibel |
| 9,218,328 | B2 | 12/2015 | Stapleton |
| 9,224,172 | B2 | 12/2015 | Churchill |
| 9,235,766 | B2 | 1/2016 | Yi |
| 9,239,848 | B2 | 1/2016 | Liu |
| 9,245,041 | B2 | 1/2016 | Pilskalns |
| 9,261,376 | B2 | 2/2016 | Zheng |
| D751,597 | S | 3/2016 | Pasceri |
| 9,311,396 | B2 | 4/2016 | Meadow |
| 9,323,855 | B2 | 4/2016 | Hochmuth |
| 9,336,240 | B2 | 5/2016 | Bhatt |
| 9,372,931 | B2 | 6/2016 | Capt |
| 9,390,104 | B2 | 7/2016 | Thomee |
| 9,405,981 | B2 | 8/2016 | Li |
| 9,418,485 | B2 | 8/2016 | Lindberg |
| 9,424,595 | B2 | 8/2016 | Svendsen |
| 9,436,374 | B2 | 9/2016 | Marr |
| 9,460,116 | B2 | 10/2016 | Pilskalns |
| 9,462,054 | B2 | 10/2016 | Poletto |
| 9,465,513 | B2 | 10/2016 | sims |
| 9,471,200 | B2 | 10/2016 | Dellinger |
| 9,471,834 | B1 | 10/2016 | Filip |
| 9,483,500 | B2 | 11/2016 | Brucher |
| 9,495,583 | B2 | 11/2016 | Gilley |
| 9,501,577 | B2 | 11/2016 | Zheng |
| 9,507,778 | B2 | 11/2016 | Jaffe |
| 9,419,682 | B2 | 12/2016 | Pujara |
| 9,535,563 | B2 | 1/2017 | Hoffberg |
| 9,536,146 | B2 | 1/2017 | Zheng |
| 9,552,376 | B2 | 1/2017 | Desmond |
| 9,557,162 | B2 | 1/2017 | Rodriguez |
| 9,576,253 | B2 | 2/2017 | Zaltzman |
| 9,582,546 | B2 | 2/2017 | Hartford |
| 9,593,957 | B2 | 3/2017 | Zheng |
| 9,600,484 | B2 | 3/2017 | Davis |
| 9,606,668 | B2 | 3/2017 | Hotelling |
| 9,626,685 | B2 | 4/2017 | Martinez |
| 9,639,740 | B2 | 5/2017 | Ganong |
| 9,646,025 | B2 | 5/2017 | Boyns |
| 9,654,570 | B2 | 5/2017 | Bisdikian |
| 9,674,650 | B2 | 6/2017 | Hartford |
| 9,677,886 | B2 | 6/2017 | Didjusto |
| 9,679,456 | B2 | 6/2017 | East |
| 9,680,929 | B2 | 6/2017 | Tseng |
| 9,683,858 | B2 | 6/2017 | Zheng |

| | | | |
|---|---|---|---|
| 9,691,073 | B2 | 6/2017 | Tseng |
| 9,703,873 | B2 | 7/2017 | Fakeih |
| 9,706,345 | B2 | 7/2017 | Davis |
| 9,710,961 | B2 | 7/2017 | Setlur |
| 9,715,366 | B2 | 7/2017 | Bostick |
| 9,721,188 | B2 | 8/2017 | Adam |
| 9,754,226 | B2 | 9/2017 | Zheng |
| 9,772,745 | B2 | 9/2017 | Hasenei |
| 9,787,799 | B2 | 10/2017 | Grue |
| 9,805,123 | B2 | 10/2017 | Nair |
| 9,811,879 | B2 | 11/2017 | Miller |
| 9,836,183 | B1 | 12/2017 | Love |
| 9,857,941 | B2 | 1/2018 | Wagner |
| 9,858,348 | B1 | 1/2018 | Higgins |
| 9,870,572 | B2 | 1/2018 | Chapin |
| 9,881,179 | B2 | 1/2018 | Patton |
| 9,882,994 | B2 | 1/2018 | Bisdikian |
| 9,916,075 | B2 | 3/2018 | Chen |
| 9,942,121 | B2 | 4/2018 | Poletto |
| 10,001,917 | B2 | 6/2018 | Kim |
| 10,019,850 | B2 | 7/2018 | Lindberg |
| 10,037,327 | B2 | 7/2018 | Thomee |
| 10,068,178 | B2 | 9/2018 | van Zwol |
| 10,073,584 | B2 | 9/2018 | Miura |
| 10,074,093 | B2 | 9/2018 | Higgins |
| 10,083,533 | B2 | 9/2018 | Bhatt |
| 10,110,541 | B2 | 10/2018 | Li |
| 10,120,947 | B2 | 11/2018 | Kritt |
| 10,139,989 | B2 | 11/2018 | Shiroor |
| 10,140,743 | B2 | 11/2018 | Hochmuth |
| 10,145,704 | B2 | 12/2018 | Lanza |
| 10,147,215 | B2 | 12/2018 | Lanza |
| 10,187,543 | B2 | 1/2019 | Lahcanski |
| 10,223,701 | B2 | 3/2019 | King |
| 10,230,803 | B2 | 3/2019 | Higgins |
| 10,235,444 | B2 | 3/2019 | Poletto |
| 10,242,051 | B2 | 3/2019 | Shinn |
| 10,282,752 | B2 | 5/2019 | Athsani |
| 10,288,433 | B2 | 5/2019 | Zheng |
| 10,289,643 | B2 | 5/2019 | Brucher |
| 10,303,975 | B2 | 5/2019 | Adam |
| 10,311,611 | B2 | 6/2019 | Stoop |
| 10,318,110 | B2 | 6/2019 | Naaman |
| 10,324,973 | B2 | 6/2019 | Circlaeys |
| 10,331,863 | B2 | 6/2019 | Patton |
| 10,360,352 | B2 | 7/2019 | Patton |
| 10,430,452 | B2 | 10/2019 | Ross |
| 10,445,346 | B2 | 10/2019 | Govindachetty |
| 10,489,980 | B1 | 11/2019 | Canavor |
| 10,540,668 | B2 | 1/2020 | Hoertz |
| 10,606,449 | B2 | 3/2020 | Canavor |
| 10,628,463 | B2 | 4/2020 | Purumala |
| 10,643,263 | B2 | 5/2020 | Wormhoudt |
| 10,650,039 | B2 | 5/2020 | Mariner |
| 10,650,475 | B2 | 5/2020 | Berg |
| 2001/0030667 | A1 | 10/2001 | Kelts |
| 2001/0043727 | A1 | 11/2001 | Cooper |
| 2002/0019224 | A1 | 2/2002 | Meyers |
| 2002/0075322 | A1 | 6/2002 | Rosenzweig |
| 2002/0097894 | A1 | 7/2002 | Staas |
| 2002/0112237 | A1 | 8/2002 | Kelts |
| 2002/0191818 | A1 | 12/2002 | Matsuo |
| 2003/0033296 | A1 | 2/2003 | Rothmuller |
| 2003/0039380 | A1 | 2/2003 | Sukegawa |
| 2003/0053663 | A1 | 3/2003 | Chen |
| 2003/0063669 | A1 | 4/2003 | Lee |
| 2003/0103652 | A1 | 6/2003 | Lee |
| 2003/0122787 | A1 | 7/2003 | Zimmerman |
| 2003/0133599 | A1 | 7/2003 | Tian |
| 2003/0179911 | A1 | 9/2003 | Ho |
| 2003/0198368 | A1 | 10/2003 | Kee |
| 2003/0210808 | A1 | 11/2003 | Chen |
| 2004/0081338 | A1 | 4/2004 | Takenaka |
| 2004/0109584 | A1 | 6/2004 | Lestideau |
| 2004/0125991 | A1 | 7/2004 | Yokoi |
| 2004/0135797 | A1 | 7/2004 | Meier |
| 2004/0190758 | A1 | 9/2004 | Doi |
| 2004/0205504 | A1 | 10/2004 | Phillips |
| 2004/0218894 | A1 | 11/2004 | Harville |

(56) **References Cited**

U.S. PATENT DOCUMENTS


2004/0225635 A1 11/2004 Toyama
2004/0264780 A1 12/2004 Zhang
2004/0264810 A1 12/2004 Taugher
2005/0031173 A1 2/2005 Hwang
2005/0060299 A1 3/2005 Filley
2005/0094849 A1 5/2005 Sung
2005/0100195 A1 5/2005 Li
2005/0105806 A1 5/2005 Nagaoka
2005/0117802 A1 6/2005 Yonaha
2005/0141766 A1 6/2005 Nagahashi
2005/0180627 A1 8/2005 Yang
2005/0183026 A1 8/2005 Amano
2005/0220347 A1 10/2005 Enomoto
2005/0251015 A1 11/2005 Takikawa
2005/0265603 A1 12/2005 Porter
2006/0001652 A1 1/2006 Chiu
2006/0021027 A1 1/2006 Saito
2006/0029265 A1 2/2006 Kim
2006/0050933 A1 3/2006 Adam
2006/0078201 A1 4/2006 Kim
2006/0133672 A1 6/2006 Li
2006/0165380 A1* 7/2006 Tanaka .................. H04N 5/772 386/227
2006/0204034 A1 9/2006 Steinberg
2006/0222215 A1 10/2006 Jung
2006/0222217 A1 10/2006 Kitamura
2006/0224738 A1 10/2006 McIntyre
2007/0110305 A1 5/2007 Corcoran
2007/0118508 A1 5/2007 Svendsen
2007/0152984 A1 7/2007 Ording
2007/0206834 A1 9/2007 Shinkai
2007/0211925 A1 9/2007 Aoki
2007/0239764 A1 10/2007 Song
2007/0271297 A1 11/2007 Jaffe
2007/0282908 A1 12/2007 Van Der Meulen
2008/0040034 A1 2/2008 Kanno
2008/0051994 A1 2/2008 Fisher
2008/0052945 A1 3/2008 Matas
2008/0056580 A1 3/2008 Okada
2008/0080743 A1 4/2008 Schneiderman
2008/0122944 A1 5/2008 Zhang
2008/0148175 A1 6/2008 Naaman
2008/0168349 A1 7/2008 Lamiraux
2008/0168402 A1 7/2008 Blumenberg
2008/0201302 A1 8/2008 Kimchi
2008/0212849 A1 9/2008 Gao
2008/0212879 A1 9/2008 Torii
2008/0220750 A1 9/2008 Steinberg
2008/0232695 A1 9/2008 Noda
2008/0250398 A1 10/2008 Takahashi
2008/0298766 A1 12/2008 Wen
2008/0309632 A1 12/2008 Westerman
2008/0317379 A1 12/2008 Steinberg
2009/0013041 A1 1/2009 Farmer
2009/0019085 A1 1/2009 Abhyanker
2009/0049408 A1 2/2009 Naaman
2009/0106705 A1 4/2009 Takamura
2009/0113350 A1* 4/2009 Hibino .................... G06F 16/41 715/853
2009/0132689 A1 5/2009 Zaltzman
2009/0132941 A1 5/2009 Pilskalns
2009/0135438 A1 5/2009 Chopra
2009/0185784 A1 7/2009 Hiroike
2009/0216704 A1 8/2009 Zheng
2009/0222302 A1 9/2009 Higgins
2009/0254867 A1 10/2009 Farouki
2009/0265631 A1 10/2009 Sigurbjornsson
2009/0278806 A1 11/2009 Duarte
2009/0279794 A1 11/2009 Brucher
2009/0288005 A1 11/2009 Stapleton
2009/0290812 A1 11/2009 Naaman
2009/0307618 A1 12/2009 Lawler
2009/0324018 A1 12/2009 Tell
2009/0325602 A1 12/2009 Higgins
2010/0030578 A1 2/2010 Siddique
2010/0041419 A1 2/2010 Svendsen
2010/0046842 A1 2/2010 Conwell
2010/0053371 A1 3/2010 Karimoto
2010/0061631 A1 3/2010 Omori
2010/0064239 A1 3/2010 Crawford
2010/0082427 A1 4/2010 Burgener
2010/0083173 A1 4/2010 Germann
2010/0088641 A1 4/2010 Choi
2010/0107125 A1 4/2010 Ockene
2010/0153348 A1 6/2010 Perczynski
2010/0162411 A1 6/2010 Chang
2010/0171763 A1 7/2010 Bhatt
2010/0172550 A1 7/2010 Gilley
2010/0182341 A1 7/2010 Lee
2010/0185509 A1 7/2010 Higgins
2010/0231537 A1 9/2010 Pisula
2010/0241689 A1 9/2010 Davis
2010/0241944 A1 9/2010 Athsani
2010/0245614 A1 9/2010 Matsunaga
2010/0268717 A1 10/2010 Pilskalns
2010/0268766 A1 10/2010 Bouget
2010/0272363 A1 10/2010 Steinberg
2010/0280913 A1 11/2010 O'Sullivan
2010/0283743 A1 11/2010 Coddington
2010/0287053 A1 11/2010 Ganong
2010/0293035 A1 11/2010 Athsani
2010/0293193 A1 11/2010 Harrison
2010/0302179 A1 12/2010 Ahn
2010/0312596 A1 12/2010 Saffari
2011/0040779 A1 2/2011 Svendsen
2011/0063108 A1 3/2011 Aonuma
2011/0093458 A1 4/2011 Zheng
2011/0109769 A1 5/2011 Bhatt
2011/0113064 A1 5/2011 Govindachetty
2011/0122153 A1 5/2011 Okamura
2011/0145258 A1 6/2011 Kankainen
2011/0188713 A1 8/2011 Chin
2011/0191014 A1 8/2011 Feng
2011/0191253 A1 8/2011 Pilskalns
2011/0202267 A1 8/2011 Svendsen
2011/0208426 A1 8/2011 Zheng
2011/0289031 A1 11/2011 Zheng
2011/0301832 A1 12/2011 Zheng
2011/0307836 A1 12/2011 Cho
2011/0314016 A1 12/2011 Svendsen
2012/0047457 A1 2/2012 Park
2012/0096361 A1 4/2012 Osten
2012/0113475 A1 5/2012 Sugiyama
2012/0114249 A1 5/2012 Conwell
2012/0158755 A1 6/2012 Gammill
2012/0162249 A1 6/2012 Tsuda
2012/0192110 A1 7/2012 Wu
2012/0204101 A1 8/2012 Yoshida
2012/0210200 A1 8/2012 Berger
2012/0218150 A1 8/2012 Oyabu
2012/0220311 A1 8/2012 Rodriguez
2012/0251011 A1 10/2012 Gao
2012/0266090 A1 10/2012 Nealer
2012/0278171 A1 11/2012 Tang
2012/0278767 A1 11/2012 Stibel
2012/0329441 A1 12/2012 Tseng
2012/0331091 A1 12/2012 Tseng
2013/0018881 A1 1/2013 Bhatt
2013/0036165 A1 2/2013 Tseng
2013/0063613 A1 3/2013 Conwell
2013/0073202 A1 3/2013 Zheng
2013/0101157 A1 4/2013 Li
2013/0138685 A1 5/2013 Brucher
2013/0141612 A1 6/2013 Bhatt
2013/0151597 A1 6/2013 Akiya
2013/0185676 A1 7/2013 Cao
2013/0202198 A1 8/2013 Adam
2013/0275536 A1 10/2013 Murdock
2013/0339440 A1 12/2013 Balassanian
2014/0040774 A1 2/2014 Chartyoniuk
2014/0059477 A1 2/2014 Wong
2014/0059492 A1 2/2014 Hashida
2014/0071272 A1 3/2014 Rodriguez
2014/0088861 A1 3/2014 Nash

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2014/0089811 | A1 | 3/2014 | Meadow |
| 2014/0101531 | A1 | 4/2014 | Capt |
| 2014/0101601 | A1 | 4/2014 | Tang |
| 2014/0112553 | A1 | 4/2014 | Yamaguchi |
| 2014/0143247 | A1 | 5/2014 | Rathnavelu |
| 2014/0149036 | A1 | 5/2014 | Amer-Yahia |
| 2014/0161326 | A1 | 6/2014 | Ganong |
| 2014/0181089 | A1 | 6/2014 | Desmond |
| 2014/0188880 | A1 | 7/2014 | Abhyanker |
| 2014/0193087 | A1 | 7/2014 | Conwell |
| 2014/0207444 | A1 | 7/2014 | Heiman |
| 2014/0258850 | A1 | 9/2014 | Carey |
| 2014/0354628 | A1 | 12/2014 | Lindberg |
| 2015/0039630 | A1 | 2/2015 | Thomee |
| 2015/0066919 | A1 | 3/2015 | Park |
| 2015/0070165 | A1 | 3/2015 | East |
| 2015/0070397 | A1 | 3/2015 | Miller |
| 2015/0116540 | A1 | 4/2015 | Gilman |
| 2015/0117713 | A1 | 4/2015 | Zheng |
| 2015/0131872 | A1 | 5/2015 | Ganong |
| 2015/0156247 | A1 | 6/2015 | Hensel |
| 2015/0186389 | A1 | 7/2015 | Zheng |
| 2015/0213057 | A1 | 7/2015 | Brucher |
| 2015/0213329 | A1 | 7/2015 | Adam |
| 2015/0244794 | A1 | 8/2015 | Poletto |
| 2015/0244833 | A1 | 8/2015 | Gm |
| 2015/0358224 | A1 | 12/2015 | Poletto |
| 2016/0048279 | A1 | 2/2016 | Han |
| 2016/0092741 | A1 | 3/2016 | Li |
| 2016/0162512 | A1 | 6/2016 | Battistini |
| 2016/0247307 | A1 | 8/2016 | Stoop |
| 2016/0253358 | A1 | 9/2016 | Bhatt |
| 2016/0314187 | A1 | 10/2016 | Poletto |
| 2016/0321269 | A1 | 11/2016 | Thomee |
| 2016/0328444 | A1 | 11/2016 | Shinn |
| 2016/0344888 | A1 | 11/2016 | Lahcanski |
| 2016/0357822 | A1 | 12/2016 | Woods |
| 2017/0024415 | A1 | 1/2017 | Brucher |
| 2017/0046565 | A1 | 2/2017 | Gilley |
| 2017/0069123 | A1 | 3/2017 | Hochmuth |
| 2017/0103081 | A1 | 4/2017 | Jones |
| 2017/0192645 | A1 | 7/2017 | Murray |
| 2017/0357672 | A1 | 12/2017 | Circlaeys |
| 2018/0181281 | A1 | 6/2018 | Suki |
| 2018/0364872 | A1 | 12/2018 | Miura |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 2410414 | B1 | 10/2019 |
| WO | WO 2011/070225 | A1 | 6/2011 |
| WO | WO 2013/019376 | A1 | 2/2013 |
| WO | WO 2013/099704 | A1 | 7/2013 |

OTHER PUBLICATIONS

Pogue, D. & Biersdorfer, J. D., "iPhoto '09: The Missing Manual," O'Reilly Media, Inc. (2009).
Amundsen, J.; "Using the Geographical Location of Photos in Mobile Phones"; Master of Science in Computer Science submission; Norwegian University of Science and Technology; Jul. 2008 (112 pages).
Gentile; L; "Using Flickr Geotags to Find Similar Tourism Destinations"; master thesis; 2011; Politecnico di Milano; Dept. of Computer Engineering (96 pages).
Hollenstein, L.; "Capturing Vernacular Geography from Georeferenced Tags"; Master Thesis; Institute of Geography, University of Zurich; Nov. 2008 (139 pages).
Nutanong, S. et al.; "An Efficient Layout Method for a Large Collection of Geographic Data Entries"; Center for Automation Research, Institute for Advanced Computer Studies, Dept. of Computer Science, University of Maryland, pp. 717-720 (4 pages)
Slingsby, A. et al.; "Interactive tag maps and tag clouds for the multiscale exploration of large spatio-temporal datasets"; Information Visualization, pp. 497-504; 2007, IV '07. 11th International Conference. ISSN: 1550-6037 (9 pages)
Hoffman, A., "Create Great iPhone Photos: Apps, Tips, Tricks, and Effects", copyright 2011, ISBN-10: 1-59327-285-5, ISBN-13: 978-1-59327-285-2 (216 pages).
Chen, Y-F. et al.; "GeoTracker: Geospatial and Temporal RSS Navigation"; AT&T Labs—Research, Florham Park, NJ, WWW 2007 / Track: Browsers and User Interfaces, Session: Smarter Browsing, pp. 41-50 (10 pages).
Goodman, E.; "Destination Services: Tourist media and networked places"; School of Information, UC Berkeley; March 2, 2007 (11 pages).
Rattenbury, T. et al.; "Towards Automatic Extraction of Event and Place Semantics from Flickr Tags"; SIGIR '07; Jul. 23-27, 2007; Amsterdam, The Netherlands; ACM 978-1-59593-597-7/07/0007 (8 pages).
Kadar, B. et al.; "Where Do Tourists Go? Visualizing and Analysing the Spatial Distribution of Geotagged Photography"; Cartographica 48:2, pp. 78-88; 2013; University of Toronto Press; doi: 10.3138/carto.48.2.1839 (11 pages).
Kennedy, L. et al.; "How Flickr Helps Us Make Sense of the World: Context and Content in Community-Contributed Media Collections"; MM '07, September 23-28, 2007, Augsburg, Bavaria, Germany, Copyright 2007, ACM 978-1-59593-701-8/07/0009 (10 pages).
Richard, G. et al.; "Geotagging Photographs for Distribution on the Web"; Mineral Physics Institute, Earth and Space Sciences Building, Stony Brook University, Stony Brook. NY, date unknown (9 pages).
Kustanowitz et al., "Motivating Annotation for Personal Digital Photo Libraries: Lowering Barriers while Raising Incentives," Tech. Report HCIL-2004-18, U. Maryland, 2005 (10 pages).
Miller et al., "Give and take: a study of consumer photo-sharing culture and practice," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 347-356, 2007 (10 pages).
Ames et al., "Why we tag: motivations for annotation in mobile and online media," CHI '07 Proceedings of the SIGCHI Conference on Human Factors in Computing Systems, pp. 971-980, ACM, 2007 (10 pages).
Yee et al., "Faceted Metadata for Image Search and Browsing", CHI 2003, pp. 401-408, 2003, ACM.
Ferre, "CAMELIS: Organizing and Browsing a Personal Photo Collection with a Logical Information System", Int. Conf. Concept Lattices and Their Applications, pp. 112-123, 2007, HAL.
Tomasson et al., "PhotoCube: Effective and Efficient Multi-Dimensional Browsing of Personal Photo Collections", ICMR '11, 2011, ACM.
Baitolini et al., "Integrating Semantic and Visual Facets for Browsing Digital Photo Collections", SBED, pp. 65-72, 2009.
Trattner et al., "Evaluating Tag-Based Information Access in Image Collections", Proceedings of the 23rd ACM Conference on Hypertext and Social Media, pp. 113-122, 2012 ACM.
Kang et al., "Capture, Annotate, Browse, Find, Share: Novel Interfaces for Personal Photo Management", International Journal of Human-Computer Interaction, 23(3), pp. 315-337, 2007, Lawrence Enbaum Associates, Inc.
Jaffe et al., "Generating Summaries and Visualization for Large Collections of GeoReferenced Photographs", MIR'06, pp. 89-98, 2006 ACM.
Tornial et al., "Sharing, Discovering and Browsing Geotagged Pictures on the Web", 2007, Hewlett-Packard Development Company, L.P., pp. 1-18.
Snavely et al., "Photo Tourism: Exploring Photo Collection in 3D", SIGGRAPH '06 ACM Transactions on Graphics, vol. 25, Issue 3, pp. 835-846, 2006 ACM.
Kisilevich et al., "Event-based analysis of People's Activities and Behavior Using Flickr and Panoramio Geotagged Photo Collections", 14th International Conference Information Visualization, pp. 289-296, 2010 IEEE.
Ahern et al., "World Explorer: Visualizing Aggregate Data From Unstructured Text in Geo-Referenced Collections", JCDL'07, pp. 1-10, 2007, ACM.

(56) **References Cited**

OTHER PUBLICATIONS

Kopf et al., "Deep photo: model-based photograph enhancement and Viewing", ACM Transactions on Graphics, vol. 27, No. 5, Article 116, Dec. 2008, ACM (10 pages).
Petition for Inter Partes Review of U.S. Pat. No. 10,621,228 by Unified Patents, filed Sep. 3, 2021 (104 pages).
Declaration of Dr. Benjamin B. Bederson supporting the IPR Petition of Unified Patents, LLC Sep. 2, 2021 (251 pages).
Declaration of Kevin Jakel supporting the IRP Petition of Unified Patents, LLC Sep. 2, 2021 (7 pages).
Bederson, B, "PhotoMesa: A Zoomable Image Browser Using Quantum Treemaps and Bubblemaps," Proceedings of the 14th Annual ACM Aymposium on User Interface Software and Technology, pp. 71-80, Nov. 11-14, 2001 (10 pages).
Suh, B. et al., "Automatic Thumbnail Cropping and its Effectiveness," Proceedings of the 16th Annual ACM Symposium on User Interface and Technology, pp. 95-104, 2003 (10 pages).
Shneiderman, B. et al., "Find That Photo! Interface Strategies to Annotate, Browse, and Share," Communications of the ACM, 49(4):69-71, Apr. 2006 (3 pages).
National Aeronautics and Space Administration, "Space Station Assembly—Baikonur Cosmosphere," Retrieved from the Internet on Sep. 1, 2021, https://web.archive.org/web/20060928234623/http://www.nasa.gov/mission_pages/station/structure/elements/baikonur.html/; alleged by Unified Patents to have been published on Sep. 28, 2006 (3 pages).
Shneiderman, B. & Plasiant, C.. "Designing the User Interface: Strategies for Effective Human-Computer Interaction (5th ed.)." Addison-Wesley Publishing Company, USA, pp. vii-xviii, 456-457, alleged by Unifed Patent to have been published in 2009 (28 pages).
Perez, L., "iPhoto 09 Basics," Florida Center for Instructional Technology, Retrieved from the Internet on Apr. 10, 2021, https://etc.usf.edu/te_mac/movies/pdf/iphoto09.pdf/; alleged by Unified Patents ot have been published on Aug. 9, 2009 (15 pages).

* cited by examiner

FIG. 1


Select All
Select None
Delete Selected
1 File(s) Selected
File Attributes:
Date: September 2, 2010 change
Location: Yellowstone, MT, USA change
People: Christopher Desmond, Nancy Desmond
Event: Fly Fishing in Yellowstone
Comments: Add
Keywords: Add
Album: Add
Star Ranking: ●●●●●
Sharing Rights: Add
Recipe: Add
Document Type: Add
File Name: IMG 123 change

FIG. 2



Comments:
Suzanne and Anthony's Wedding Party where the cousins posed for a photo in the grass. Note, Jack with the lollipop and the photographer with his shoe in the photo

People:
Jack Wong
CJ Wong
Mary Firestone
Zoe Peika
Nick Persons

Event: Suzanne & Anthony's Wedding Reception 2010

Camera Details: more



Location:
Historical Society
Lisle, IL 60532

FIG. 3


Thumbnail | Table
Mary Bader and Clint Firestone Wedding October 11, 1945
Capt. Clint Firestone 1952
Germany Trip 1955
Father's Day 1966
Christopher 1st Year 1972
College Break 1992
LA Trip 1993
EIU College Graduation 1994
Cairo, Egypt 1996
Europe Backpacking 1996
Nancy James and Christopher Desmond Wedding October 17, 1998
Amazon Fishing Trip November 2009
Cousins Party 2010
Fishing in Yellowstone Montana September 2010

FIG. 4



Captions On | Off
Christopher Desmond and Nancy Desmond Wedding – October 17, 1998
Event

**FIG. 5**



FIG. 6


Thumbnail | Table
Clint Firestone
Tim Dog
Steve Fire
Suzanne Lucky
Steve Fwah
Ben Sherman
Joe Schmo
Mary Virginia
Clint Dewitt
Charlotte Killian
Chris Jeep
Peter LongHorn
Tim Dog
Steve Fire
Suzanne Lucky
Steve Fwah
Ben Sherman
Joe Schmo
Mary Virginia
Clint Dewitt
Charlotte Killian

FIG. 7



**Clinton Dewitt Firestone IV**

Birth: July 12, 1896
Death: April 29, 1971
Parents: Clinton Dewitt Firestone III and Viola Miller
Comments: He was a WWII U.S. Air force pilot and POW in WWII and veteran honorably discharged in December of 1947. He worked for 44 years for the Firestone Tire and Rubber Company in retail, wholesale and original equipment sales, marketing and management. He was born in Akron, OH and is buried in Columbiana, OH.

Edit bio

Locations Timeline Family Tree Recipes



FIG. 8



FIG. 9


Year
Month
Day
Cousins Party 2010
Fishing in Yellowstone
Montana September 2010

**FIG. 10**


Desmond's Yellow Thai Chicken Curry
Curry Mix
• Coconut milk (400 ml) – DO NOT SHAKE IT UP
• 800 gram of chicken (4 chicken breast)
• Fish sauce (Nam Pla) Thai Bamboo Garden – Bottle
• Garlic (2 cloves)
• Broccoli ( 2cups chopped)
• 2 Peppers (chopped)
• 2 Carrots (chopped)
• 1 Zucchini (chopped)
• Thai Basil (8 leaves)
• Lemon Grass (in jar) 1 teaspoon
• Chinese Ginger Root (in jar) 1 teaspoon
Rice
• Thai Rice (something that only takes 2 cups of water)
• Dice chicken in bowl and add two tablespoons of fish sauce. Let marinate for 20 minutes.
• Take thick part of coconut milk out into pan (about 4 tablespoons), Curry paste, 1 spoon of lemon grass, 1 spoon of ginger and garlic. Heat over high with boil and THEN stir for 1 minute. Add meat (uncooked) and fry until cooked over high heat
• Add milk, brown sugar and salt. Bring back to slight boil and constantly stir. Add veggies and soy sauce. Cook for about 10-14 minutes COVERED until veggies are cooked. Serve with a smile.
Chef: Barry Desmond
Video on How to Make It
Original Handwritten Recipe

FIG. 11

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

**FIG. 12**

Thumbnail | Table

| Album/Event | Date | Location | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|
| Jack Monk's Arrival | 26-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's First Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 2nd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 3rd Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Jack Wrigley Monk's Arrival | 29-Dec-2003 | Chicago, IL | 69 | 4 | 4 |
| Mike Testy's 4th Birthday | 13-Sep-1983 | Minneapolis, MN | 54 | 21 | 0 |
| Cubs Beat Cards 1998 | 5-Aug-1998 | Chicago, IL | 36 | 2,199 | 2 |
| Nancy Learns How to Ride a Bike | 21-Jul-1978 | St. Louis, MO | 76 | 2 | 0 |

**FIG. 13**

Thumbnail | Table

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| + Alberts | 2 | 8 | 0 | 0 |
| + Annex | 2 | 7 | 0 | 0 |
| + Bade | 3 | 8 | 0 | 0 |
| + Bacon | 4 | 8 | 0 | 0 |
| + Bates | 5 | 7 | 1 | 0 |
| + Boone | 6 | 6 | 2 | 2 |
| + Danas | 7 | 5 | 4 | 1 |
| + Danes | 8 | 7 | 3 | 2 |
| - Monk (All) | 2 | 499 | 4 | 14 |
| Monk, CJ | 1 | 200 | 2 | 7 |
| Monk, Jack | 1 | 199 | 2 | 7 |
| + Firestone | 21 | 1249 | 17 | 39 |
| + Moore | 1 | 4 | 6 | 3 |
| + Slythe | 1 | 9 | 0 | 9 |
| + Stein | 2 | 249 | 1 | 3 |
| + Testy | 4 | 788 | 2 | 12 |

**FIG. 14**

Thumbnail | Table

| Last Name | Relationship | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Alberts, John | Cousin | 8 | 0 | 0 |
| Killian, Jack | Son | 7 | 0 | 0 |
| Killian, Brian | Nephew | 8 | 0 | 0 |
| Killian, Kevin | Nephew | 8 | 0 | 0 |
| Killian, Sarah | Daughter-in-law | 7 | 1 | 0 |
| Killian, John | Great Nephew | 6 | 2 | 2 |
| Killian, Mark | Great Nephew | 5 | 4 | 1 |
| Killian, Louis | Great Grandson | 7 | 3 | 2 |
| Killian, John | Grandson | 499 | 4 | 14 |
| Monk, CJ | Great Grandson | 200 | 2 | 7 |
| Monk, Jack | Great Grandson | 199 | 2 | 7 |
| Firestone, Mike | Third Cousin | 1249 | 17 | 39 |
| Moore, Bertha | Great Niece | 4 | 6 | 3 |
| Slythe, Sarah | Sister | 9 | 0 | 9 |
| Killian, John | Brother | 249 | 1 | 3 |
| Killian, Mike | Brother | 788 | 2 | 12 |

**FIG. 15**

Thumbnail | Table

| Location Name | Address | City | State | Country | # Photos | # Videos | # Docs |
|---|---|---|---|---|---|---|---|
| Dom | | Cologne | | Germany | 3 | 2 | 0 |
| Lucilla & Roberto | | Montalcino | | Italy | 6 | 1 | 0 |
| Lisle Home | 898 West St | Lisle | IL | USA | 45 | 12 | 2 |
| College | 545 Market | Akron | OH | USA | 64 | 2 | 0 |
| Amazon Trip | | Manus | | Brazil | 235 | 8 | 2 |
| Cabin | 999 Pine | Lake Geneva | WI | USA | 98 | 2 | 0 |
| Grad School | 903 Plymouth | Charleston | IL | USA | 1256 | 32 | 4 |
| Griffith Park | 298 Glencarin | Los Feliz | CA | USA | 12 | 0 | 0 |
| LA Equestrian Ctr | 568 Horse Dr | Glendale | CA | USA | 4 | 4 | 0 |
| Del Coronado | 12 Coronado Dr | Coronado | CA | USA | 321 | 4 | 0 |
| Fenway Park | 123 Yawke | Boston | MA | USA | 57 | 3 | 5 |
| Wrigley Field | 1190 W Addison | Chicago | IL | USA | 498 | 7 | 3 |
| Home | 444 Main | Anywhere | IL | USA | 10,987 | 49 | 9 |
| GA Grill Party | 321 Silver | Macon | GA | USA | 15 | 0 | 0 |
| Pike's Market | 786 Market | Seattle | WA | USA | 18 | 1 | 0 |
| Raffels | 345 Fong | Singapore | | Singapore | 23 | 2 | 0 |

FIG. 16

Category | Card | Table

| Recipe | Chef | Date | Category |
|---|---|---|---|
| Blacks Yellow Thai Chicken Curry | Jack Black | 31 Jan 2010 | Dinner |
| Skinny Germans | Gerda | 29 Dec 2003 | Breakfast |
| KFC in a Bag | The Kernal | 13 Sept 1988 | Anytime |
| Shit on a Shingle | George James | 5 Aug 1998 | Anytime |
| Mrs. Fields Cookies | Mrs. Fields | 21 July 1978 | Dessert |
| Chicken Pot Pie | Jack Black | 31 Jan 2010 | Dinner |
| Roll Your Own Dough | Vito Spadavecchio | 29 Dec 2003 | Dinner |
| Pizza ala Franciscan | Charles Faso | 13 Sept 1988 | Dinner |
| Meatball Delight | Ben Delight | 5 Aug 1998 | Dinner |
| Almond Cookies | Lori James | 21 July 1978 | Dessert |
| Jumpin Jack Flap Jacks | Jack Jack | 31 Jan 2010 | Breakfast |
| Vicki's Chow Mein | Vicki Firestone | 29 Dec 2003 | Dinner |
| Fat Steak | Barry Monk | 13 Sept 1988 | Dinner |
| Mud Pie | Nancy Monk | 5 Aug 1998 | Dessert |
| Caesar Salad | Christopher Monk | 21 July 1978 | Anytime |
| Daddio Pancakes | Barry Monk | 2 March 2011 | Breakfast |

FIG. 17



**FIG. 18**


Advanced Search Filter
Keywords: Add
Date: Add
Location:
Chicago, IL USA
Yellowstone, MT USA
Cologne, Germany
People:
Mike Cubbie
Mary Lamb
Christopher Monk
Nancy Monk
Dwight Schrut
Event:
Jack's 1st Birthday
Fly Fishing in Yellowstone
Raking Leaves
Christmas 2010
Thanksgiving 2010
July 4th Parade
Album: Add
Star Ranking: Add
Sharing Rights: Add
Document Type: Add

**FIG. 19**

**Captain Phil's Memory-Webb**

Welcome, Captain Phil
Last Login: 11.18.2010

**My recent memories:**
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10
- 12 visitors since last login date
- 123 Photos uploaded on 11.07.10
- 2 albums created 11.17.10

**My recent Webb views:**
- Captain Phil 2010 (photo album)
- Chicken Pot Pie (recipe)
- Captain Phil (Timeline)

**Updates and Alerts:**
- License renewal due 1.15.2011

| Media | Count | Archive Status | Count |
|---|---|---|---|
| # Photos | 1,342 | | 80% complete |
| # Videos | 75 | | 61% complete |
| # Documents | 173 | | |

**People Stats:**

| Last Name | # People | # Photos | # Videos | # Docs |
|---|---|---|---|---|
| Monk | 7 | 499 | 4 | 14 |
| Firestone | 11 | 1,249 | 17 | 39 |
| Testy | 4 | 788 | 1 | 12 |

**Event Stats:**

| Event | Date | Location | # Media |
|---|---|---|---|
| Mike Testy's 1st Birthday | 13-Sept-1988 | Minneapolis, MN | 21 |
| Cubs Beat Cards Aug 1998 | 5-Aug-1998 | Chicago, IL | 2,199 |
| Nancy Learns to Ride Bike | 21-July-1978 | St. Louis, MO | 2 |

FIG. 20


0050
Start
0101
Original Digital file(s) upload to MemoryWeb
0401
Third Party Facial Recognition Provider
0501
Third Party Media Provider
1101
Third Party Geographical Mapping Provider
1201
Individual / Group of People
1301
MW Modified File exported from MemoryWeb to Storage System
Outside MW System
Inside MW System
0400
Third Party Facial Recognition System
0500
Third Party Media System (Data Exchange)
1000
Share to Social Network Provider System
0300
User Relationship Table
System Indexing Digital Files and Tag Data Blocks for a Digital File within User Relationship Table
1100
Third Party Geographical Location Mapping System
System Reading Phase
0100
System Interpreting and Adding Data to Relationship Table Phase
0200
1200
Share to Individual System
1300
Application Export System
Application Digital Tag Organizer System
0600
Continuous Link of Application Dot-Tags System
0700
Advanced Filters System
0800
Keyword Fast Search System
0900

**FIG. 21**



System Reading Phase
0100
Start
Original Digital file begins to upload to MemoryWeb
0101
Outside MW System
Inside MW System
0102
Duplicate File?
No
Yes
Locate EXIF Image File Directories in Digital File
0103
File not uploaded
0104
System Interpreting and Adding Data to Relationship Table Phase
0200
Third Party Facial Recognition Provider
0401
Third Party Facial Recognition System
0400
Read and iterate through each EXIF tag item
0201
Upload original file into MW
0211
Create duplicates of original file in different file sizes
0203
Is MW Tag?
0204
Save EXIF data to User Relationship Table for Digital File
0205
Parse EXIF data into MemoryWeb Tag data
0206
Look up MW tag data
0207
Tag data exists?
0208
Create new MW tag data
0209
Associate existing Tag data
0210
System Indexing Digital Files and Tag Data Blocks for a Digital File within User Relationship Table
0300
User Relationship Table
User Settings
1900
Storage of Original File
0301
XL Duplicate File
0302
Large Duplicate File
0303
Medium Duplicate File
0304
Small Duplicate File
0305
Thumbnail Duplicate File
0306
EXIF Tag (Data Blocks)
0320
Microsoft Windows Tag (Data Blocks)
0340
MemoryWeb Tag (Data Blocks)
0360
MemoryWeb Person Tag (Data Blocks)
0380

**FIG. 22**

0320

**EXIF Tags version 2.3 Image File Directories (Data Blocks)**

| | Tag Labels (0321) | EXIF Family Group Name (0322) | Location (0323) |
|---|---|---|---|
| 0324 | Description Title | IFD0 | 0x9c9b or 0x010e |
| | Description Subject | IFD0 | 0x9c9f |
| 0325 | Description Rating | | N/A |
| | Description Tags | IFD0 | 0x9c9e |
| | Description Comments | IFD0 | 0x9c9c |
| | Origin Authors | IFD0 | 0x9c9d |
| 0326 | Origin Date Taken | ExifIFD (0334) | 0x9003 (0335) |
| | Origin Date Acquired | | N/A |
| | Origin Copyright | IFD0 | 0x8298 |
| | *Image (Image ID, Dimensions, Width Height, etc)* | | *Multiple* |
| 0327 | Width | | 0xbc80 |
| 0328 | Height | | 0xbc81 |
| | *Camera (Camera Maker, Camera Model, etc)* | | *Multiple* |
| | *Advanced Photo (Lens Maker, Lens Model, etc)* | | *Multiple* |
| 0329 | User Comment | ExifIFD | 0x9286 |
| 0330 | GPS Latitude | GPS | 0x0002 |
| 0331 | GPS Latitude Ref | GPS | 0x0003 |
| 0332 | GPS Longitude | GPS | 0x0004 |
| 0333 | GPS Longitude Ref | GPS | 0x0005 |
| | GPS Altitude | GPS | 0x0006 |

**MemoryWeb_Tag (Data Blocks)** 0360

| MemoryWeb Tag | 0361 |
|---|---|
| MediaAsset.Caption | 0362 |
| | |
| MediaAsset.StarRanking | 0363 |
| | |
| | |
| | |
| MediaAsset.DateCreated | 0364 |
| | |
| | |
| | |
| MediaAsset.Width | 0365 |
| MediaAsset.Height | 0366 |
| | |
| | |
| This is used to inject information that do not currently have EXIF standardized tags including Collection, People, Location Name, Recipe Name, Person Tag Data Blocks (0380), etc. | 0367 |
| MediaAsset.Location.Latitude | 0368 |
| MediaAsset.Location.Latitude | 0369 |
| MediaAsset.Location.Longitude | 0370 |
| MediaAsset.Location.Longitude | 0371 |
| | |

FIG. 23


0340
Windows Imaging Component (WIC) Metadata (Data Blocks)
Tag Label
0341
0342
File Name
File Item Type
0343
File Folder Path
File Date Created
File Date Modified
File Size
File Attributes
File (Offline availability, Offline status, Shared with, Owner, Computer, etc)
Other
0360
MemoryWeb_Tag (Data Blocks)
MemoryWeb Tag
0361
MediaAsset.Filename
0372
MediaAsset.UploadBatch.BatchName
0373

FIG. 24


0380
MemoryWeb Person Tag (Data Blocks)
Person Name
0395
Nickname
0381
Birthdate
0382
Date of Death
0383
Biography
0384
Mother
0385
Father
0386
Brother 1 , Brother 2, ...
0387
Sister 1 , Sister 2, ...
0388
Daughter 1 , Daughter 2, ...
0389
Son 1 , Son 2. ...
0390
Spouse 1 , Spouse 2, ...
0391
Facial Recognition Data (Taylor?)
0392
Facebook ID
0393
pets
0394
...
0396

FIG. 25


0400
0401
Third Party Facial Recognition Provider
Outside MW System
Inside MW System
Start
0402
System request for thumbnails of all Digital Files that have unconfirmed faces
0300
User Relationship Table
0403
Retrieves Thumbnails of all Digital Files that have unconfirmed faces
0404
System sends Digital Files to Third Party Facial Recognition Provider
0405
System receives response from Third Party Facial Recognition Provider
0406
System parses identified faces and corresponding Facial Recognition data for each Digital File
0407
Existing (Trained) Face ID in User Relationship Table?
Yes
No
0408
Is Face Recognition above score threshold?
Yes
No
0409
System records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0410
System generates facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table
0411
System generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table

FIG. 26



0500
0501
Third Party Media Provider
Outside MW System
Inside MW System
0503
Systems sends registration confirmation
0504
Systems receives registration confirmation, Third Party Media ID
0507
System receives contact names and IDs from Third Party Media Provider (daily)
0502
User selects sharing of their information with Third Party Media Provider with MemoryWeb
0505
System sends registration information to User Setting Table?
0506
System requests contact names and IDs from Third Party Media Provider (daily)
0508
Is Person a Match
Yes
No
0509
System associates existing Person to Tag Data Block of Relationship Table for Digital File
Start
0300
User Relationship Table
0510
System add new person to Tag Data Block of Relationship Table for Digital File
1000
User Settings Table
Share to Third Party Media Provider System
1900

FIG. 27


1900
Item
1901 User's Name
1902 Payment ID
1903 Password
1904 Account Type
1905 User's email
1906 Language preference
1907 Date format
1908 Email notifications
1909 Contacts (with third Party Social Media)
1910 Facebook ID
1911 API Token
1912 Payment Date
1913 ...

FIG. 28


Start
User selects Digital File in MW
0601
System sends request to Relationship Table for specific Digital File
0602
User Relationship Table
0300
System retrieves Digital File and Digital File Tag Data Blocks from User Relationship Table
0603
System will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags
0604
User selects Application Dot-Tag
0605
Continuous Link of Application Dot-Tag System
0700
0600
User selects add for a MemoryWeb Tag
0606
Tag data exists?
0607
Yes
No
User selects matching MemoryWeb Tag
0608
User adds New MemoryWeb Tag
0609
System associates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0610
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0611
User selects edit for a MemoryWeb Application Dot-Tag
0612
Tag data exists?
0613
User selects matching MemoryWeb Tag
0614
User adds New MemoryWeb Tag
0615
System associates existing MemoryWeb Tag to Tag Data Block of Relationship Table for Digital File
0616
System creates new MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0617
User selects delete for a MemoryWeb Application Dot-Tag
0618
System deletes association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File
0619

FIG. 29


Structure
0650
0652
0651
0653
#### User Defined Tag Label
Examples
Within Character Limit for Labels and Numbers
453 Cologne Germany
0654
Exceeds Character Limit for Label and Numbers
>999 Holiday Photos from ...
0657
0658
0655
Dotted Application Dot-Tag denotes partial relationship. In this example, person is a half-sibling to another person.
45 Frank Smith
0656

**FIG. 30**



Start
User selects Application Dot-Tag
0701
0700
0716
Displays Image in Slideshow view
0702
Is Person Dot-Tag?
Yes
No
0703
Is Collection Dot-Tag?
Yes
No
0704
Is Location Dot-Tag?
Yes
No
0705
Is Date Dot-Tag?
Yes
No
0706
Is Recipe Dot-Tag?
Yes
No
0707
...
Yes
0708
System sends request to Relationship Table
User Relationship Table
0300
0709
If Person Application Dot-Tag, system retrieves data for that person from User's User Relationship Table and displays relationship data in People Profile View
0710
If Collection Application Dot-Tag, system retrieves data from that collection from User's User Relationship Table and displays relationship data in Collection View
0711
If Location Application Dot-Tag, system retrieves data from that Location from User's User Relationship Table and displays relationship data in individual Location View
0712
If date Application Dot-Tag, system retrieves data from that date from User's User Relationship Table and displays relationship data in Uploads View
0713
If Recipe Application Dot-Tag, system retrieves data from that Recipe from User's User Relationship Table and displays relationship data in Recipe View
0714
...
Yes
0715
Is Image Selected?
No
0717
User selects Application Dot-Tag

FIG. 31


0750
Export
0751
Share:
0760
0761
0759
0762
edit
0752
0753
SCHOOL
0754
Jackson and JC's First Day of School
0755
edit
0756
0757
0758
0763
People
0764
0780
Jackson Smith
0765
Dates
8/28/2013
0766
Locations
0767
0768
Abe Lincoln Elementary School
0769
Collections
First Day of School
0770
Jackson and JC Photos 2013
0771
Smith Family Photos
0781
0773
Star Ranking:
0782
0774
Recipe:
Media Type: Memento
0776
Original File Details
0778
0779
Delete Item

FIG. 32



Multiple People Application View
1401
1450
1451
1400
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Sort By:
Newest to Oldest
1402
Jon Smith
Jane Smith (Doe)
Jackson Smith
JC Jon Smith
1405
Page:
1
1403
1404
Items Per Page:
20
50
100
1430
Single People Profile Application View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all People
1432
1431—JC Jon Smith
Edit
1447
1453
1454
1433—Nicknames: Chip
1434—Born: 5 1/1/2004
1448
1449
1435—Parents: 4 Jon Smith and 4 Jane Smith (Doe)
1436—Siblings: 5 Jackson Smith
1437—Children:
1438—Biography: JC was named after his great, great grandfather from German who's real name was Johan Christoph.
1439
Change Profile Photo
1440
JC Tags:
1452
1441
1442
1443
1444
1445
4 Photos
3 Collections
2 Facial Recognitions
3 Locations
7 Family Relationships
1 Recipe
1446
Page:
1
Items Per Page:
20
50
100

FIG. 33


Multiple Collection View
1501
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1500
Sort By: Newest to Oldest
1502
1507
Our family
Smith Family Photos
Europe Trip
First Day of School
Jackson and JC Photos 2013
Baseball Games
Page: 1
1503
1504
1505
1506
Items Per Page: 20 50 100
1530
Individual Collection View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Collections
1531
Share this Collection:
Edit
1534
Smith Family Photos
1532
1535
Our family
1533
Page: 1
Items Per Page: 20 50 100

FIG. 34



Multiple Location Application View
1605
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1600
Sort By:
Newest to Oldest
1606
Wrigley Field
Abe Lincoln Elementary School
Home Sweet Home
Stonehenge
Page:
1
1601
1602
1603
1604
Items Per Page:
20
50
100
1630
Single Location Application View
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
< View all Locations
1631
Share this Collection:
Edit
1636
1637
Wrigley Field
3651 N. Clark St.
1632
Chicago Illinois, United States
1633
1 Photos
1634
1635
Page:
1
Items Per Page:
20
50
100

**FIG. 35**


1700
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
1701
1702
Current usage: 2.0 MB
1703
Sort By:
File Batch Name (A-Z)
File Folder: C:/2013/Family Fun
1704
1705
File Folder: C:/2013/General
1706
1707
1735
1708
1737
File Folder: C:/2013/First Day of School
1709
1710
1711
Page:
1
1739
1712
1713
1714
2 Selected:
Select All
Select None
Delete Selected
1715
People
1716
1733
1731
1717
1734
+ Add People
1718
1719
Dates
1720
1730
1721
1722
Locations
1723
1735
1724
1732
1725
Collections
1726
First Day of School
1727
1728
1729
1738
Items Per Page:
20
50
100

FIG. 36


1800
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
Show all Recipes
1802
Lori Doe Pecan Puffs
1801
Share this Collection:
1812
Edit
1813
Chef
1804
Lori Doe
1816
+ add / edit Chef
1803
Recipe Photos
1806
1807
Ingredients
1809
1 Stick of butter
1 cup of flour
½ teaspoon of vanilla
1 cup of grand pecans
2 tablespoons of sugar
Directions
1810
Mix all. Roll gently into 1 inch balls. 300
and immediately roll in sugar.
Comments
1811
This is one of my favorite recipes around the holidays and was
one of Grandma Lori's best!
1814
1808
1815

**FIG. 37**


0800
Start
User selects Advanced Filter
0801
0802
User types information into the text box
0803
System sends request
0300
User Relationship Table
0804
0805
System displays possible matches of filters
System produces request
0806
User selects filter(s)
0807
User selects apply
0808
System sends request
0809
If in Uploads view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0810
If in Collections view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0811
If in Locations view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0814
If in People view, system retrieves data for applied filter(s) from User's User Relationship Table and displays relationship data
0812
•••
0813
User desires to add additional Advanced Filter
Continuous Link of Application Dot-Tags System
0700

FIG. 38


0830
Fast Search
Apply Filters...
0831
Apply Multiple Filters
0838
Search for Filters to Add:
Smith
0836
0832
Available Filters
Current Active Filters
Person: JC Smith
Person: Jackson Smith
Person: Jon Smith
Person: Jane Smith
Location: Smithsonian
Collection: Smithsonian Trip
Apply
Clear Filters
Cancel
0839
0833
Apply Multiple Filters
Search for Filters to Add:
Smith
0837
Available Filters
Current Active Filters
0834
Person: JC Smith
Person: Jackson Smith
Person: Jon Smith
Person: Jane Smith
Location: Smithsonian
Collection: Smithsonian Trip
Person: JC Smith
Apply
Clear Filters
Cancel
0835

FIG. 39


0850
Application Dot-Tag in Uploads Application View
0851
Uploads
Collections
People
Locations
Recipe
Family Tree
"JC Smith"
Current usage: 1.9 MB / 5GB
Sort By
Newest to Oldest
Uploaded: 12/27/2013
Uploaded: 12/20/2013
0852
Application Dot-Tag in Collections Application View
0853
"JC Smith"
Jackson and JC Photos 2013
Europe Trip
First Day of School
Smith Family Photos
0854
Application Dot-Tag in People Application View
0855
"JC Smith"
Sort By:
Alphabetical A-Z
JC Smith
4 tags
0 recognitions

**FIG. 40**


0860
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
0861
Current usage: 1.9 MB
Sort By: Newest to Oldest
Viewing Photos from: 2013-07-04
Uploaded: 12/30/2013
1 Selected: Select All Select None
People
Dates
Locations
Collections
Page:
1
Items Per Page:
20
50
100

FIG. 41


0870
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
View Locations as List
0871
Click on map to zoom in
"JC Smith"
Clear Filters
0872
0873
0874
0875
0876

FIG. 42


0880
Fast Search
Apply Filters ..
0881
Apply Multiple Filters
Search for Filters to Add:
Abe
0882
Available Filters
Current Active Filters
Location: Abe Lincoln Elementary School
Person: JC Smith
Apply
Clear Filters
Cancel
0883
Apply Multiple Filters
Search for Filters to Add:
Abe
Available Filters
Current Active Filters
0884
0885
Location: Abe Lincoln Elementary School
Person: JC Smith
Location: Abe Lincoln Elementary School
0886
Apply
Clear Filters
Cancel

FIG. 43


0890
Uploads
Collections
People
Locations
Recipe
Family Tree
Fast Search
Apply Filters
View Locations as List
Click on map to zoom in
"JC Smith"
"Abe Lincoln Elementary School"
Clear Filters
0891
0892
0893

FIG. 44



0900
Start
0901
User selects Search bar
0902
User types information to search
0903
System sends request
0300
User Relationship Table
0904
System searches all potential tags blocks
0905
System displays possible matches by category
0906
User selects match
0907
If user selects Person fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Person Profile View
0908
If user selects Collection fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Collections View
0909
If user selects Location fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Locations View
0910
If user selects Date fast search tag, system retrieves data Person Profile from User's User Relationship Table and displays relationship data in Uploads View
0911
•••
Continuous Link of Application Dot-Tags System
0700

FIG. 45


0930
Fast Search
Apply Filters...
0931
0932
Wrigley
0933
Results
Person: Jon Wrigley Doe
Collection: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0934
Wrigley
Results
Person: Jon Wrigley Doe
Album: Family trip to Wrigley August 2013
Location: Wrigley Field
Recipe: Wrigley Field Cookies
Comments: Jon and Jane's first game at Wrigley Field
0935
0936

FIG. 46


0501
Share to Third Party Media Provider
1000
Outside MW System
Inside MW System
1300
Application Export System
Start
1001
User selects share of Digital File or collection of Digital Files
1002
System requests Digital File and Tag Data Blocks
1003
System retrieves Digital File from Relationship Table
1006
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1004
System retrieves Digital Tags for Digital File from Relationship Table
1005
Inject tags into EXIF Tag Data Blocks
User Relationship Table
0300

**FIG. 47**



1101
1100
Third Party Geographical Mapping Provider
Outside MW System
Inside MW System
Start
1102
Location Application Dot-Tag?
Yes
No
1104
User selects location Application Dot-Tag
1105
System sends request to Relationship Table
1106
System requests mapping for specific location to Third Party Mapping System
1107
System receives mapping for specific location from Third Party Mapping System
1110
Systems combines map from Third Party Mapping System with Application Dot-Tags for specific location in Location View
1103
User selects Location Application View
0300
User Relationship Table
1108
System retrieves data from that Location from User's User Relationship Table.
1109
System sends Application Dot-Tags for that specific location

FIG. 48


1200
1207
Individual / Group of People
Outside MW System
Inside MW System
1300
Application Export System
Start
1201
User selects share of Digital File or collection of Digital Files
1202
System requests Digital File and Tag Data Blocks
1203
System retrieves Digital File from Relationship Table
1205
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
1204
System retrieves tags for Digital File from Relationship Table
1206
Inject tags into EXIF Tag Data Blocks
User Relationship Table
0300

FIG. 49



1300
End
1301
MW Modified File exported from MemoryWeb to Storage System
Outside MW System
Inside MW System
Start
1302
User selects Digital File download?
Yes
1303
System requests Digital File and Tag Data Blocks
1304
System retrieves Digital File from Relationship Table
1307
Save Original Digital File with new tags within EXIF Image File Directories as MW Modified File
No
1308
Yes
User installed MW Automatic Uploader/Downloader Application?
User Relationship Table
0300
1305
System retrieves tags for Digital File from Relationship Table
1306
Inject tags into EXIF Image File Directories
No
1309
Application Export not initiated

**FIG. 50**





| Ref. | 1401 Sample EXIF Image File Directories and ExifTool family 1 group names | 1402 Original File EXIF Tag Data | 1403 MW Modified File Tag Data | Ref. |
|---|---|---|---|---|
| | Description Title | | | |
| | Description Subject | | | |
| 1404 | Description Rating | 1416 | ☆☆☆☆☆ | 1410 |
| | Description Tags | | | |
| 1405 | Description Comments | 1417 | CAPTION: Jackson and JC's first day at school!<br>PERSON: Jackson Smith, JC Smith<br>LOCATION NAME: Abe Lincoln Elementary School<br>COLLECTION: First Day of School<br>COLLECTION: Jackson and JC Photos 2013<br>DATE: 8/28/2013 | 1411 |
| | Origin (Authors, Date Taken, Date Acquired, Copyright) | | | |
| | Image (Image ID, Dimensions, Width, Height, etc.) | | | |
| | Camera (Camera Maker, Camera Model, etc.) | | | |
| | Advanced Photo (Lens Maker, Lens Model, etc.) | | | |
| 1406 | GPS Latitude | 1418 | 39; 46; 4.3774999999999999 | 1412 |
| 1407 | GPS Longitude | 1419 | 89; 39; 55.319999999999953 | 1413 |
| | File Name | IMG_3826.JPG | IMG_3826.JPG | |
| | File Item Type | JPG | JPG | |
| 1408 | File Folder Path | C:\Photos\2013 — 1420 | C:\Photos\MW Backup\2013 | 1414 |
| 1409 | File Date Created | 11/01/2013 10:00 AM — 1421 | 08/28/2013 8:00 AM | 1415 |
| | File Date Modified | | | |
| | File Size | 2.42 MB | 2.42 MB | |
| | File Attributes | A | A | |
| | File (Offline availability, Offline status, Shared with, Owner, Computer, etc.) | | | |

# METHOD AND APPARATUS FOR MANAGING DIGITAL FILES

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/375,927, filed Dec. 12, 2016, now allowed, which is a continuation of U.S. patent application Ser. No. 14/193,426, filed Feb. 28, 2014, now U.S. Pat. No. 9,552,376, which is a continuation-in-part of and claims priority to U.S. patent application Ser. No. 13/157,214, filed Jun. 9, 2011, now U.S. Pat. No. 9,098,531, each of which is hereby incorporated by reference herein in its entirety.

## FIELD OF THE INVENTION

The present invention relates generally to the management of digital files and, more particularly, to a computer-implemented system and method for managing and using digital files such as digital photographs.

## BACKGROUND OF THE INVENTION

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums, or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, event, etc.) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos were printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of digital files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty digital files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution. However, they don't allow much organization of digital tags, dynamic viewing of digital files, and the ability to export the digital files with new digital tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of digital files is a medium that allows people to organize, view, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow digital files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

## SUMMARY

In accordance with one embodiment, a computer-implemented method of associating digital tags with digital files



comprises (1) storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having embedded therein content data and metadata including tags; (2) receiving, via a user interface device of a client device, a first tag label containing alphanumeric text created and inputted by a user of the client device; (3) modifying, using a controller device, a selected first one of the tags of the metadata in a first of the digital files to include the first tag label; (4) receiving, via the user interface device or another user interface device, an instruction to search for all of the digital files having at least the first tag label; (5) responsive to receiving the instruction, automatically searching for all of the digital files having at least the first tag label; and (6) displaying, on a video display device associated with the client device, a first indication of the first tag label.

In another embodiment a computer-implemented method of associating digital tags with digital files comprises storing, on one or more non-transitory computer-readable storage media, a plurality of digital files, each of the digital files having a content data portion and a metadata portion including tags; displaying, on a video display device associated with a client device, a first graphical representation of a first tag label of a first of the tags and associated with a first of the digital files; receiving, via a user interface device of the client device, a selection by a user of the client device of the first graphical representation of the first tag label as a search filter criterion or a search string entered via the user interface device corresponding to the first tag label; responsive to the receiving, automatically searching through the digital files, using at least the first tag label as a search filter, for the digital files satisfying at least the search filter criterion; and displaying, on the video display device, an indication of the first tag label and a representation of the number of the digital files satisfying at least the search filter criterion.

In accordance with a further embodiment, a web-based digital file storage system comprises a digital file repository for storing and retrieving digital files; a digital tagging system permitting the user to assign a plurality of digital tags to each of the digital files, wherein the digital tagging system comprises at least one type of data selected from the group consisting of a person's name, a location, a recipe, a date, a family relationship, a person's profile, an event name, a rating, and a document type; a search filter, wherein the search filter allows the digital files to be searched according to a plurality of types of data; and a user interface that presents the digital files on a user's screen based on the digital tags, wherein the user interface further comprises a digital tag image, the digital tag image having at least one type of data represented thereon with text.

As described in detail below, the various embodiments provide much-needed platforms that save a user significant time, provide significant information with minimal screen space, and provide an appealing and customizable interface that will enhance the user experience.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may best be understood by reference to the following description taken in conjunction with the accompanying drawings, in which:

FIG. **1** is a screenshot of an organizational functionality view of one embodiment of the disclosed system.

FIG. **2** is a screenshot of a photo detail view of one embodiment of the disclosed system.

FIG. **3** is a screenshot of a gallery view of an event or album of one embodiment of the disclosed system.

FIG. **4** is screenshot of an individual event or album view of one embodiment of the disclosed system.

FIG. **5** is a screenshot of a location view of one embodiment of the disclosed system.

FIG. **6** is a screenshot of a people thumbnail view of one embodiment of the disclosed system.

FIG. **7** is a screenshot of a people profile view of one embodiment of the disclosed system.

FIG. **8** is a screenshot of a family tree view of one embodiment of the disclosed system.

FIG. **9** is a screenshot of a timeline view of one embodiment of the disclosed system.

FIG. **10** is a screenshot of a recipe chart, according to one embodiment of the disclosed system.

FIG. **11** is a screenshot of an album chart view of one embodiment of the disclosed system.

FIG. **12** is a screenshot of an event chart view of one embodiment of the disclosed system.

FIG. **13** is a screenshot of a people chart view of one embodiment of the disclosed system.

FIG. **14** is a screenshot of a family tree chart view of one embodiment of the disclosed system.

FIG. **15** is a screenshot of a location chart view of one embodiment of the disclosed system.

FIG. **16** is a screenshot of a recipe chart view of one embodiment of the disclosed system.

FIG. **17** is a screenshot of a slideshow view of one embodiment of the disclosed system.

FIG. **18** is a screenshot of an advanced search filter view of one embodiment of the disclosed system.

FIG. **19** is a screenshot of a homepage view of one embodiment of the disclosed system.

FIG. **20** is a diagram of the Overall System Process Flow of MemoryWeb.

FIG. **21** is a diagram of the System for Reading Phase, System Interpreting, and Adding Digital File and Corresponding Data to Relationship Table Phase.

FIG. **22** is a table of the EXIF and MemoryWeb Tag Data Blocks

FIG. **23** is a table of the Microsoft Windows and MemoryWeb Tag Data Blocks.

FIG. **24** is a table of the MemoryWeb Person Tag Data Blocks.

FIG. **25** is a diagram of the Third Party Facial Recognition System.

FIG. **26** is a diagram of the Third Party Media System (Data Exchange).

FIG. **27** is a table of the User Settings Table.

FIG. **28** is a diagram of the Application Digital Tag Organizer System.

FIG. **29** is an illustration of the Application Dot-Tag Shape and Content.

FIG. **30** is a diagram of the Continuous Link of Application Dot-Tag System.

FIG. **31** is an illustration of the Slideshow View of Digital File and Application Dot-Tags.

FIG. **32** is a screenshot of People Application Views.

FIG. **33** is a screenshot of Collection Application Views.

FIG. **34** is a screenshot of Location Application Views.

FIG. **35** is screenshot of Uploads Application View.

FIG. **36** is a screenshot of Recipe Application View.

FIG. **37** is a diagram of the Advanced Filters System.

FIG. **38** is a screenshot of Adding the First Application Dot-Tag using Advanced Filter.

FIG. **39** is a screenshot of Single Application Dot-Tag Filter for Each Application View.

FIG. **40** is a screenshot of Single Application Dot-Tag Filter for Date in Uploads Application View.

FIG. **41** is a screenshot of the Single Application Dot-Tag Filter in Location Application View.

FIG. **42** is a screenshot of Adding Another Application Dot-Tag Filter.

FIG. **43** is a screenshot of the Multi-Dot-Tag Filter in Location Application View.

FIG. **44** is a diagram of the Keyword Fast Search System.

FIG. **45** is a screenshot illustration of Using Keyword Fast Search.

FIG. **46** is a diagram of the Share to Third Party Social Network Provider System.

FIG. **47** is a diagram of the Third Party Location Mapping System.

FIG. **48** is a diagram of the Share to Individual System.

FIG. **49** is a diagram of the Application Export System.

FIG. **50** is a table illustrating the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb.

## DETAILED DESCRIPTION OF ILLUSTRATED EMBODIMENTS

Although the invention will be described in connection with certain preferred embodiments, it will be understood that the invention is not limited to those particular embodiments. On the contrary, the invention is intended to cover all alternatives, modifications, and equivalent arrangements as may be included within the spirit and scope of the invention as defined by the appended claims.

The present disclosure relates to one or more of the following features, elements or combinations thereof. A web-based digital file storage system is disclosed. The storage system may include a digital file repository for storing and retrieving digital files, such as photos, a digital tagging system configured to assign digital tags to the digital files, a sorting system, and a user interface.

The digital tagging system may include various types of data, such as a person's name, a location, a recipe, a date, a family relationship to the user, an event name, a rating, sharing rights, file type and a document name. The sorting system can allow the digital files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the digital files on a user's screen based on these user inputs.

The digital file repository may be accessible over the Internet. The sorting system may provide a user with the ability to search based on a plurality of digital tags. The disclosed system may also provide a way to track relationships between users, so that a family tree can be displayed.

Recipes may also be linked to a person's name, with, for example, a video and digital copy of original hand-written recipe to create a recipe view.

Moreover, the digital files and data can be exported as a single file with the digital tagging embedded within the exported file.

In another embodiment, a method of storing digital photographs is disclosed. The method may include the steps of storing a digital photograph in a file repository, associating a plurality of digital tags having different tag types with the digital photograph, providing a search function that permits searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a

relationship, an event name, a rating, file type and a document type. The method may include a further step of providing access to the file repository via the Internet. The method may also allow for tracking relationships between users so that a family tree can be displayed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The presently disclosed method and application (herein alternatively referred to as a "system") provides users with an Internet-based interactive platform to gather, organize, view, share and archive digital files using a proprietary organization system and export tagging process. As used herein, the word "tag" refers to any type of digital data that can be assigned to a file to describe some aspect of that file through a tagging process. For images, the tagging is preferably in EXIF format. For videos, documents and other file formats, any appropriate format may be used. The disclosed system allows users to create, view and share digital files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals.

One disclosed embodiment includes an import feature. Users can import media files from users' favorite sources (e.g., computers, mobile phones, social networks, etc.). If any meta-tag information is embedded within the media (e.g., date taken and GPS coordinates), the system could automatically read and utilize it for the user. Digital files, media, meta-tags, and other data discussed herein may be saved to one or more file repositories (also referred to as a database herein).

In another aspect of the disclosed system, organizational functionality is provided. Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system and organizing feature allows a user to arrange large amounts of digital files with tags that can characterize and document the digital file(s). Digital files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, event, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. Tags can be assigned to a single file at a time, or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos and enter the tag only once. An example of the manner in which digital photos can be organized is presented is seen in FIG. **1**.

Yet another feature is the multiple views from which a user can display his or her digital media files and their tagged attributes. Using a user interface (e.g. a keyboard, mouse, or touch screen), users can select individual files, groups of files meeting specific criteria, or all files in their account from which to create views. These views may alternately take the form of a chart. These views will be auto-populated based upon either tag information already associated with the digital file upon import or the tags assigned to the digital files by the user within the aforementioned organization functionality. Each digital file can be enlarged, from any view or chart, by clicking an information ("i") button to show an enlarged version of the digital media file with all the tags that are assigned to that digital file, as illustrated in FIG. **2**. In another embodiment, the user interface may be user-configurable, as discussed further herein.



The following views are shown with particularity. In FIG. **1**, the gallery view allows the user to see all the digital media that are associated within a group such as an event or custom album. The gallery view for either events or albums is illustrated in FIG. **3**.

As shown in FIG. **2**, an individual album or event view allows one to see the files associated with a specific group. For example, one can view the digital files that relate to a group of files called "Trip to Italy 2011." The individual album or event view is illustrated in FIG. **4**.

A location view, as shown in FIG. **5**, identifies within an interactive map (Google map shown as an example), where digital files were taken or originated. The location view can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users.

A people view, as shown in FIG. **6**, shows thumbnail photos of all the people in the system that can be clicked in for a people profile view. A people profile view, as shown in FIG. **7**, shows a profile picture of an individual, their birth/death information, family relationships, overview (comments) on the person, as well as links to other views that contain that individual in the system.

A family tree view, as shown in FIG. **8**, can illustrate interactive family trees where one can see the family tree of an individual or family. If a user clicks on an individual within the family tree, it will take him or her to the people profile view of that person.

The timeline view, as shown in FIG. **9**, will be an interactive timeline that allows you to set ranges of digital files by year, month and day. The digital files shown in the timeline will also be interactive and if the user clicks on a digital file or group of digital files (e.g., event or album), the user will then view the information related to the digital file(s).

A recipe view, as shown in FIG. **10**, will show a recipe along with any digital files that are associated with it. For example, a cherished family recipe may show a digital copy of the original handwritten recipe, a photo of the family member who was the chef and a video of the family member making the recipe.

Each of the aforementioned views may also be seen in a chart format view that is interactive when any item on the chart is clicked, the user will them be taken to a new screen that details all relevant digital files (and file types) for the clicked item.

For album or event chart views, as shown in FIGS. **11** and **12**, the elements listed in those charts will include individuals who are part of each album/event, number of digital files, date and other pertinent information.

A people view, shown in FIG. **13**, may demonstrate all the names of individuals that are in the system in an alphabetical listing. Such a people view can also contain details on each person such as the number of photos and videos that are associated with that person. The user can click on that person to pull up the profile view of the individual or click on the number of photos to see all the photos associated with that person.

In the family tree chart view, shown in FIG. **14**, family lineage can be viewed in multiple ways. For example, a user can set himself as the tree anchor and then see a tree of all people entered into the database related to the user. The user could also set a contact as the tree anchor and then just view the descendants of that individual.

For a location chart view, as show in FIG. **15**, listings of all the locations that are in the system are displayed along with the number of digital files, as well as names of persons associated with each. A user can click on the location to see all the digital media files that are associated with a specific location.

A recipe chart, as shown in FIG. **16**, can show recipes that uploaded to the system. Along with the ingredients and steps of each recipe, this view can identify the chef(s) name, number of photos and videos associated with each.

For any of the views, the user can click on the digital file to start a slideshow feature that will allow them to scroll through an enlarged view of the digital file as illustrated in FIG. **17**.

Another aspect of the disclosure is the search filter. This filter allows users to select one or more criteria that will narrow down their results to just those digital files matching input criteria. The entire system can be filtered by, for example, key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify digital files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, no upload date information or are lacking any other tag.

It should be noted that in one embodiment, searching via key word will search through all tagged information (user populated or auto-generated upon import). For example, if a user searched for the term "Ohio," the system would search for that term associated with any file in any way. If the user had files with Ohio as a state, file name, street name, person's name, file comment, etc., all would be retrieved.

Settings applied in the advanced search filter can cumulatively carry over to any subsequent pages until new criteria are selected. For example, a user can apply a filter to retrieve files associated with a particular person. Then the user can set a date range to further narrow results to show only those files for that selected person within the date range. Any pages viewed from that point forward throughout the entire site would only contain files associated with person and the date range specified. The advanced search filter is illustrated in FIG. **18**.

Yet another feature can be a user's homepage, as illustrated in FIG. **19**, that can summarize the user's content within the system including relevant information in the system. It is contemplated that a user's homepage may show a summary of the total number of photos, videos, documents and audio files that the user has uploaded. In this embodiment, for each group of digital files (e.g., photos), the percent of files that has been organized with pertinent data such as date, name(s) and location can be noted. In addition, the homepage can show a list of people that are in the system and the respective count for photos, videos, documents and audio files associated with each person. Also contemplated is a summary of the events, albums and locations that have been entered into the system. The user homepage may serve as an executive summary dashboard of one's entire system and can be modified to provide data in an executive summary format for a user.

Another feature is that the entire system including the dynamic views can be presented in a wide range of user outputs—e.g. on the user's computer, smartphone or tablet display. The user may choose to present the digital files in any of the various types of ways disclosed herein. Other ways of outputting the files are also possible. The user can create and modify various sharing rights so that third parties may view the files and if desired, provide comments, apply tags or even download/copy the files for their own use.



Still another embodiment can provide export functionality. Once a user has used the organization functionality to assign information to data file(s), a user may want to export the data file in its original form (e.g., .jpg, .mp4, etc.) with the tags embedded within the digital file in the form of EXIF tags. In other words, a user can export his or her entire set of digital files, or may choose a subset based on keywords and tags. The exported digital files can include key tags and attributes users have assigned, and in one embodiment, such tags and attributes can be embedded within the digital files. For example, each exported digital file may be imbedded with user-entered data such as the people, location, and event name. This feature will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing digital files such as a social media website) where it can be viewed with these attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its digital files to a new digital archiving system.

A method is also disclosed. The method may include the steps of storing a digital file in a file repository, associating a plurality of digital tags having different tag types with the digital file, providing a search function that permits simultaneously searching by a plurality of digital tag types and provides a search result, and providing a user-configurable output to display the search result. The digital tag types may include, for example, a person's name, a location, a recipe, a date, a relationship between individuals, an event name, a rating, and a document type.

Under the disclosed method, access may be provided to the repository via the Internet. Relationships between users may also be tracked such that a family tree can be displayed. A recipe may also be linked to a user or person. Finally, the method may include the step of outputting a digital file and its associated digital tags into a single file.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

A plurality of advantages arise from the various features of the present disclosure. It will be noted that alternative embodiments of various components of the disclosure may not include all of the features described yet still benefit from at least some of the advantages of such features. Those of ordinary skill in the art may readily devise their own implementations of a digital file organization system that incorporate one or more of the features of the present disclosure and fall within the spirit and scope of the disclosure.

Application (also called "MemoryWeb Application" or "System")—The Application is an online program constructed using a mix of freeware code as well as custom-built proprietary coding with an interface that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share

Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files. This Application has already been disclosed in U.S. patent application Ser. No. 13/157,214 and incorporated herein by reference. This Application is also being trademarked as "Memory-Web" with the US Commissioner for Trademarks on Dec. 26, 2013 under application No.: 86/152,930. The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on mobile communication devices such as smart phones (e.g., iPhones), Personal Digital Assistants (PDAs) and Tablets (e.g., iPads).

Application Views—The Application Views utilizes the Application's ability to associate Digital Tags to Digital Files and display them in customized views such as Uploads, Collections, Slideshow, Location, Timeline, Family Tree, People Profile, and Recipes.

Application Advanced Filter System—A function that provides search capabilities using one or more Digital Tags within the Application, resulting in a narrowed output display of the applied filters to display one or more Digital Files and viewed in one or more Application Views. The Application Advanced Filter System can allow Digital Files to be searched and sorted according to a plurality of types of data and can be used for creating and organizing special views. The user interface may be user-configurable, and can present the Digital Files on a user's screen based on these user inputs.

Application Dot-Tag—The manner in which a Digital Tag is displayed within the Application using pill-shaped indicators that can reside near a file's image or overlaid on the file's image. MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag. However, it should be understood that other shapes and indicators are contemplated by the present invention, and may even be user-configurable. For example, the indicator may take the form of a sticky note, a different shape, a doted shape, or any number of variations of indicators that may be functional in displaying one or more words. Colors may also be used to indicate differing categories of indicators, or differing associations/intersection of the indicators. Within the pill-shaped indicator, the specific Digital Tag information is used to display information about a Digital File. Throughout this document, the Application Dot-Tag is shown as illustrated in FIG. **29** (indicators **0650**, **0654**, **0655** and **0656**).

Application Digital Tag Organizer System—Within the Application, a function for assigning one or more Digital Tags to one or more Digital Files at the same time through the Application Dot-Tag Organizer System. This feature allows Digital Tags to be assigned to items such as photos, videos, audio files, and documents. The information created from this functionality drives the outputs for the Application Views. The Application Digital Tag Organizer System will allow the tagging of key items as date, GPS location, star ranking, people (both name and facial recognition), album (s), family relationships, a date, event name, sharing rights, file type, document name, and recipes. Each of the Digital Tags is user-configurable.

Application Export System—Ability to export Digital File(s) from the Application, with the Digital Tags that were created within or imported/uploaded into the Application, embedded inside the Digital File. The Digital Tags within the exported Digital File can then be viewed and used by any other applications that can read EXIF tags.

Application Programming Interface ("API")—The Application Programming Interface (API) is the system that interacts with other communication points or services over HTTP via a POST, GET, PUT, DELETE methods. The API provides a way for users to access their MemoryWeb data outside of the web browser on mobile devices or other web connected devices. The actions within the API deliver MemoryWeb Digital Files and Digital Tags along with all meta data associated with such files and tags.

MW Automatic Uploader/Downloader Application—Separate from the main MemoryWeb Application, there are additional proprietary applications created by MemoryWeb for user to upload and download (export) Digital files to and from the main MemoryWeb Application. The first is the MW Automatic Uploader/Downloader built for Window's compatible computers. The second is the MW Automatic Uploader/Downloader build for MAC computer. Both of the MW Automatic Uploader/Downloader applications can be installed on the user's computer to automatically upload the desired Digital Files from their computer to the main MemoryWeb Application. In addition, the MW Automatic Uploader/Downloader applications allow for Digital Files to be exported from the main MemoryWeb Application to a desired folder on the user's computer with the updated tags embedded within the Digital File.

Storage System—A storage system can be a cloud-based Storage System (e.g., Amazon's AWS, Dropbox, Box.net, Deutsche Telecom's Cloud, etc.), hard-drive, server, or any venue that allows one's information to be stored. The storage system would act as a database and file repository for storage and retrieval of Digital Files to and from the Application.

Digital Files—An electronic file that can be in various file formats (e.g., PNG, JPEG, PDF, TIFF, MP3, MP4, WAV, and GIF) that are of items such as photos, videos, audio files, and documents.

Digital Tags—The word "Digital Tag" refers to any type of digital data that can be assigned to a file to distinguish and describe some aspect of that file through a tagging process. Digital Tags will be comprised of various groups of digital data including:

a) EXIF Tags—EXIF stands for "Exchangeable Image File Format" and is a standard that specifies the formats for images, sound, video, and ancillary tags. The EXIF standard is an Open Standard produced by the Standardization Committee and is detailed within their document called Standard of the Camera & Imaging Products Association. Standard of the Camera & Imaging Products Association, CIPA DC-008 Translation-2012. Exchangeable image file format for digital still cameras: EXIF Version 2.3. Established on April, 2010 and Revised on December, 2012. Prepared by: Standardization Committee. EXIF tags are also called "meta tags" or "metadata." The EXIF information is formatted according to the TIFF specification, and may be found in JPG, TIFF, PNG, JP2, PGF, MIFF,

HDP, PSP and XCF images, as well as many TIFF-based RAW images, and even some AVI and MOV videos. The EXIF meta information is organized into different Image File Directories (IFD's) within an image. The names of these IFD's correspond to the ExifTool family 1 group names.

When Digital Files are captured with digital cameras (including smartphones), scanners and other systems handling image, video and sound files, certain EXIF tags are automatically populated within the Digital File and can cover a broad spectrum of information such as:

- Descriptions (e.g., Title, Subject, Star Ratings, Tags, People, Comments)
- Origin (e.g., Authors, Date taken, Copyright)
- Image information (e.g., dimensions, color representation and size)
- Camera Setting Information (e.g., camera maker, camera model), including static information such as the camera model and make, and information that varies with each image such as orientation (rotation), aperture, shutter speed, focal length, metering mode, and ISO speed information.
- Advanced Photo Information (e.g., lens maker, lens model, contrast, brightness, EXIF version, etc.)
- File Information (e.g., file name, item type (e.g., JPG file), date created, date modified, size, etc.)
- A thumbnail for previewing the picture on the camera's LCD screen, in file managers, or in photo manipulation software.
- Global Positioning System (GPS) information that is also known as geocoding.
- The Application will auto-populate any existing EXIF Tags from the original Digital File upon upload into the Applications (as illustrated in FIG. **21**) and put this information into the Users Relationship Table on the Storage System.

b) Extensible Metadata Platform (XMP)—This is Adobe's Extensible Metadata Platform (XMP) format for labeling metadata within an Adobe file.

c) Png Textual Data (tEXt)—This is Portable Network Graphics (PNG) metadata format for labeling within a PNG file.

d) Microsoft Windows Tags—These are Microsoft Windows File Attributes that are stored in Data Blocks from Microsoft's system.

e) MemoryWeb Tags—These tags are typically developed within MemoryWeb and can relate to People Names, Recipes, Collections, Location Name, Family Relationships (also discussed in MemoryWeb Person Tags), Social Network Data (e.g., ID, contact IDs, etc.), File Folder Batch Name. This would be folder directory name that includes the name of each folder that eventually leads to the folder that the digital file was actually stored within the User's PC. This is used to help the user organize data within MemoryWeb based upon the users organization system used on their PC. Facial Recognition Data, and other type of tags that are user defined.

f) MemoryWeb Person Tags—These user defined tags within MemoryWeb are specific to each person profile including such areas as Nicknames, Birthdates, Date of Birth, Date of Death, Biography, Family Relationships (e.g., Mother, Father, Brother, Sister, Daughter, Son, Spouse, etc.), Pets, and Firsts (e.g., First Steps, First Words, First time riding a bike, etc.).

The combination of all the aforementioned tags is collectively referred to as "Digital Tags." The list of groups and Digital Tag types will grow as technology in this area



improves over time. These Digital Tags are also referred to as "File DNA" for MemoryWeb.

User Relationship Table—Within the Application, each User will store the data related to Digital Files, Digital Tags, User Settings, and other specific information related to a User's repository of information is kept within the User Relationship Table.

Data Blocks—Within the User Relationship Table, there are Data Blocks that will store information related to EXIF Tags, Microsoft Windows Tags, MemoryWeb Tags, and MemoryWeb Person Tags. These Data Blocks are used to generate the information that is displayed in such key components such as the Application Views and Application Dot-Tags. Custom Code—Proprietary scripts and code developed by MemoryWeb to enable key functions such as Dot-Tag relationships and ability to embed new user-defined tags into a file and/or override existing EXIF tags and the ability to navigate the application and it's functions via connections drawn from the associated tags

Open Source Libraries—Non-proprietary code taken from the free, open source community integrated that is used by the Application.

User Interface—The Application may be accessible over various "User Interfaces" including Personal Computers (e.g., Macs, Windows, etc.), Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad). The User Interfaces can be controlled through the Application using various tools such as a keyboard, mouse, and touch screen.

The present invention relates to an Application that has many functions including: 1) the ability to import, associate and embed Digital Tags to Digital Files by using existing Tags of a Digital File as well as the Application's custom Digital Tag options (also called the Application Digital Tag Organizer) for use in the Application; 2) view, sort, annotate, and share Digital Files from the various Application Views; 3) navigate using the proprietary Application Dot-Tag System; 4) filter Digital Files using the Application Advanced Filter System or Fast Search System; 5) store the Digital Files through an interactive Storage System through a User Relationship Table; and 6) export the Digital Files with the Digital Tags embedded within the Digital Files.

Prior to the invention of digital photography, people tended to share photos by displaying printed copies in frames and albums or would store them in a container in hope of preserving these assets for future use or future generations. Important photos would often be inscribed on the back with significant details (people, location, and event) to preserve the memory of that particular occasion. Many people would share their memories by assembling an album that could be viewed with others. Occasionally, extra copies of special photos may have been printed for friends, relatives, etc. At one time, film slide shows were also a popular medium for sharing photo memories.

With the evolution of Digital Files, there has been explosive growth in the number of individuals taking digital photos, converting old photos to digital copies, making movies and gathering digital documents and in the sheer number of files people are capturing digitally. Today, virtually every personal computing device contains some kind of photo, movie or other type of digital file creator/player/viewer/storer/etc.

At the same time, there is little to no cost for people to store large amounts of photos in various "containers" of the modern age. Facebook, Flickr, Shutterfly and countless other social media and specialty Digital Files sites allow users to post and share images to a community with a frequency and ease that continues to feed the fire of the digital revolution.

However, they don't allow much organization of Digital Tags, dynamic viewing of Digital Files, and the ability to export the Digital Files with new Digital Tags. Questionable and ever-changing privacy terms for user/account information, including digital files, have also left the marketplace leery of posting their full digital archive and associated context to these sites.

What is needed to complement the widespread availability of Digital Files is a medium that allows people to organize, view, navigate, search, preserve and share these files with all the memory details captured, connected and vivified via an interactive interface. Such a solution would allow Digital Files, including documents, photos, videos and audio, to tell a full story now, and for generations to come.

As disclosed in detail herein, the application provides the much needed platform that saves a user significant time, provides significant information with minimal screen space, and provides an appealing and customizable interface that will enhance the user experience.

Anytime the MemoryWeb Application exchanges information with an external Storage System or User Interface such as a phone, tablet, computer or other internet based user device, the interaction with the MemoryWeb Application involves Application Programming Interface (API). The API's allow each system to call the specific Digital Files and Digital Tags associated with each request so they can be viewed.

Additional features of the disclosure will become apparent to those skilled in the art upon consideration of the following detailed description of preferred embodiments exemplifying the best mode of carrying out the invention as presently perceived.

The present disclosure relates to one or more of the following features, elements or combinations thereof. The Application allows the importation of Digital Files and then the association of Digital Tags to the Digital Files by using existing EXIF Tags of a Digital File as well as the Application's custom organization of Digital Tags for use in the Application. The Application then allows the Digital Files to be viewed, sorted, annotated, navigated, and shared using the various Application Views. The Application can also filter Digital Files using the Application Advanced Filter System functionality. The Digital Files can be stored through a Storage System that interacts with the Application. In addition, the Application allows for Digital Files to be exported with the Application's Digital Tags embedded within the Digital Files.

The Application may be accessible over various user interfaces that may use the Internet and via applications that would be used on User Interfaces such as Personal Digital Assistants (PDA) (e.g., iPhones) and Tablets (e.g., iPad).

The presently disclosed Application provides users with an interactive platform to gather, organize, view, share and archive Digital Files using a proprietary organization system called the Application Digital Tag Organizer and export the modified Digital files with the Application's Digital Tags embedded within the Digital Flies using the Application Export feature.

The Application allows users to create, navigate, search, view and share Digital Files, which could represent, for example, the memories a user has collected from the past and present, and could incorporate additional memories for generations to come. As outlined herein, various embodiments are disclosed that can accomplish these and other goals. Description of embodiments

In FIG. **20**, the overall process flow of MemoryWeb is depicted. Each of the boxes depicted that are Inside the



Memory-Web System (**0050**) are detailed additional figures within this application. However, to help illustrate the overall process flow, FIG. **20** was created. In FIG. **20**, the process begins when original digital file(s) are uploaded to MemoryWeb (**0101**). This process can take place in a variety of ways including when a user manually selects uploads from the Uploads Application View (see FIG. **35** indicator **1701**), installs the a MW Automatic Uploader/Downloader Application on their computer, or imports Digital Files from the users' other sources (e.g., mobile phones, social networks, etc.).

Once a file is uploaded, the System Reading Phase (**0100**) begins. Information from the System Reading Phase is then sent to the System Interpreting and Adding Data to Relationship Table Phase (**0200**). During this phase, information is passed back and forth to the Third Party Facial Recognition System (**0400**) to the Third Party Facial Recognition Provider (**0401**). The system will also coordinate between the Third Party Social Media (Data Exchange) (**0500**) and then to various Third Party Media Providers (**0501**). Another key step from the System Interpreting and Adding Data to Relationship Table Phase is adding both the Digital Files and the corresponding tags to the User Relationship Table (**0300**). As illustrated in subsequent figures within the patent application, the User Relationship Table serves as the key repository for all of the user's data that generates virtually every display from the application. From the User Relationship Table, the user can use the Applications Digital Tag Organizer System (**0600**), the Continuous Link of the Application Dot-Tag System (**0700**), the Advanced Filters System (**0800**), or the Keyword Fast Search System (**0900**). The user can also share Digital File(s) through the Share to Social Network Provider System (**1000**) to a Third Party Social Network Provider (**0501**) that is outside the MemoryWeb system or use the Share to Individual System (**1200**) to a Person (**1201**) that is Outside the MemoryWeb system using the data from the User Relationship Table. To help generate some of the map views, the system will utilize a Third Party Geographical Mapping System (**1100**) that connects to a Third Party Geographical Mapping Provider (**1101**) that is Outside the MemoryWeb system. The user can also export Digital Files with the Digital Tags embedded within the Digital File using the Application Export System (**1300**) that will send a MemoryWeb Modified File from MemoryWeb (**1301**) to a designated location by the User that is outside the MemoryWeb system.

As illustrated in FIG. **21**, the System Reading Phase (**0100**) is described in further detail. The System Reading Phase will first check if the digital file is a duplicate file (**0102**) that is already in the User's collection. If the file is a duplicate, it will not be uploaded (**0104**). However, if it is a new file for the user, the System Reading Phase will then locate the EXIF Image File Directories in the digital file (**0103**) and then send that information to the System Interpreting and Adding Data to Relationship Table Phase (**0200**).

As further illustrated in FIG. **21**, the System Interpreting and Adding Data to Relationship Table Phase will take the EXIF Image File Directories sent from the System Reading Phase and read and iterate through each EXIF tag item (**0201**). At this time, the system will identify faces from the digital file and then send this information to the Third Party Facial Recognition System (**0400**) that will coordinate with the Third Party Facial Recognition Provider (**0401**) that is outside the MemoryWeb. When the Third Party Facial Recognition System (**0400**) sends back data related to facial recognition of faces in the Digital File, it comes back then the system sends information related to people facial rec-

ognition tags to the MemoryWeb Person Tag (Data Blocks) within the User Relationship Table (**0300**). The detailed process of the Third Party Facial Recognition System (**0400**) is further explained in FIG. **25**.

During the Read & Integrate Through Each EXIF Tag item (**0201**) the process will also upload a the original Digital File in MemoryWeb (**0211**), the process will also store a copy of the original file within the User Relationship Table (**0300**) and create five duplicate copies (**0203**) of different resolution sizes as follows: XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and a Thumbnail Duplicate File (**0306**). Each duplicate file is used in different parts of the application depending upon the photo size needed for such areas within the Application such as Application Views, Application Dot-Tags, and Application Digital Tag Organizer System.

Another embodiment during the Read and iterate through each EXIF tag item (**0201**) stage is determining if a MemoryWeb tag exists (**0204**). A MemoryWeb tag is a Digital Tag that is currently being used as an Application Dot-Tag within the Application. If it is not a Digital Tag that MemoryWeb is currently using, the application will Save EXIF data to the User Relationship Table for Digital File (**0205**) and send this to the User Relationship table. This is done in case there are EXIF data that are desired to be used in future releases of the Application. For the Digital Tags that are being used in the Application, the system will Parse EXIF data into MemoryWeb Tags (**0206**), look up MW tag data (**0207**) and determine if a Digital Tag currently exists (**0208**). If a Digital Tag does not exist, the system will Create a new MW tag data ((**0209**) and send this to the appropriate Data Blocks within the User Relationship Table (**0300**). If Digital Tag data does exist, the system will Associate existing tag data ((**0210**) to the appropriate Data Blocks within the User Relationship Table (**0300**).

The third and final area within FIG. **21** is the System Indexing Digital Files and Tag Data Blocks for a Digital File within the User Relationship table (**0300**). In the User Relationship Table, the user's information system information stored such as User Settings (**0390**). Copies of the Original Digital File (**0301**), XL Duplicate File (**0302**, Large Duplicate File (**0303**), Medium Duplicate File (**0304**), Small Duplicate File (**0304**), and Thumbnail Duplicate File (**0306**) are stored. The final area of the User Relationship Table relates to the data blocks including EXIF Tag (Data Blocks) (**0320**), Microsoft Windows Tag (Data Blocks) (**0320**), MemoryWeb Tag (Data Blocks) (**0360**), and MemoryWeb Person Tag (Data Blocks) (**0380**).

In FIG. **22**, there are two charts that illustrate EXIF and MemoryWeb Tag Data Blocks. The first chart illustrates the EXIF Tags Version 2.3 (Data Blocks) (**0320**). For the EXIF Tags Version 2.3 (Data Blocks) (**0320**), the information from this table is an expert from an Open Source Library code produced by the Standardization Committee that is detailed within their document called Standard of the Camera & Imaging Products Association. While all the EXIF tags that are contained within a Digital File are read (as previously illustrated in FIG. **21** within the System Interpreting and Adding Data to Relationship Table Phase (**0200**)) and are stored within the system's User Relationship Table (**0300**), a summary of the primary EXIF tags that are currently used within MemoryWeb are illustrated in the EXIF Tag Blocks (**0320**). The EXIF tag information is organized into different Image File Directories (IFD's) or "Data Blocks" within an image and organized in the column heading of Tag Label (**0321**). The names of these IFD's correspond to an EXIF



standard for ExifTool family 1 group names that are depicted in the column heading of EXIF Group (**0322**). The IFD's are stored within a specific data block location within a Digital File and these locations have a standard name of the specific location (**0323**) within the Digital File. The primary EXIF tags that are read and used by MemoryWeb to generate Application Dot-Tags are: Description Title (**0324**), Description Rating (**0325**), Origin Date Taken (**0326**), Digital File Width (**0327**), Digital File Height (**0328**), User Comment (**0329**), GPS Latitude (**0330**), GPS Latitude Ref (**0331**), GPS Longitude (**0332**), and GPS Longitude Ref (**0333**).

In FIG. **22**, the second chart illustrates the MemoryWeb Tag (Data Blocks) (**0360**) that overlap with standard EXIF Tag blocks. As previously illustrated in FIG. **21**, the EXIF Tag Data blocks are read and brought into the User Relationship Table (**0300**). When the data is stored within the system's User Relationship Table, they are also stored with the corresponding EXIF tag label as illustrated in the column called MemoryWeb Tag (**0361**). For example, when a Digital File is brought into MemoryWeb and the system reads the Origin Date Taken (**0326**) for the EXIF Tag block, the system will denote this in the MemoryWeb table as MediaAsset.DateCreated (**0364**). This designation is very important as it allows MemoryWeb to re-inject any updated or new MemoryWeb Tag data into the corresponding standard EXIF Tag blocks of a Digital File when it is exported from MemoryWeb (as previously illustrated in FIG. **20** with the Application Export System (**1300**)). Continuing with this example, if the Origin Date Taken is modified within the MemoryWeb system, when the file is exported through the Application Export System (**1300**), the new updated date from MemoryWeb (**0364**) will be mapped to the EXIF Tag Data block with the Tag Label of Origin Date Taken (**0326**) with the EXIF Group called ExifIFD (**0334**) and the Location called 0x9003 (**0335**).

In situations where there is no standard EXIF Tag data block for the MemoryWeb Tag for such items such as Collections, People Location Name, Recipe Name, etc. (**0367**), they are mapped to a general EXIF Tag data block called User Comment (**0329**). As the standards for EXIF Tag data blocks change, the system can be mapped to any new specific EXIF Tag data blocks. For example, if an EXIF Tag Data block is made for Recipe Name, the MemoryWeb Tag related to Recipe Name will be mapped specifically to that new EXIF Tag data block as opposed to User Comment.

In FIG. **23**, there are two charts that illustrate Microsoft Windows and MemoryWeb Tag Data Blocks. The first chart illustrates the standard Windows Imaging Component (WIC) Metadata (Data Blocks) (**0340**). Microsoft Windows has their metadata tag blocks contained in areas called Tag Labels (**0341**). The primary WIC Metadata data blocks that are read and used by MemoryWeb to generate Application Dot-Tags are: File Name (**0342**) and File Folder Path (**0343**). The corresponding MemoryWeb Tag data blocks (**0360**) for the WIC metadata tag blocks are called MediaAsset.Filename (**0372**) for the Microsoft file name and MediaAsset.UploadBatch.Batchname (**0373**) for the Microsoft File Folder Path. The ability for MemoryWeb to read the File Folder Path from Microsoft is a unique process used within MemoryWeb to help the user organize their photos based upon the organization methods they have already used within Microsoft. For example, if the user stored a group of photos on their Microsoft computer in the file directory C:/Photos/2013/First Day of School, MemoryWeb will automatically place the photos that were located within that Microsoft File Folder Path into a MemoryWeb Application Dot-Tag under a collection called "First Day of School" based upon the last

folder within the file folder path. An example of the Application Dot-Tag that would be generated from the File Folder Path is in FIG. **31** with the label "First Day of School" (**0770**). In addition, MemoryWeb will allow the user to view the photos that are within a specific File Folder Path in the MemoryWeb Uploads Application View so that the user can organize photos from the same File Folder Path. An example of how this will be illustrated within MemoryWeb's Uploads Application View is in FIG. **35** with the groping of photos with the File Path Name C:/Photos/2013/First Day of School (**0709**).

In FIG. **24**, the MemoryWeb Person Tag Data Blocks (**0380**) that are contained with a User Relationship Table are illustrated. For any person that is added within a user's account, various MemoryWeb Person Tag Data Blocks are stored including: Person Name (**0395**), Nickname (**0381**), Birthdate (**0382**), Date of Death (**0383**), Biography (**0384**), Mother (**0385**), Father (**0386**), Brother(s) (**0387**), Sister(s) (**0388**), Daughter(s) (**0389**), Son(s) (**0390**), Spouse(s) (**0391**), Facial Recognition (**0392**), FacebookID (**0393**), Pets (**0394**), and other data blocks that will be added in the future as the Application grows (**0396**). These data blocks are primarily used in the People Profile Application View as illustrated in FIG. **32** (indicator **1430**). One embodiment within the MemoryWeb Person Tag Data Block contains the FacebookID (**0393**). As illustrated in FIG. **26** (indicator **0507**), information from Third Party Media Providers will be exchanged within MemoryWeb and the user's FacebookID will be provided and stored within the MemoryWeb Person Tag Data Block. In addition, any of the User's contacts from Facebook will also be downloaded into the corresponding MemoryWeb Person Tag Data Blocks for any matching persons within the User's MemoryWeb account. The information from the Third Party Media Providers that are stored within MemoryWeb will be used to provide "push notifications" to the user for various items such as when the user or any one of its contacts posts a photo to that Social Media venue.

As illustrated in FIG. **25**, the Third Party Facial Recognition System (**0400**) is described in further detail. As photos are imported or uploaded into the Application, the systems will request thumbnail Digital Files (**0404**) from the User Relationship Table (**0300**). On a routine basis (e.g., daily), the system will retrieve all the thumbnails of Digital Files with unconfirmed faces (**0403**) and the send those Digital Files (**0404**) to the Third Party Recognition Provider (**0401**). The Third Party Facial Recognition Provider (**0401**) uses their algorithms to find location of eyes, nose, mouth and many other points for each face detected in the photo. They will also determine gender, check if the person is smiling, have eyes open, lips sealed or wearing glasses. The Third Party Facial Recognition Provider will use their algorithms to associate potential matches of faces for the user's collection of photos. For each face, the system will send back attributes including gender (male, female), glasses (true, false), smiling (true, false), lips (sealed, parted), eyes, (open, closed), mood (happy, sad, angry, surprised, disgusted, scared, neutral), field in the response have two subfields: value (string) and confidence (integer). For each attribute, the Third Party Facial Recognition Provider will assign percentages of confidence (0% to 100%) for each attribute that can be used by the MemoryWeb Application to utilize.

The Third Party Facial Recognition Provider will then send the information relating to a person back to MemoryWeb (**0405**). The MemoryWeb Application parse the identified faces and corresponding Facial Recognition data for each Digital File (**0406**). The system will interact with the User Relationship Table and determine if the face is an existing (i.e., "trained") face in MemoryWeb where there is a Face ID in the User Relationship Table (**0407**). If not, the system generates a facial recognition record for unknown person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0410**). If yes, the system will then determine if the face is above the system's thresholds for confirming a face is a specific person in the user's MemoryWeb system (**0408**). If no, system generates virtual unconfirmed facial recognition record for person and then sends information to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0411**). If yes, the system records and associates specific face for Digital File with a MemoryWeb Person ID and sends to MemoryWeb Person Tag (Data Blocks) in User Relationship Table (**0409**).



Typically, the ability to confirm and deny facial recognition matches will be within the People Profile Application View as illustrated in FIG. **32** within the facial recognitions area (indicator **1442**). The system will also have other facial resonations area where the user can confirm or deny the suggested facial recognitions of a person for a Digital File. When the user denies the suggested facial recognition, the system dis-associates potential person match Tag, search's the user's collection for other potential matches, and then sends information to Tag Data Block of Relationship Table for the Digital File. If the user accepts the suggested facial recognition, the system sends this facial recognition tag confirmation to the User Relationship Table for the Digital File. Once a confirmation is made, the newly associated Digital File will have that confirmed person Application Dot-Tag associated to that Digital File for all Application Views. Each time an accepted or denied facial recognition is made for a specific person, the specific data points used for facial recognition is improved and sent to the Third Party Facial Recognition Provider for more accurate confirmations of that person during the next run for that person.

As illustrated in FIG. **26**, the Third Party Media System (Data Exchange) (**0500**) is described in further detail. There are numerous types of third party media systems that are contemplated for MemoryWeb including social network providers (e.g., Facebook, Twitter, and LinkedIn) and other photo sites (e.g., Flickr and Picasa). In addition, it is contemplated for the ability to print Digital Files from MemoryWeb using third party print providers such as Walgreens or Shutterfly. Further contemplated solutions might be from digital file warehouses such as Dropbox and box.net. All of the Third Party Media Systems will interact with MemoryWeb using the same system that is described within FIG. **26**. The Third Party Social Media System starts when the user initiates sharing of their information with Third Party Media Provider with MemoryWeb (**0502**). When this is initiated, the system will send registration information (**0503**) to the Third Party Media Provider (**0501**). Once received, the Third Party Media Provider will send back a confirmation with the Third Party Social Media ID (**0504**) and then the system will send the information (**0505**) to the User Settings Table (**0390**) within the User Relationship Table (**0300**). The system will then send daily requests from the User Relationship Table for contact names and IDs (**0506**) to the Social Media Provider (**0506**). If there are new contact names that are not part of the user's current people, the system will receive new contact names and IDs from the Social Media Provider (**0501**). The user will have the ability to confirm or deny matches (**0508**) with their contacts within MemoryWeb. If there is a match, the system will associate the existing person within MemoryWeb to the

same ID of the person within the Third Party Social Media platform (**0509**) and then send this to the User Relationship Table. If there is not a match, the system will add this additional contact as a new person and send (**0510**) this to the User Relationship Table. If the user wants to share or print Digital Files from MemoryWeb, they can do this with the Share to Third Party Media Provider System (**1000**) that is further detailed within FIG. **46**.

In FIG. **27**, the MemoryWeb User Settings Table is illustrated. As illustrated in the User Settings Table (**1900**), various data blocks of information is stored including the User's Name (**1901**), Payment ID (**1902**) that is used with third party payment providers, Password (**1903**), Account Type (**1904**) (i.e., free or paid account), User's email (**1905**), Language preference (**1906**), Date format preference (**1907**), Email notification (**1908**) preferences, the ability to share Contacts (with third Party Social Media) (**1909**), Facebook ID (**1910**), API Token (**1911**), Payment Date (**1912**) and other settings that will evolve as the Application grows (**1913**).

In FIG. **28**, the Application Digital Tag Organizer System (**0600**) is illustrated. Within various Application Views the user can select, add, delete and edit MemoryWeb Tags for such areas as people, date, location, collections, star rankings, and recipes. An illustration of an Uploads Application View where MemoryWeb Tags for a Digital File can be selected, added, deleted, or edited is illustrated in FIG. **35**. The Application Digital Tag Organizer System begins when the user selects one or more Digital Files in MemoryWeb (**0601**). The system then sends a request to the User Relationship Table for the specific Digital File (**0602**). The system then retrieves the Digital File and the Digital File Tag Data Blocks (**0603**) from the User Relationship Table (**0300**). Next, the system will display the Digital File and the corresponding Digital File Tag Data Blocks in the form of Application Dot-Tags (**0604**). An example of how the system can illustrate a Digital File with the corresponding Application Dot-Tags is in FIG. **31** (indicators **0780**, **0765**, **0766**, **0768**, **0770**, and **0771**).

If the user selects an Application Dot-Tag (**0605**), the system will utilize the Continuous Link of Application Dot-Tags System (**0700**) to produce the results of that Application Dot-Tag within one of the Application Views that is later illustrated in FIG. **30**.

If the user selects add for a MemoryWeb Tag (**0606**), the user can add a new MemoryWeb Tag. When the user begins to type in text to add a tag, the system will produce suggestions on matching MemoryWeb Tags or the option to add a new tag (**0607**). If a matching tag is selected (**0608**), the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0610**). Alternatively, if the tag does not exist the user can create a new MemoryWeb Tag (**0609**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0611**).

If the user selects edit for a MemoryWeb Application Dot-Tag (**0612**), the user can add information text to edit the MemoryWeb Tag and the system will produce suggestions or matching MemoryWeb tags or the option to add a new tag (**0613**). If there is a match within the user's system, the matching MemoryWeb Tag will appear and the user can select the MemoryWeb Tag (**0614**). Once the matching tag is selected, the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0616**). Alternatively, the user can create a new MemoryWeb Tag (**0615**) and then the system associates the new MemoryWeb tag to the Tag Block of the Relationship Table for the Digital File (**0617**). If the user selects delete for a MemoryWeb Application Dot-Tag (**0618**), the system deletes the association of MemoryWeb tag to Tag Data Block of Relationship Table for Digital File (**0619**).

In FIG. **29**, the Application Dot-Tag Shape and Content is illustrated (**0650**). MemoryWeb Tags are illustrated as Application Dot-Tags within the Application to help the user organize their Digital Files with key components of related information such as people, date of file, location, collection, star ranking, and recipe. The MemoryWeb Application Dot-Tag is more than just text (as traditional tagging systems) because Memory-Web Application Dot-Tags act as mini search engines that allow the user to see how many matching files there are to that MemoryWeb Tag and if selected will take the user to the corresponding Application View to illustrate the linked search results of that Application Dot-Tag (as illustrated in FIG. **30**). In essence, the Application Dot-Tags operate as mini search engines for the user's Digital Tags.

The structure of an Application Dot-Tag (**0650**) can take on an solid-line enclosed shape of a pill, dot or similar depiction (**0651**) and within the shape the name of the MemoryWeb Tag is displayed (**0653**) along with the number of Digital Files (**0652**) that are also associated with that same MemoryWeb Tag. FIG. **29** further illustrates more examples of the Application Dot-Tags. If the number of Digital Files associated with a specific MemoryWeb Tag is less than a certain number (e.g., 1000), the actual number of Digital Files associated with that MemoryWeb Tag is displayed. In FIG. **29**, this is illustrated with an Application Dot-Tag that has **453** files that are associated with the location of Cologne, Germany (**0654**). However, if the number of Digital Files associated with a specific MemoryWeb tag are greater than the character length, a greater sign along with a number sequence that is less than the total number of associated Digital Files will be displayed (**0655**). In FIG. **29**, this is illustrated with an Application Dot-Tag that has ">999" (**0657**) as the number of Digital Files with the exact same MemoryWeb Tag and if the name of the MemoryWeb tag is longer than the text sequence, only a portion of the MemoryWeb tag will be displayed along with an ellipse as illustrated with "Holiday Photos from . . . " (**0658**). Finally, the Application Dot-Tag may be illustrated with a dotted or similar distinction (as opposed to a solid line) to help indicate a partial relationship (**0656**). In the illustration in FIG. **29**, the dotted line is to indicate that only some of the selected Digital Files have the MemoryWeb Tag of Frank Smith.

In FIG. **30**, the Continuous Link of Dot Tag System is illustrated (**0700**). When a user selects an Application Dot-Tag, it will take them to the corresponding Application View that relates to the type of MemoryWeb Tag. The Continuous Link of Application Dot-Tag System begins when a user selects an Application Dot-Tag (**0701**).

If the Application Dot-Tag is a Person (**0702**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of how a user can select a person Application Dot-Tag is in FIG. **31** (indicator **0764**). For a person tag, the system receives data for that person from the User Relationship Table and displays the relationship data in a People Profile View (**0709**). A sample illustration of a selected Person Application Dot-Tag is in FIG. **32** (indicator **1430**).

If the Application Dot-Tag is a Collection (**0703**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a collection Application Dot-Tag that

can be selected is in FIG. **31** (indicator **0781**). For a collection tag, the system receives data for that collection from the User Relationship Table and displays the relationship data in a Collection View (**0710**). A sample illustration of a selected Collection Application Dot-Tag within a Collection View is in FIG. **33** (indicator **1530**).

If the Application Dot-Tag is a Location (**0704**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a location Application Dot-Tag that can be selected is in FIG. **31** (indicator **0768**). For a location tag, the system receives data for that location from the User Relationship Table and displays the relationship data in a Location View (**0711**). A sample illustration of a selected Location Application Dot-Tag within a Location View is in FIG. **34** (indicator **1630**).

If the Application Dot-Tag is a Date (**0705**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). A sample illustration of a date Application Dot-Tag that can be selected is in FIG. **31** (indicator **0766**). For a date tag, the system receives data for that date from the User Relationship Table and displays the relationship data in Uploads View with that date filtered (**0712**). A sample illustration of a selected Date Application Dot-Tag within Uploads View is in FIG. **40** (indicator **0861**).

If the Application Dot-Tag is a Recipe (**0706**), the system will send a request to display the requested information (**0708**) to the User Relationship Table (**0300**). For a recipe tag, the system receives data for that recipe from the User Relationship Table and displays the relationship data in a Recipe View with that date filtered (**0713**). A sample illustration of a selected Date Application Dot-Tag within Recipe View is in FIG. **36** (indicator **1800**).

The Application is contemplated to have additional types of Application Dot-Tags (**0707**) in the future including Family Trees, Timespan, etc. and each of these MemoryWeb Tags will go through the same continuous link of Application Dot-Tag process. For an additional type of Application Dot-Tag, the system will receive data from the User Relationship Table and displays the relationship data in the corresponding view for that type of Application Dot-Tag (**0714**).

If within any of the Application Views the user selects a Digital File (**0715**), the Digital File is then displayed in a Slideshow View (**0716**) where the user can again select an Application Dot-Tag (**0701**) and start the continuous link of Application Dot-Tag functionality over again. Also within an Application View, if the user selects another Application Dot-Tag (**0717**), the entire continuous link of Application Dot-Tag functionality begins again and sends the request back to ask if the newly selected Application Dot-Tag is a person (**0702**).

In FIG. **31**, the Slideshow view of a Digital File, Application Dot-Tags, and comments are illustrated (**0750**). When viewing a Digital File or group of Digital Files within the Slideshow Application View (**0750**), the selected Digital File is displayed in the center of the screen (**0754**). If the user wants to export this photo with all the associated MemoryWeb Tags, they can select export (**0751**) which will initiate the Application Export System as illustrated in FIG. **49**. If the user wants to see the Digital File that is one file before the selected Digital File, they select the left arrow (**0752**) or they can select the right arrow (**0753**) to display the next photo in the sequence. Below the Digital File, the comments (**0755**) that are specific to that Digital file are depicted. If the user wants to edit the comments, they select edit (**0756**). If the user would like to see a moving slideshow of all the photos that are part of the group of Digital Files, they can select on the play sign (**0757**) or simply click the specific thumbnail of a Digital File (**0758**) to be displayed. The user can also have the slideshow in a full screen slideshow by selecting the full screen icon (**0759**). If the user wants to share the individual Digital file via email, they can select the mail icon (**0760**) or share it through a third party median provider, in this case Facebook (**0761**). A more detailed description on how the share functionality works is in FIG. **46** (indicator **1000**).



In FIG. **31**, each Application Dot-Tag that is associated with a Digital File is illustrated to the right of the Digital File under each major MemoryWeb Tag area. For this example, the People area (**0763**) has Application Dot-Tags of Jackson Smith (**0780**) and J C Smith (**0764**) associated with the selected Digital File. In the Dates area (**0765**), the Application Dot-Tag of Aug. 28, 2013 (**0766**) is associated with the selected Digital File. In the Locations Area (**0767**), the Application Dot-Tag of Abe Lincoln Elementary School (**0768**) in the location associated with the selected Digital File. In the Collections Area (**0769**), the Application Dot-Tags of First Day of School (**0770**) and Jackson and J C Photos 2013 (**0771**) are associated with the selected Digital File. The Star Rankings Area (**0782**) shows that four out of five stars (**0773**) was selected for this Digital File. If the Digital File is associated with a Recipe (**0774**) the Application Dot-Tag would be illustrated in this area. The Media Type area indicates that this is a Memento (**0776**). If the user wants to delete this Digital File from the Application, they can select the Delete Item function (**0779**). If the user wants to edit the Application Dot-Tags, they can select the edit icon (**0762**) and all the MemoryWeb Tag areas will be in edit mode as later illustrated in FIG. **35**. Finally, any original Digital File detail (e.g., file name, camera specifications, etc.) is illustrated (**0778**).

In FIG. **32**, both of the People Application Views are illustrated. The first People Application View (**1400**) is used to display all the people that were created within the user's Application. This view can be seen by selecting "People" (**1401**) from any of the Application Views within the Application. The people can be listed in various sort orders though a drop-down (**1402**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. Additional sorts are contemplated such as age sort. For each person, a thumbnail of their face along with their name is depicted. In this figure, Jon Smith (**1403**) and J C Jon Smith (**1404**) along with some other people are illustrated. Also, the user can determine if they want to have 20, 50 or 100 people shown at one time (**1405**) by selecting the corresponding number box. At the top of every Application View within the Application, the user can select Fast Search (**1450**) that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters (**1451**) that is further described in FIGS. **37-43**.

In the second People Application View within FIG. **32**, a single people profile (**1430**) is illustrated. The individuals name is displayed at the top of the page (**1431**) along with their Nicknames (**1433**), when they were Born (**1434**), who their parents are (**1435**), Siblings (**1436**), Children (**1437**), and the person's Biography (**1438**). The Person Profile Photo of that individual is illustrated (**1439**) and if the user wants to change the profile photo, they can change by selecting change profile photo (**1440**). For each person, the system can allow the user to quickly see all the tags that are associated to a person. In this example, the system illustrates

that there are four photos (**1452**) associated with that person and will also illustrate thumbnails of each of the four photos (**1446**). These thumbnails can be selected and then the user will be taken to the slideshow view for that Digital File. If the user selects Collections (**1441**), all of the collections that the person has been tagged within will be displayed. If the user selects Facial Recognitions (**1442**), all the faces that are confirmed or need to be confirmed are displayed. This is the area where the user can select to confirm or deny a suggested facial recognition through the Third Party Facial Recognition System that is illustrated in FIG. **25**. If the user selects Locations (**1443**), all of the Locations that the specific person has been tagged within will be displayed. If the user selects Family Relationships (**1444**), the seven people that the user is associated with will be displayed in a family chart or tree. If the user selects Recipe (**1445**), all the recipe's that the user has been tagged within will be displayed. If the user wants to edit any details within the individual people profile, they can select edit (**1447**) and all the fields will allow the ability to edit the details. If the user selects any of the Application Dot-Tags such as the individuals mother Jane Smith (Doe) (**1449**), the application will utilize the Continuous Link of Application Dot-Tag System (see FIG. **30**) and take the user to an individual people profile view of Jane Smith (Doe). If the user selects View all People (**1432**), the Application will go back to the multiple People View (**1400**).

In FIG. **33**, both of the Collection Application Views are illustrated. The first Collection Application View is used to display all the collections that were created within the user's Application (**1500**). This view can be seen by selecting "Collections" (**1501**) from any of the Application Views within the Application. The collections can be listed in various sort orders though a drop-down (**1502**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each collection, a thumbnail of a Digital File from that collection depicted. In this figure, Smith Family Photos (**1503**), Europe Trip (**1504**), First Day of School (**1505**), Jackson and J C Photos 2013 (**1506**), and Baseball Games (**1507**) is illustrated. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

In the second Collections Application View within FIG. **33**, a single collection (**1530**) is illustrated. The individual collection name is displayed at the top of the page (**1532**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system shows photos (**1533**) associated with the Smith Family Photos Collection. If the user wants to edit any Digital Files within the collection, they can select edit (**1535**) and then the user can add or delete any Digital Files as well as set the cover photo for a collection. If the user wants to share this collection (**1534**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1531**), the Application will go back to the multiple Collection View (**1500**).

In FIG. **34**, both of the Location Application Views are illustrated. The first Location Application View is used to display all the locations that were created within the user's Application (**1600**). This view can be seen by selecting "Locations" (**1605**) from any of the Application Views within the Application. The locations can be listed in various sort orders though a drop-down (**1606**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. For each location, a thumbnail of a Digital File from that location depicted. In this figure, Wrigley Field (**1601**), Abe Lincoln Elementary School (**1602**), Home Sweet Home (**1603**), and Stonehenge (**1604**) is illustrated. What is also contemplated instead of a Digital File from that location is that a zoomed in image of a map from the specific location using the Third Party Geographical Mapping System later depicted in FIG. **47**. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.



In the second Locations Application View within FIG. **34**, a single location (**1630**) is illustrated. The individual location name is displayed at the top of the page (**1632**). Thumbnails of each Digital File within the specific collections are illustrated. In this example, the system illustrates a one photo (**1633**) taken at Wrigley Field (**1634**) that is associated with the location called Wrigley Field. If the user wants to edit any Digital Files within the collection, they can select edit (**1637**) and then the user can add or delete any Digital Files. If the user wants to share the Digital Files associated with this location (**1636**), they can select a method to share and this will take the user through the Share to Third Party Media Provider System illustrated later in FIG. **46**. If the user selects View all Collections (**1631**), the Application will go back to the multiple Collection View (**1600**). As part of the individual Location View, an interactive map displaying a zoomed-in image of the specific location is displayed (**1635**).

In FIG. **35**, the Uploads Application View and how it uses the Application Digital Tag Organizer System is illustrated (**1700**). Similar to the concept of writing certain information "on the back of a photo," the system's digital tagging system (also called Application Digital Tag Organizer) allows a user to select large amounts of Digital Files and add Digital Tags that can characterize and document the digital file(s). Digital Files can be individually or group organized at the same time for many tags including, but not limited to, a person's name, family relationships of the subjects to the user and between each other (e.g., mother/father), location, date, album, comments, document type (e.g., birth certificate, poetry), recipe, ranking or rating, and sharing rights. One or more Digital Files can be selected at the same time and displayed with an overlaid check mark when activated (**1705** and **1710**) and then Digital Tags can be assigned to a single file at a time or to a plurality of files at once. For example, if a user wishes to assign the tag "grandma" to 100 photos at once, the system provides a way for a user to select all 100 photos (**1713**) and enter the tag only once. In addition, the system does include an indicator that appears when a user hovers over the Digital File providing all the relevant Digital Tags associated with that specific Digital File (**1737**) and in this example it shows the caption of "Family Smith finally sees Stonehenge," that four People are tagged to this photo, one collection is tagged to this photo, there are zero people recognized through Facial Recognition, and the date of this photo is from Dec. 21, 2013. If the user wants to delete a single photo from uploads, they can click on the "x" (**1735**) that is displayed when the user hovers over the Digital File thumbnail. When there are multiple Digital Files, the user can determine how many images are displayed at one time in the Items Per Page Buttons (**1738**) that include such numbers at 20, 50 and 100 on the page at the same time. When there is are more Digital Files that items per page,

they are automatically grouped by pages and a Page Button (**1739**) can be selected to see the next set of Digital Files.

In the Uploads Location View, Digital Files can be directly uploaded to the Application by selecting Upload Files (**1701**) and the user will have the option to select the specific Digital Files to be uploaded from their Storage System. Users also have the option to install the Memory-Web Download Application that can be installed on either a Microsoft or MAC computer that will automatically upload and sync photos to and from the users Storage System to the MemoryWeb Application. Also displayed is the amount of space being used by the user within the Application (**1702**). Uploads of Digital Files can be listed in various sort orders though a drop-down (**1703**) such as: Newest to Oldest (added), Oldest to Newest (added), Alphabetical (A-Z), Alphabetical (Z-A), etc. In addition, the Digital Files can be sorted by File Batch Name (A-Z) or File Batch Name (Z-A). In FIG. **35**, the sort of File Batch Name (A-Z) is selected (**1703**) and this provides three groups of Digital Files with the names File Folder C:/2013/Family Fun (**1704**), File Folder C:/2013/General (**1706**), and of File Folder C:/2013/First Day of School (**1709**). The File Batch Name is created when Digital Files are uploaded to the Application. The File Batch Name allows the user to see the file directory of how they had their Digital Files stored from another Storage System (e.g., on their computer hard drive) that allows for easier organization within the MemoryWeb Application. For example, in the sort of File Folder C:/2013/General (**1706**), two digital files (**1707** and **1708**) are illustrated that came from the exact same file folder path of the Users Storage system upon upload. At the top of every Application View within the Application, the user can select Fast Search that is further described in FIG. **44**. Also at the top of every Application View within the Application, the user can select Apply Filters that is further described in FIGS. **37-43**.

On the right side of FIG. **35**, the associated Application Dot-Tags along with the ability to organize one or more Digital Files at the same time is illustrated. At the top of the screen, it shows how two Digital Files are selected (**1712**) that correspond to the selected (checked) Digital Files (**1705** and **1710**). Below this area illustrates all the Application Dot-Tags that are associated with the two selected Digital Files. The user has the option to select all (**1713**) the Digital Files being viewed in the Uploads View as well as selecting none (**1714**). By selecting all, the user can administer Application Dot-Tags to all the selected Digital Files at the same time. If the user wants to delete Digital Files, they can select the Digital Files to be deleted and then select the Delete Selection (**1715**) option.

In FIG. **35**, each Application Dot-Tag that is associated with the selected Digital File(s) is illustrated. For this example, the People area (**1716**) has Application Dot-Tags of Jackson Smith (**1734**), Jane Smith (**1733**), Jon Smith (**1731**, and J C Smith (**1717**) that are associated with the two selected Digital Files (**1710** and **1705**). If the user wants to add a person to all the selected Digital Files, they can click on "+Add People" (**1718**) that will display a pop-up where the user can search for an existing person within the user's existing people within the Application or add a new person to the user's group of people within the Application. It is contemplated to have a Facial Recognition suggestions appear in this area of the Application that will allow users to confirm or deny a recognized person to a specific Digital File. However, the current version of the People area is useful for situations where a face is not recognized, but the user desires to tag a person to a Digital File, they can manually assign a Person Application Dot-Tag to that Digital File for an existing person (e.g., if the person's back is turned, it is a document that contains that person, a piece of art created by that person, etc.).

In the Dates area (**1719**), the organize functionality for assigning a Digital Tag of a date within the Digital File(s) is illustrated. Upon upload, the date when the Digital File was created is automatically read by the Application and illustrated as an Application Dot-Tag (**1720** and **1730**). As illustrated in the Dates area, the Application Dot-Tags of Jul. 4, 2013 (**1720**) and Aug. 28, 2013 (**1730**) are illustrated as they correspond to the dates that are associated with each of the selected Digital Files. If the user wants to change the date for all the selected Digital Files, they can click on "+Add/Edit Date" (**1721**) that will display a pop-up where the user can add a new date for the selected digital files within the Application. This is a very useful feature when an incorrect date is assigned to a digital file (e.g., if a photo from Oct. 31, 1951 was digitized on Dec. 31, 2012, the digitized dates would show as an Application Dot-Tag that the user can change in this section to the correct date of Oct. 31, 1951).

In the Locations area (**1722**), the organize functionality for assigning Digital Tags of locations within the Digital File(s) is illustrated. Upon upload, the GPS location of where the Digital File was created (if applicable) is automatically read by the Application and illustrated as an Application Dot-Tag for locations of the selected files. In the locations area, the Application Dot-Tags of Abe Lincoln Elementary School (**1723**) and Wrigley Field (**1735**) are illustrated as they correspond to the locations that are associated with each of the selected Digital Files. If the user wants to change the location for all the selected Digital Files, they can click on "+Add/Edit location" (**1724**) that will display a pop-up where the user can search for an existing location within the user's existing locations within the Application or add a new location to the user's group of locations within the Application. Another added function to assign a location to the selected Digital Files is to use Search with Map (**1732**) that utilizes the Application's Third Party Geographical Mapping System that is further illustrated in FIG. **47** that allows the user to type in any relevant information (e.g., location name, address, state, etc.) and then the Application will search and pinpoint that location on a map.

In the Collections Area (**1725**), the organize functionality for assigning Digital Tags of albums within the Digital File(s) is illustrated. Digital Files can be associated to multiple albums. As illustrated in the Collections area, the Application Dot-Tags of First Day of School (**1726**), Jackson and J C Photos 2013 (**1727**), and Baseball Games (**1728**) are associated with the Collections for the selected Digital Files. If the user wants to add a Collection to all the selected Digital Files, they can click on "+Add/Create Collection" (**1729**) that will display a pop-up where the user can search for an existing Collection within the user's existing Collections within the Application or add a new Collection to the user's group of Collections within the Application.

Within the Uploads View, the ability to perform similar tagging of Star Rankings, Recipes, Family Relationships, and Media Types/Document Type are also contemplated as part of the Application Digital Tag Organizer System. For Star Rankings, it is contemplated to assign MemoryWeb Tags of star rankings within the Digital File(s). Upon upload, if the star ranking is already contained within the Digital File, it is automatically read by the Application and illustrated as an Application Dot-Tag. The user can select one or more Digital Files and then apply a star ranking between 1 and 5 in the Uploads Application View. For Recipes, it is contemplated to assign MemoryWeb Tags of Recipes to

Digital File(s). The user can select one or more Digital Files and then type within the "Recipe" search bar to either add a new recipe or associate the Digital File(s) to an existing recipe. Digital Files can be associated to multiple recipes. For Media Type/Document Type, the user can choose from a list of common document types (e.g., Birth Certificate, Death Certificate, Marriage Certificate, etc.) can be utilized for common document type associations. Once a document type is assigned to one or more Digital Files, the document type appears within an Application Dot-Tag. Digital Files can be associated to multiple document types.

In FIG. **36**, an individual recipe view (**1800**) allows one to see all the information that is associated with a specific recipe. The name of the specific recipe is displayed at the top of the page (**1801**) and the People Profile picture of the "chef" associated with the recipe is illustrated (**1804**). If no chef is assigned, the user can select the "+add/edit chef" (**1803**) to either choose an existing person from the user's People in the Application or add a new person.

The view of various Digital Files within the recipe (**1808**) along with scrolling through the Digital Files using the arrow icons (**1814** and **1815**), the ability to share this recipe with others by selecting the sharing icon (**1812**), As the Digital Files are selected on using the film strip on the bottom, a larger thumbnail illustrating the Digital File is shown (**1807**). The recipe view also allows you to choose a chef for the recipe from the people within the user's Application. When a chef is selected, the profile picture (**1804**) of the person along with their name as an Application Dot-Tag (**1816**) is displayed. For each recipe, the user can insert the ingredients (**1809**), directions (**1810**), and comments (**1811**). Each of these areas can be edited by selecting the edit button (**1813**). Another contemplated feature allows the user to apply star rankings for the recipe as well as categorize they type of recipe (e.g., appetizer, entrée, etc.). It is further contemplated that the Digital Files within the individual recipe view may also include videos where they can be watched showing the chef making the recipe. It is also contemplated that the recipes will be interactive with external sources (e.g., the Food Network) so that recipes can be shared or imported with the Application and that visitors to the account will be able to post/share comments about the recipe. It is further contemplated that the user can print the recipe using a print icon.

In FIG. **37**, the Advanced Filters System is illustrated (**0800**). This feature allows the user to narrow the Digital Files being viewed within the Application Views by searching the user's entire collection of MemoryWeb Tags within the Application and then displaying the filtered information in one of the Application Views. Advanced Filters System can be filtered by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates. A user may filter based on more than one criterion at a time. To help users quickly identify Digital Files that may still need to be organized, the advanced search filter also allows users to isolate files that have no date, no location, no people, no specific date/range, and no upload date information or are lacking any other tag. The Advanced Search Filter can be used within many of the views the Application to narrow the set of Digital Files being viewed. For example, you can use the Advanced Filter Button to only show the map view of locations a specific person has traveled in their lifetime.

When a user selects the "Advanced Filters" from almost any Application View (**0801**) (the button can be seen in FIGS. **32**, **33**, **34**, **35**, and **36**), a pop-up will appear that allows the user to type in text into the text box (**0802**). As the user is typing, the system sends a request (**0803**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0804**) and illustrate the potential matches of the filters to the user (**0805**). As the user types in another letter, the process of sending a request (**0803**) to the User Relationship Table (**0300**), producing results (**0804**) and producing a new set of results (**0805**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0806**) and then selects to apply this filter (**0807**), the system will send this request to the User Relationship Table (**0300**). This portion of the Advanced Filter System is further illustrated in FIG. **38**.

If the Advanced Filter System is applied within the Uploads View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0809**). An example of this output is later illustrated in FIG. **39** (indicator **0850**).

If the Advanced Filter System is applied within the Collections View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0810**). An example of this output is later illustrated in FIG. **39** (indicator **0852**).

If the Advanced Filter System is applied within the Locations View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0811**). An example of this output is later illustrated in FIG. **40** (indicator **0856**).

If the Advanced Filter System is applied within the People View, the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0814**). An example of this output is later illustrated in FIG. **39** (indicator **0854**).

If the Advanced Filter System is applied within other contemplated views within the Application such as Recipe, Family Trees, Timespan, etc. the system retrieves data for the applied filter(s) from the User's Relationship Table and displays the relationship data (**0812**).

If the user decides to add an additional filter (**0813**), the process is repeated when the user selects "Advanced Filter" (**0801**) while the pre-existing filters are still applied. An example of this process is later illustrated in FIG. **42** and FIG. **43**. If the user selects an Application Dot-Tag, then the continuous Link of Application Dot-Tags System is engaged as illustrated in FIG. **30** (**0700**).

In FIG. **38**, the process of the Adding the First Application Dot-Tag using the Advanced Filter is illustrated. This is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0830**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0831**). The user can then type in the alphanumeric text search criteria within the Advanced Filters text box (**0838**). In this example, the word "Smith" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters (**0836**) that meet the criteria. In this example, the user selects the Application Dot-Tag of a person named J C Smith (**0832**). In Stage 3, "Apply" is selected and then the application lists the Application Dot-Tag of a Person named J C Smith as a current active filter (**0837**). This filter will then be applied to each Application view that is further illustrated in FIGS. **39** through **41**. If the user wants to clear all the filters, they can select "clear filters" (**0839**).

In FIG. **39**, an illustration of the results for a Single Application Dot-Tag Filter for each Application view is depicted. If the Advanced Filter is applied in the Uploads

Application View (**0850**), the filter of "J C Smith" (**0851**) is illustrated and only the Digital Files that contain the person J C Smith are illustrated. If the Advanced Filter is applied in the Collections Application View (**0852**), the filter of "J C Smith" (**0853**) is illustrated and only the Collections that contain the person J C Smith are illustrated. If the Advanced Filter is applied in the People Application View (**0854**), the filter of "J C Smith" (**0855**) is illustrated and only the person named J C Smith is illustrated.

In FIG. **40**, an illustration of the results for a Single Application Dot-Tag Filter for a date within the Uploads Application View is depicted (**0860**). If the Advanced Filter is applied using a date filter within the Uploads Application View (**0861**), the filter date of "2013-07-04" (**0876**) is illustrated and only the Digital Files that contain that date are illustrated.

In FIG. **41**, an illustration of the results for a Single Application Dot-Tag Filter in the Location Application View is depicted (**0870**). Within the Location Application View the Digital Files are displayed within an interactive map (Google map shown as an example). The Location View can also provide additional outputs such as a journey route that identifies the specific locations for an event or trip that can be customized by users. In this view, individual or groups of Digital Files are illustrated as photo thumbnails (see indicators **0874** and **0875**)) on the map and the user can select the thumbnail to see all the Digital Files with the same location (as seen FIG. **34** (indicator **1630**)) or the user can use the interactive map and narrow the map view by either using the zoom in/zoom out bar (**0876**) on the left or simply selecting the map. Note that the pinned locations include a thumbnail of the Digital File (or Collection cover) and the number of Digital Files for that location.

If the Advanced Filter is applied in the Locations Application View, the filter of "J C Smith" (**0872**) is illustrated and only the Digital Files that contain the person J C Smith are illustrated with their geographic location on the map. The user can select to clear this filter (**0873**) or see this Advanced Filter with the view of locations as a list (**0871**). In FIG. **41**, there are two illustrated on the map (**0874** and **0875**).

In FIG. **42**, the process of the Adding another Application Dot-Tag using the Advanced Filter is illustrated. Continuing on the process that was illustrated in FIG. **38** where the first Application Dot-Tag filter of "Person: J C Smith" was applied, the ability to add a second Application Dot-Tag if further illustrated in FIG. **42**. As with FIG. **38**, FIG. **42** is a visual depiction of the process that was illustrated in FIG. **37**. In Stage 1 (**0880**), the user selects "Apply Filters." This takes the user to Stage 2 where the Application generates the Apply Multiple Filters box (**0881**). The user can then type in the text search criteria for the second Advanced Filter within the Advanced Filters text box. In this example, the word "Abe" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available filters that meet the criteria. In this example, the user selects the Application Dot-Tag of a location named Abe Lincoln Elementary School (**0882**). In Stage 3 (**0883**), the application lists the Application Dot-Tags of both the Person named J C Smith (**0884**) as well as the location of Abe Lincoln Elementary School (**0885**) as part of the Current Active Filters. The user then selects "Apply" (**0886**) to see these filters illustrated in the Application Views. This filter will then be applied to each Application view as previously illustrated in FIGS. **39** through **41**.

In FIG. **43**, an illustration of the results for Adding Another Application Dot-Tag Filter in the Location Application View is depicted (**0890**). Continuing on the process



that was illustrated in FIG. **42**, in FIG. **43** (**0890**) the Application Dot-Tag filters of "Person: J C Smith" (**0891**) and "Location: Abe Lincoln Elementary School" (**0892**) are illustrated. There is one overlapping location that contains both filters for a Digital File that is illustrated on the map (**0893**).

In FIG. **44**, the Fast Search System is illustrated (**0900**). Throughout the Application, groups or individual Digital Files can be searched quickly using the Fast Search bar that is at the top of each Application View. Once a key word or phrase is entered into this area, the user's entire collection of Digital Tags within the Application that includes all the Digital tags are searched for potential matches. This feature allows the user to search their entire collection of MemoryWeb Tags within the Application and then displays the information grouped by people, collections, locations, documents, and recipes. The Fast Search System can be searched by such items as key words (or plurality of key words), event names, location, people, albums, star rating, file type, document type, and dates.

When a user selects the Fast Search bar from almost any Application View (**0901**), the user can type in alphanumeric text into the text box (**0902**). As the user is typing, the system sends a request (**0903**) to the User Relationship Table (**0300**) to look up any possible MemoryWeb Tag matches. The system will then produce the request (**0904**) and illustrate the potential matches by category for the user (**0905**). As the user types in another letter, the process of sending a request (**0903**) to the User Relationship Table (**0300**), producing results (**0904**) and producing a new set of results (**0905**) is re-run. If the user selects one of the suggested MemoryWeb tags (**0906**), the system will send this request to the User Relationship Table (**0300**). This process is further illustrated in FIG. **45**.

If the user selects a person Fast Search tag, the system retrieves data for the person from the User's Relationship Table and displays the relationship data (**0907**) in the Person Profile View as illustrated in FIG. **32** (indicator **1430**).

If the user selects a collection Fast Search tag, the system retrieves data for the collection from the User's Relationship Table and displays the relationship data (**0908**) in the Collection View as illustrated in FIG. **33** (indicator (**1530**).

If the user selects a location Fast Search tag, the system retrieves data for the location from the User's Relationship Table and displays the relationship data (**0909**) in the Location View as illustrated in FIG. **34** (indicator **1630**).

If the user selects a date Fast Search tag, the system retrieves data for the date from the User's Relationship Table and displays the relationship data (**0910**) in the Uploads View as illustrated in FIG. **40** (indicator **1861**).

If the Fast Search System is applied within other contemplated views within the Application such as Family Trees, Timespan, etc. the system retrieves data for the search from the User's Relationship Table and displays the relationship data (**0911**). As part of the contemplated search process is to also search comments related to a Digital File.

In FIG. **45**, the process of using the Keyword Fast Search is illustrated. This is a visual depiction of the process that was illustrated in FIG. **44**. In Stage 1 (**0930**), the user selects the Fast Search bar at the top of one of the Application Views. This takes the user to Stage 2 (**0931**) where the user can then type in the alphanumeric text search criteria within the Fast Search text box (**0932**). In this example, the word "Wrigley" was typed within the text box. As the alphanumeric text is typed within the text box, the application automatically generates the available MemoryWeb Tag results (**0933**) that meet the criteria. Note how the results are

organized by various MemoryWeb Tag categories such as Person, Collection, Location, Recipe, and comments. In Stage 3 (**0934**), the user selects one of the results. In this example, the user selects the location of Wrigley Field (**0935**). When the user selects a specific MemoryWeb Tag, it takes them to Stage 4 where the information related to that tag is displayed in the corresponding view as discussed within FIG. **44**. For the example where the user selected the Location of Wrigley Field, the user was taken to the individual locations Application View where the location of Wrigley Field and the corresponding Digital Files are displayed (**0936**).

In FIG. **46**, the Share to Third Party Media Provider System (**1000**) is illustrated. This feature allows the user to share Digital Files from MemoryWeb directly to a third party application. The process begins when the user selects to share a Digital File or collection of Digital Files within the MemoryWeb Application (**1001**). Examples of where the user can select share can be seen in FIG. **31** (indicator **0760**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Once the request is made, the system requests the Digital File and Tag Data Blocks (**1002**) from the User Relationship Table (**0300**). The system then retrieves the Digital File from the User Relationship Table (**1003**). At the same time, the system will also retrieve the Digital Tags from the Relationship Table (**1004**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1005**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1006**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to the Third Party Media Provider (**0501**).

In FIG. **47**, the Third Party Geographical Mapping System is illustrated (**1100**). When Digital Files are imported into MemoryWeb, if there is any GPS data available from the EXIF Tags (See FIG. **22** (indicators **0330**, **0331**, **0332**, and **0333**)), the system will utilize this data and automatically create a MemoryWeb location tag within the Application (See FIG. **22** (indicators **0368**, **0369**, **0370** and **0371**)). However, if the GPS coordinates were missing from a Digital File when it was imported into the Application (See FIG. **50** (indicators **1418** and **1419**)), the user can add the Location (which the application will automatically add the associated GPS tags) to the Digital File using the Application Digital Tag Organization System (see FIG. **28**). As locations are associated with a Digital File, the Application can interact with a Third Party Geographical Mapping System to pull maps that correspond to the exact location of Digital Files that have a location tag (see FIG. **34** (indicator **1630** and FIG. **40**, indicator **0875**)). In addition, the Application utilizes a world map view to illustrate all the locations that are associated to one or more Digital Files for a user within the Location Application View (see FIG. **41** (indicator **0880**)).

The Third Party Geographical Mapping System begins when a Location Application Dot Tag (**1102**) is selected (**1104**), the system will send a request (**1105**) to the User Relationship Table (**0300**). Examples of when Location Application Dot-Tags can be selected are illustrated in FIG. **31** (indicator **0768** and FIG. **35**, indicators **1723** and **1735**). In FIG. **47** if the Locations Application View is selected



(**1103**), the system will send a request (**1105**) to the User Relationship Table. The Location Application View can be selected from almost any Application view as illustrated in FIG. **34** (indicator **1605**). When either a single location or the world map view is selected, the system will retrieve the data (**1108**) from the User Relationship Table (**0300**) and send a request (**1106**) to the Third Party Geographical Mapping Provider (**1101**) who generates the map request and then sends the information back to the system for the specific location (**1107**). At the same time, the Application Dot-Tags and Digital Files associated with the location or map request are retrieved and then sent (**1109**) to the Locations Application view. The system will combine the map information along with the Application Dot-Tags and Digital Files and display this information within the Location Application View (**1100**). Examples of a single Location Application View can be seen in FIG. **34** (indicator **1630**) and FIG. **40** (indicator **0875**), and an example of a world map view can be seen in FIG. **41** (indicator **0880**).

In FIG. **48**, the Share to Individual System is illustrated (**1200**). The Share to an individual person or a group of people starts when a user initiates share of a Digital File or a Collection of Digital Files (**1201**). Examples of where the user share functions are illustrates are in FIG. **31** (indicators **0760** and **0761**), FIG. **33** (indicator **1534**), FIG. **34** (indicator **1636**), and FIG. **36** (indicator **1812**). Next, the system requests the Digital File and Tag Data Blocks (**1202**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1203**) from the User Relationship Table.

At the same time, the system will also retrieve the Digital Tags of the Digital File from the Relationship Table (**1204**). The system will then inject the tags to the corresponding EXIF Tag Data Blocks (**1206**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File (**1205**). The application then exports the Digital File with the new EXIF Tag Data Blocks using the Application Export System (**1300**) which then sends the Digital File outside the MemoryWeb Application to an Individual or Group of People (**1207**).

In FIG. **49**, the Application Export System is illustrated (**1300**). The Application Export System starts when a user selects the export of a Digital File within the application (**1302**) or has installed the MW Automatic Uploader/Downloader Application (**1308**). An example of where the user can select the export of a Digital file within the Application is FIG. **31** (indicator **0751**). If the user has installed the MW Automatic Uploader/Downloader Application, the export functionality of the user's entire collection of Digital Files will be downloaded to the User's desired folder on their computer with the Digital Tags embedded within the Digital Files. If neither a user initiated download nor the MW Automatic Uploader/Downloader Application is not used, then the Application Export is not initiated (**1309**). For either a user initiated download or one using the MW Automatic Uploader/Downloader Application, the system requests the Digital File(s) and Tag Data Blocks (**1303**) from the User Relationship Table (**0300**). They system will retrieve corresponding Digital File (or collection of Digital Files) (**1304**) from the User Relationship Table. At the same time, the system will also retrieve the Digital Tags of the Digital File from the User Relationship Table (**1305**). The system will

then inject the tags to the corresponding EXIF Tag Data Blocks (**1306**). The mapping of the EXIF Tag Data Blocks and those of MemoryWeb Data Blocks is illustrated in FIG. **22**. Note, for any tags that were modified within the MemoryWeb application, only the new tag information will be transferred into the EXIF Tag Data Blocks. The system then combines the EXIF Tag Data Blocks and embeds them within the Original Digital File(s) (**1307**). The application then exports the Digital File(s) with the new EXIF Tag Data Blocks to the desired Storage System of the user (**1301**).

In FIG. **50**, there are three charts for the Digital File Image File Directory Data Blocks of JPG Photo within Microsoft Before and After MemoryWeb. This Figure is meant to demonstrate how the EXIF Tag Data Blocks for a Digital File (in this example a JPG file) prior to the use of MemoryWeb Application appear and then how these EXIF Tag Data Blocks are populated with Digital Tags upon export from the MemoryWeb Application.

The first chart illustrates common EXIF Tags (Data Blocks) (**1401**) and lists certain common the EXIfTool Family 1 Group names that are displayed in the file properties of a JPG file when using Microsoft Windows (these are the same EXIF Tag Blocks that were illustrated in FIG. **22** (indicator **1320**)). In the second chart (**1402**), the Digital Tags associated with the original Digital File are displayed. In the third chart (**1403**), the updated Digital Tags for the same original Digital File once exported from the MemoryWeb Application is displayed.

In the second chart (**1402**), the original Digital File prior to import to the MemoryWeb Application did not have Digital Tags for data blocks such as Description Rating (**1416**), Description Comments (**1417**), GPS Latitude (**1418**), GPS Longitude (**1419**). Also in the second chart the Digital Tags for the data blocks of File Folder Path (**1420**) and File Date Created (**1421**) are illustrated.

In the third chart (**1403**), the original Digital File that was exported from the MemoryWeb Application now contains new or modified Digital Tags for certain data blocks. For example, a star rating of four out of five stars (**1410**) with the new MW Modified Digital File is now associated with the Description Rating (**1404**) where it was blank (**1416**) with the original file before using the MemoryWeb Application.

Another example is the listing of MemoryWeb Tags within the Description Comments data block (**1411**) as: CAPTION: Jackson and J C's first day at school!, PERSON: Jackson Smith, J C Smith, LOCATION NAME: Abe Lincoln Elementary School, COLLECTION: First Day of School, COLLECTION: Jackson and J C Photos 2013, DATE: 8/28/2013. All of these Digital Tags are now associated with the Description Comments (**1405**) where it was blank (**1417**) with the original file before using the MemoryWeb Application.

Also updated in the MW Modified Digital File are the GPS Latitude (**1412**) and GPS Longitude (**1413**) as Digital Tags that were assigned in the MemoryWeb Application using the location feature with the Application Digital Tag Organizer System. These tags now replace the blank tags (indicators **1418** and **1419**) that were in the original file before using the MemoryWeb Application.

A final example is how the date was modified in the MemoryWeb Application where a new date of Aug. 28, 2013 (**1415**) was assigned to the Digital File. This replaced the old date that was originally tagged with a date of Nov. 1, 2013 (**1421**). In a typical Digital File, only the date and perhaps the GPS location if taken with certain newer photo device is pre-populated in a Digital File. For the example in FIG. **50**, the Digital File may have been created or scanned on Nov. 1, 2013, but with the MemoryWeb Application Digital Tag Organizer System the user was able to correctly assign the date the photo was taken and now this date is always part of the Digital File within the MemoryWeb Application, but also when the Digital File is exported from MemoryWeb.

A benefit of the Export System is that users can export a single Digital File or their entire set of Digital Files (using the MW Automatic Uploader/Downloader Application), with all the updated Digital Tags from the MemoryWeb Application embedded within the Digital File(s). This feature is unique as it will allow the users to back up their files to another source (e.g., external computer hard drive) or to transport it to another venue (e.g., another website that is used for viewing and/or sharing Digital Files such as a social media website) where it can be viewed with these Digital Tag attributes. This export feature can provide users with the advantage of never losing key data that was stored simply because the user chooses to move its Digital Files to a new digital system.

The application also contemplates the use of a Family Tree Application View where the individual people that have been created within the Application can be displayed with family relationships. This view can illustrate interactive family trees where one can see the family tree of an individual or family. Any family relationships created in the user's personal profile are already pre-populated by the Application for the Family Tree View. If a user selects on an individual within the family tree, it will take them to the people profile Application View of that person. Family Trees can quickly be viewed with the family tree drop-down sort feature. As with other areas within the Application, the family tree view can be narrowed down using an Advanced Filters System. For matching family members, the system will have drag/drop functionality to make new associations to a family tree. It is also contemplated that various family tree views could be displayed (e.g., pedigree chart, fan chart, directs descendants chart, etc.). In addition, it is contemplated that family tree relationships from either data files (e.g., GEDCOM files) or other sources (e.g., Family Search database) would either be imported into the user's versions of the Application or utilize these sources in associating the family tree information.

Another Application View that is contemplated is Timespan or Timeline. The Timeline Application View will have an interactive timeline to display the dates within the Digital Files of the Application for a user. The timeline view acts as an interactive filter or funnel of Digital Files whereas when the user starts to define the parameters of dates towards the bottom, the information above it is filtered to display the major groups of Digital Files that meets the selected date range criteria in various formats until you are able to view an individual Digital File. This funnel approach is designed to allow the user to appreciate the vast amount of data that can be associated with a date range, but then allow them to filter the information with the user's desired criteria. This will be a very useful tool when users want to see the growth and progress of an individual as well as memorialize a lifetime of a friend or family member.

While the disclosure is susceptible to various modifications and alternative forms, specific exemplary embodiments thereof have been shown by way of example in the drawings and have herein been described in detail. It should be understood, however, that there is no intent to limit the disclosure to the particular forms disclosed, but on the contrary, the intention is to cover all modifications, equivalents, and alternatives falling within the spirit and scope of the disclosure as defined by the appended claims.

The invention claimed is:

1. A method comprising:

causing an interface to display a search-filter view, the search-filter view permitting a user to filter a plurality of digital files based on one or more criteria;

responsive to a first input within the search-filter view, causing the interface to display a people view including a first image associated with a first person and a second image associated with a second person;

responsive to an input that is indicative of a selection associated with the first person, causing a first person view to be displayed on the interface, the first person view including a first digital file associated with the first person;

responsive to an input that is indicative of a selection associated with the first digital file, causing a first detail view to be displayed on the interface, the first detail view including (i) the first digital file, (ii) first information associated with the first digital file and (iii) a first map image associated with the first digital file, the first digital file having a first size in the first person view and a second size in the first detail view, wherein the second size is greater than the first size;

responsive to an input that is indicative of a selection associated with the second person, causing a second person view to be displayed on the interface, the second person view including a second digital file associated with the second person;

responsive to an input that is indicative of a selection associated with the second digital file, causing a second detail view to be displayed on the interface, the second detail view including (i) the second digital file, (ii) second information associated with the second digital file and (iii) a second map image associated with the second digital file; and

responsive to a second input within the search-filter view, causing the interface to display a locations view including a first name associated with a first location, and a second name associated with a second location;

responsive to an input that is indicative of a selection associated with the first location, causing a first set of digital files to be displayed on the interface, each digital file in the first set of digital files being associated with the first location; and

responsive to an input that is indicative of a selection associated with the second location, causing a second set of digital files to be displayed on the interface, each digital file in the second set of digital files being associated with the second location.

2. The method of claim **1**, wherein the people view further includes a first name associated with the first person and a second name associated with the second person.

3. The method of claim **2**, wherein the first name associated with the first person is adjacent to the first image and the second name associated with the second person is adjacent to the second image.

4. The method of claim **3**, wherein the first person view includes the first name associated with the first person and the second person view includes the second name associated with the second person.

5. The method of claim **4**, wherein the first image associated with the first person is a first thumbnail image and the first digital file associated with the first person is a first profile image and wherein the second image associated with the second person is a second thumbnail image and the second digital file associated with the second person is a second profile image.

6. The method of claim **5**, wherein the input indicative of the selection associated with the first person is a click or tap of the first thumbnail image associated with the first person.

7. The method of claim **5**, wherein the first thumbnail image associated with the first person includes a face of the first person and the second thumbnail image associated with the second person includes a face of the second person.

8. The method of claim **7**, wherein the first thumbnail image includes at least a portion of the first digital file and the second thumbnail image includes at least a portion of the second digital file.

9. The method of claim **5**, wherein the first information in the first detail view includes the first name associated with the first person and the second information in the second detail view includes the second name associated with the second person.

10. The method of claim **9**, wherein the first information includes a first date associated with the first digital file and the second information includes a second date associated with the second digital file.

11. The method of claim **10**, wherein the first map image in the first detail view is indicative of a first geographic location associated with the first digital file and the second map image in the second detail view is indicative of a second geographic location associated with the second digital file.

12. The method of claim **4**, wherein the first person view further includes relationship information associated with the first person and another person.

13. The method of claim **12**, wherein the relationship information is indicative of a family relationship between the first person and the another person.

14. The method of claim **13**, wherein the another person is the user of the interface.

15. The method of claim **1**, further comprising:

causing the interface to display an albums view, the albums view including a first album image and a first album name associated with a first album, the first album including a third set of digital files; and

responsive to an input that is indicative of a selection associated with the first album, causing the third set of digital files to be displayed on the interface.

16. The method of claim **15**, wherein the albums view includes a second album image and a second album name associated with a second album, the second album including a fourth set of digital files, the method further comprising responsive to an input that is indicative of a selection associated with the second album, causing the fourth set of digital files to be displayed on the interface.

17. The method of claim **16**, wherein the first album name is displayed adjacent to the first album image in the albums view and the second album name is displayed adjacent to the second album image in the albums view.

18. The method of claim **17**, further comprising:

prior to causing the albums view to be displayed on the interface, receiving first alphanumeric text as the first album name;

receiving an input indicative of a desire to associate the third set of digital files with the first album name; and

causing the third set of digital files to be associated with the first album.

**19**. The method of claim **1**, wherein a first portion of the first information is generated by a user and wherein a first portion of the second information is generated by the user.

**20**. The method of claim **19**, wherein a second portion of the first information is automatically generated and wherein a second portion of the second information is automatically generated.

**21**. The method of claim **20**, wherein the second portion of the first information includes first tag information and wherein the second portion of the second information includes second tag information.

**22**. The method of claim **21**, further comprising causing a gallery view to be displayed on the interface, the gallery view including a plurality of digital files.

**23**. The method of claim **22**, wherein the plurality of digital files includes the first digital file, the second digital file, the first set of digital files, and the second set of digital files.

**24**. The method of claim **1**, wherein the interface is a computer display, a smartphone display, or a tablet display.

**25**. The method of claim **1**, subsequent to causing the interface to display the search filter view, causing the interface to display a map view including (i) an interactive geographic map, (ii) a first indication on the interactive map that is associated with one or more digital files, and (iii) a second indication on the interactive map that is associated with one or more digital files.

**26**. The method of claim **25**, wherein the first indication on the interactive geographic map is a third image and the second indication on the interactive geographic map is a fourth image.

**27**. The method of claim **1**, further comprising, responsive to receiving a first one of the one or more criteria within the search-filter view, causing one or more digital files to be displayed on the interface based at least in part on the received first one of the one or more criteria.

**28**. The method of claim **27**, wherein the one or more criteria include a keyword, a location, a person, an event, a date, or any combination thereof.

**29**. A digital file storage system comprising:

a non-transitory computer-readable storage medium storing a plurality of digital files and instructions; and

one or more processors configured to execute the instructions to:

cause an interface to display a search-filter view, the search-filter view permitting a user to filter the plurality of digital files based on one or more criteria;

responsive to a first input within the search-filter view, cause the interface to display a people view including a first image associated with a first person and a second image associated with a second person;

responsive to an input that is indicative of a selection associated with the first person, cause a first person view to be displayed on the interface, the first person view including a first digital file associated with the first person;

responsive to an input that is indicative of a selection associated with the first digital file, cause a first detail view to be displayed on the interface, the first detail view including (i) the first digital file, (ii) first information associated with the first digital file and (iii) a first map image associated with the first digital file, the first digital file having a first size in the first



person view and a second size in the first detail view, wherein the second size is greater than the first size;

responsive to an input that is indicative of a selection associated with the second person, cause a second person view to be displayed on the interface, the second person view including a second digital file associated with the second person;

responsive to an input that is indicative of a selection associated with the second digital file, cause a second detail view to be displayed on the interface, the second detail view including (i) the second digital file, (ii) second information associated with the second digital file and (iii) a second map image associated with the second digital file; and

responsive to a second input within the search-filter view, cause the interface to display a locations view including a first name associated with a first location, and a second name associated with a second location;

responsive to an input that is indicative of a selection associated with the first location, cause a first set of digital files to be displayed on the interface, each digital file in the first set of digital files being associated with the first location; and

responsive to an input that is indicative of a selection associated with the second location, cause a second set of digital files to be displayed on the interface, each digital file in the second set of digital files being associated with the second location.

**30**. The digital file storage system of claim **29**, wherein the people view further includes a first name associated with the first person and a second name associated with the second person, the first person view includes the first name associated with the first person, and the second person view includes the second name associated with the second person.

**31**. The digital file storage system of claim **30**, wherein the first image associated with the first person is a first thumbnail image and the first digital file associated with the first person is a first profile image and wherein the second image associated with the second person is a second thumbnail image and the second digital file associated with the second person is a second profile image.

**32**. The digital file storage system of claim **29**, wherein, subsequent to the interface displaying the search filter view, the one or more processors are configured to execute the instructions to further cause the interface to display a map view including (i) an interactive geographic map, (ii) a first indication on the interactive map that is associated with one or more digital files, and (iii) a second indication on the interactive map that is associated with one or more digital files.

**33**. The digital file storage system of claim **29**, wherein a first portion of the first information is generated by a user and a second portion of the first information is automatically generated, and wherein a first portion of the second information is generated by the user and a second portion of the second information is automatically generated, and wherein the one or more processors are configured to execute the instructions to further cause a gallery view to be displayed on the interface, the gallery view including the plurality of digital files, the plurality of digital files including the first

digital file, the second digital file, the first set of digital files, and the second set of digital files.

**34**. The digital file storage system of claim **29**, responsive to receiving a first one of the one or more criteria within the search-filter view, the one or more processors are configured to execute the instructions to further cause one or more of the plurality of digital files to be displayed on the interface based at least in part on the received first one of the one or more criteria.

* * * * *